# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

SHERI L. SCHUMANN TAX &
ACCOUNTING, INC.,

       And

THE ZION EVANGELICAL LUTHERAN       Case No. 1:20-cv-12924
CHURCH OF BAY CITY, MICHIGAN,

                                          Hon. Thomas Ludington
                                          Magistrate Judge Patricia Morris

          Plaintiffs,

v.

TCF NATIONAL BANK, and

JOHN DOES 1-10,

          Defendants.

---

## DEFENDANT/COUNTER-PLAINTIFF TCF NATIONAL BANK'S COUNTERCLAIM AGAINST PLAINTIFFS/COUNTER-DEFENDANTS SHERI L. SCHUMANN TAX & ACCOUNTING, INC. AND THE ZION EVANGELICAL LUTHERAN CHURCH OF BAY CITY, MICHIGAN

Defendant/Counter-Plaintiff TCF National Bank ("TCF"), by its attorneys Warner Norcross + Judd LLP, hereby brings its Counterclaim against Plaintiffs/Counter-Defendants Sheri L. Schumann Tax & Accounting, Inc. ("Schumann Tax") and the Zion Evangelical Lutheran Church of Bay City Michigan ("Zion") as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Upon information and belief, Schumann Tax is a Michigan corporation with its principal place of business in Bay City, Michigan.

2.      Upon information and belief, Zion is a Michigan non-profit corporation with its principal place of business in Bay City, Michigan.

3.      At all relevant times, TCF was a national banking association duly organized and existing under the laws of the United States, with its principal place of business in Sioux Falls, South Dakota.[1]

4.      This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and the amount in controversy exceeds $75,000 excluding costs. This Court may also exercise supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. §1367(a).

5.      Venue is proper in this juridical district under 28 U.S.C. § 1391 because Schumann Tax and Zion's principal places of business are located in this District.

## BACKGROUND

6.      Zion is a Lutheran church and school located in Bay City, Michigan.

---

[1] On June 9, 2021, TCF merged with The Huntington National Bank.  The Huntington National Bank is a national banking association duly organized and existing under the laws of the United States, with its principal place of business in Columbus, Ohio.

2

7. Schumann Tax is owned and operated by Sheri L. Schumann ("S. Schumann"), a licensed Enrolled Agent, and offers tax and accounting services to customers.

8. Upon information and belief, Schumann Tax has provided tax and accounting services to Zion since at least as early as the year 2000.

9. On June 9, 2021, TCF merged with The Huntington National Bank. At all relevant times, TCF was a full-service banking provider.

10. At all relevant times, TCF offered various internet banking services to its business customers through an online platform known as Business eBanking ("BeB"). TCF also offered a comprehensive selection of treasury management products and services to fit the needs of its business clients.

11. Among other capabilities, BeB allowed TCF's business customers to view and manage their accounts online and utilize various treasury management services such as electronic transfers of funds using the Automated Clearing House ("ACH") network. Customers enrolled in ACH services could use BeB to initiate and/or receive electronic payments via the ACH network.

12. Among other security procedures, TCF provides multi-factor security, which requires both specific login credentials and out-of-band authentication to initiate ACH transactions.

13.     When enrolling in BeB, TCF's business customers agree to be bound by the BeB Terms and Conditions ("BeB Agreement T&Cs").

14.     Likewise, to receive treasury management products or services, TCF's business customers agree to be bound by TCF's Treasury Management Services Terms and Conditions ("TM Services Agreement T&Cs").

15.     A true and accurate copy of the TM Services Agreement T&Cs effective August 24, 2020 is attached hereto as **Exhibit A**.  A true and accurate copy of the applicable BeB Agreement T&Cs is attached as Exhibit 1 to the TM Services Agreement T&Cs.

**Schumann Tax Accounts**

16.     Schumann Tax opened a client trust account (account ***9435) and a business account (account ***5560) at Chemical Bank in 2000 (together, the "Schumann Tax Accounts").

17.     In 2007, Schumann Tax enrolled the Schumann Tax Accounts in online BeB services ("Schumann Tax BeB") and Treasury Management Services (including ACH transactions) at Chemical Bank.

18.     S. Schumann was an authorized signer on the Schumann Tax Accounts and the Company Administrator for Schumann Tax BeB.

19.     In August 2020, Chemical Bank merged with TCF, and the Schumann Tax Accounts transferred to TCF.

20.    On August 11, 2020, S. Schumann accepted the BeB Agreement T&Cs and the TM Services Agreement T&Cs (Ex. A) on behalf of Schumann Tax.

**Zion Account**

21.    Zion opened a business account at Chemical Bank (account ***6771) in 2003 (the "Zion Account").

22.    Zion enrolled the Zion Account in online BeB services at Chemical Bank ("Zion BeB") in 2012.

23.    In 2016, the Zion Account was also added to Schumann Tax BeB.  By adding the Zion Account to the Schumann Tax BeB, Schumann Tax was able to view and manage the Zion Account and initiate Zion Account ACH transactions through Schumann Tax BeB.

24.    S. Schumann was an authorized signer on the Zion Account and identified as the Company Administrator for Zion BeB.

25.    Zion enrolled in the Treasury Management Service- ACH, in 2018.

26.    Following the 2020 merger between Chemical Bank and TCF, the Zion Account became an account at TCF.

27.    On August 25, 2020, S. Schumann, acting as Company Administrator for Zion, accepted the BeB Agreement T&Cs and the TM Services Agreement T&Cs (Ex. A) on behalf of Zion.

**Zion and Schumann Tax Agreed to Indemnify TCF**

28.     The TM Services Agreement T&Cs, Part II, §4.7 addresses "Liability

for failure to Maintain Security Procedures," and provides in pertinent part:

> If [Zion/Schumann Tax] does not comply with all recommended
> and required Security Procedures or this Section 4,
> [Zion/Schumann Tax] agrees that [Zion/Schumann Tax]: (1)
> accepts the entire risk of Loss due to [Zion/Schumann Tax]'s
> failure to implement such controls and standards and (2) shall
> defend, indemnify and hold harmless [TCF] and [TCF]-Related
> Parties from and against any and all Losses incurred by any of
> them by reason of, arising directly or indirectly out of, or in
> connection with any claim, allegation or assertion made by
> [Zion/Schumann Tax] or any Third Party with respect to, caused
> by or arising from [Zion/Schumann Tax]'s failure to comply with
> the recommended and required Security Procedures. . . .

Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

29.     The TM Services Agreement T&Cs, defines "Losses" as:

> all damages, losses, liabilities, claims, demands, fines,
> judgments, arbitration awards, amounts paid in settlement,
> penalties, costs, expenses and fees of any kind including, but not
> limited to, reasonable attorneys' fees, expert fees, court costs,
> adjusters fees and any other expenses incurred in connection with
> any claim or proceeding (civil, criminal, administrative or
> investigative), arbitrations, governmental investigations or
> reviews.

*Id.* at Part I, § 2.

30.     The TM Services Agreement T&Cs, defines "Security Procedures" as:

> [T]he 'Security Procedures' attached as Exhibit 2 [to the TM
> Services Agreement T&Cs], incorporated by reference, and also
> located on the Forms and Documents page in Business eBanking,
> as supplemented by [Zion/Schumann Tax]'s current security

designations, all other security procedures contained in the Account Contract, and all other measures implemented, recommended or required by [TCF] from time to time to help safeguard access to and use of Accounts, Services, and Digital Banking.

*Id.*

31.     Part II, § 10.4 of the TM Services Agreement T&Cs, contains an

additional indemnification provision, which states in pertinent part:

> [Zion/Schumann Tax] agrees to indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses, which result directly or indirectly, in whole or in part, from: (i) disputes or legal actions by parties other than [Zion/Schumann Tax] and [TCF] concerning a Service; (ii) [TCF]'s providing of the Service(s) to [Zion/Schumann Tax], which is in compliance with the Agreement; (iii) [Zion/Schumann Tax]'s failure to comply with applicable Legal Requirements; and/or (iv) [Zion/Schumann Tax]'s breach of any provision of the Agreement, including, but not limited to, any of the representations or warranties made by [Zion/Schumann Tax] in the Agreement. . . .

*Id.* at § 10.4.

32.     Finally, Part IV, §2.14 of the TM Services Agreement T&Cs, contains

an indemnification provision in connection with the applicable security

requirements, and provides:

> [Zion/Schumann Tax] agrees to follow applicable Security Requirements established by NACHA and the Security Procedures applicable to ACH originations. Without limiting the foregoing, [Zion/Schumann Tax] should:
>> (a) Establish, implement, and update, as appropriate, policies, procedures, and systems with respect to the

initiation, processing, and storage of Entries that are designed to:(i) protect the confidentiality and integrity of Protected Information until its destruction; (ii) protect against anticipated threats or hazards to the security or integrity of Protected Information; and (iii) protect against unauthorized use of Protected Information.

(b) Promptly notify the TCF if any unauthorized person may have gained access to Protected Information.

(c) Ensure that information contained in or related to any ACH Entry is, at all times, from the point of data entry through transmission, encrypted or transmitted via a secure session, in either case using a commercially reasonable technology that provides a level of security that, at a minimum, is equivalent to current NACHA recommendations for encryption technology. Information required to be so protected includes ACH entries, routing numbers, account numbers, PINs or other identification symbols or information.

If [Zion/Schumann Tax] fails to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures, [Zion/Schumann Tax] acknowledges and agrees that [Zion/Schumann Tax]: (1) accepts the entire risk of loss due to [Zion/Schumann Tax]'s failure to implement such controls and standards and (2) shall defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by [Zion/Schumann Tax] or any Third Party with respect to, caused by or growing out of [Zion/Schumann Tax]'s failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures.

*Id.* at Part IV, §2.14.

33.   In addition, the BeB Agreement also provides the following indemnity provision:

[Zion/Schumann Tax] agrees to indemnify, defend and hold harmless [TCF] from and against any and all actions, suits, claims, damages, losses, liabilities, penalties, assessments, charges, taxes, costs and expenses (including reasonable attorneys' fees, costs of investigation and court costs at the trial level and in any appeal) (together, the "Losses") directly or indirectly arising from or relating to (i) [TCF]'s honoring or complying with any Payment Order (or a request to cancel or change the terms of a Payment Order),whether or not such request was actually authorized by [Zion/Schumann Tax], so long as [TCF] accepts the Payment Order in good faith and in compliance with the applicable required Security Procedures, (ii) [TCF]'s honoring or complying with any Payment Order (or any amendment or cancellation of a Payment Order) which was actually authorized by [Zion/Schumann Tax] even if [TCF] has waived any Security Procedures in connection with such Payment Order (iii) [TCF]'s refusal to accept or process a Payment Order that is communicated to it other than in compliance with the Security Procedures, (iv) the failure of [Zion/Schumann Tax] (or its employees, agents, affiliates or representatives) to comply with its obligations in this Agreement or the Account Contract, including [Zion/Schumann Tax]'s failure to observe, maintain or comply with the Security Procedures, (v) the failure of [Zion/Schumann Tax] (or its employees, agents, affiliates or representatives) to comply with any applicable law, (vi) [TCF]'s compliance with applicable federal, state, local and foreign laws, regulations, codes, orders, rulings and judgments in performing the Services, including compliance with inconsistent orders or laws of competing jurisdictions, (vii) other acts or omissions of [Zion/Schumann Tax] (including its affiliates, agents, employees and representatives) or any third party which create, lead to or result in claims, liability, damages, costs or expenses, or (viii) any action taken or omitted to be taken by [TCF] in reliance upon information or instructions provided to [TCF] by [Zion/Schumann Tax] or any affiliate or subsidiary of [Zion/Schumann Tax] or by anyone using the login credentials of Users; provided, however, that [Zion/Schumann Tax] shall not be obligated to indemnify [TCF] for any Losses that are caused

9

directly by [TCF]'s gross negligence, willful misconduct or bad faith.

*Id.* at Exhibit 1, BeB Agreement, § 15.

34.     The BeB Agreement terms and conditions include the following

pertinent definitions:

> 'Digital Banking' means [TCF]'s business online banking system currently known as "Business eBanking" or "BeB" and the Mobile Application. . . .
> 'Payment Order' means any instruction to transfer funds from an Account (i) through a wire transfer; (ii) through the ACH Network; or (iii) through a bill payment request or other transfer initiated through Digital Banking. . . .
> 'Security Procedures' means the "Security Procedures" located on the Forms and Documents page in Digital Banking as supplemented by any security designation completed by [Zion/Schumann Tax] and any security procedures contained in the Account Contract, and all other measures implemented, recommended or required by [TCF] from time to time to help safeguard access to and use of Accounts, the Services and Digital Banking. . . .

*Id.* at Exhibit 1, BeB Agreement, § 2.

**Alleged Fraudulent ACH transfers**

35.     On or about September 15, 2020, an individual logged into Schumann

Tax BeB using S. Schumann's login credentials and the IP address associated with

Schumann Tax and added a new phone number for purposes of out-of-band

authentication.

36.     On September 15, 2020, when the new phone number was added to

Schumann Tax BeB, two system-generated alerts regarding the new phone number

and the updated user profile were sent to sheri@schumanntax.com (the "Schumann Email Address"), the email address registered with Schumann Tax BeB. Such alerts are automatically generated and sent when a user's demographic information is changed.

37.     Similarly, on or about September 23, 2020, an individual logged into Zion BeB using S. Schumann's login credentials from the IP address associated with Schumann Tax, and then added to the Zion Account, the same new phone number that had been added to the Schumann Tax Accounts for purposes of out-of-band authentication.

38.     When the new phone number was added to the Zion BeB on September 23, 2020, two system-generated alerts regarding the new phone number and the updated user profile were sent to the Schumann Email Address, the email address registered with Zion BeB.

39.     From September 15, 2020 through September 28, 2020, a total of ten ACH transfers were initiated from Schumann Tax BeB at a rate of no more than one ACH transfer initiated per day (the "Schumann Tax ACH Transfers").

40.     Of the Schumann Tax ACH Transfers, three directed that funds be transferred from Schumann Tax Accounts (***9435 and ***5560) and seven directed that funds be transferred from the Zion Account (***6774).

41.    From September 23, 2020 through September 28, 2020, a total of four ACH transfers were initiated from Zion BeB at a rate of no more than one ACH transfer per day (collectively, the "Zion ACH Transfers").

42.    Of the Zion ACH transfers and the Schumann Tax ACH transfers, seven included ACH entries that were returned by the receiving banks.  Such returns resulted in additional system-generated alerts being sent to the Schumann Email Address.

43.    The amount of each of the Schumann Tax ACH Transfers and Zion ACH Transfers was at or below the daily limit for ACH initiations on those accounts.

### Notice of Alleged Security Breach and Investigation

44.    In the late afternoon of September 28, 2020, S. Schumann visited TCF's branch in Bay City, Michigan and advised TCF that one or more of the Schumann Tax ACH Transfers and/or the Zion ACH Transfers were unauthorized.

45.    Upon information and belief, each of the Schumann Tax ACH Transfers and Zion ACH Transfers was caused by (a) an individual who accessed Schumann Tax BeB and Zion BeB at the Schumann Tax office, and/or (b) malware installed on a computer at the Schumann Tax office, which enabled the individual(s) to access the Schumann Tax computer from an offsite location.

46.    TCF's online banking records further reveal that the username and password of S. Schumann, who was the account administrator for both accounts,

were used to log into Schumann Tax BeB and Zion BeB to initiate the Schumann Tax ACH Transfers and the Zion ACH Transfers.

47.   As referenced in Paragraphs 35 and 37 above, the unknown individual(s) then used the new phone number associated with Schumann Tax BeB and Zion BeB to receive the out-of-band authentication codes necessary to initiate the Schumann Tax ACH Transfers and the Zion ACH Transfers.

48.   Upon information and belief, the purported security breach associated with the Schumann Tax Accounts and Zion Accounts, through Schumann Tax BeB and Zion BeB, which resulted in the Schumann Tax ACH Transfers and Zion ACH Transfers, were caused, in whole or in part, by Schumann Tax, Zion, and/or their respective agent(s) and/or representative(s), for including, but not limited to, the following reasons:

a. Schumann Tax and Zion failed to comply with the required and recommended Security Procedures set forth in the TCF Agreement T&Cs and the BeB Agreement. *See* Ex. A.

b. Schumann Tax and Zion had unlimited access to review their online banking profiles and accounts through BeB.  Upon information and belief, S. Schumann logged into Schumann Tax BeB and/or Zion BeB during the period of September 15, 2020 through September 28, 2020

when the fraud was allegedly occurring, yet failed to notify TCF of the alleged fraud until nearly two weeks after it began.

c.  During the relevant period, TCF offered dual authorization to initiate ACH transfers.  *See* Ex. A, TM Services Agreement T&Cs, at Exhibit 2.  Dual authorization requires authorization by two different users, meaning that one user must initiate the transfer using standard security protocols and the second user must approve the transfer using standard security protocols prior to the transfer being processed.  Neither Zion nor Schumann Tax chose to use dual authorization, despite TCF highly recommending that they do so.  *See id.*  Upon information and belief, dual authorization would have prevented, in whole or in part, the alleged fraud that resulted in the Schumann Tax ACH Transfers and Zion ACH Transfers.

d.  During the relevant period, TCF permitted BeB users to identify one or more email addresses and/or phone numbers to receive system-generated alerts.  Zion and Schumann Tax did not register multiple email address or phone numbers, nor did they adequately monitor the system-generated alerts sent to the Schumann Email Address that provided notice that the user profile and phone number for the Zion Account and Schumann Tax Accounts had been updated with a new

14

phone number and that there were numerous ACH returns in connection with the Schumann Tax ACH Transfers and Zion ACH Transfers.

e.  S. Schumann's failure to monitor the email account associated with the Schumann Email Address, including but not limited to the email settings and message delivery "rules" associated therewith and its trash folder, contributed, in whole or in part, to losses allegedly suffered by Schumann Tax and Zion.

### The Underlying Litigation

49.  On February 17, 2021, Schumann Tax and Zion filed their First Amended Complaint, identifying TCF as a defendant along with various John Does (the "Litigation").  In the Litigation, Plaintiffs/Counter-Defendants seek to recover their net losses, among other damages, stemming from the purportedly unauthorized Schumann Tax ACH Transfers and Zion ACH Transfers.  *See* Dkt. 6.

50.  The Amended Complaint includes the following claims against TCF: Count IV, Violation of Michigan Compiled Laws sections 440.4601, *et seq.* and Count V, Negligence Against TCF.  *See id.*

51.  TCF denies that is liable to Plaintiffs/Counter-Defendants in the Litigation.  *See* Dkt. 10, TCF's Answer and Affirmative Defenses.

### <u>COUNT I – INDEMNITY AGAINST SCHUMANN TAX IN CONNECTION WITH ZION'S CLAIMS AGAINST TCF</u>

### (TM Services Agreement T&Cs,

**Part II, §§ 4.7, 10.4 and Part IV, §2.14)**

52.    TCF incorporates by reference the allegations contained in the preceding paragraphs.

53.    For good and valuable consideration, Schumann Tax agreed to be bound by the TM Services Agreement terms and conditions.

54.    TCF performed its obligations under the TM Services Agreement T&Cs with Schumann Tax.

Indemnity Under Part II, § 4.7 of TM Services Agreement T&Cs

55.    Pursuant to Part II, § 4.7 of the TM Services Agreement T&Cs, in the event Schumann Tax "does not comply with all recommended and required Security Procedures or this Section 4," Schumann Tax agrees to "defend, indemnify, and hold harmless [TCF] and [TCF-Related Parties] from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by. . . any Third Party with respect to, caused by or arising from [Schumann Tax's] failure to comply with the recommended and required Security Procedures."  Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

56.    Part I, § 2 of the TM Services Agreement T&Cs, defines the following terms used in § 4.7 as follows:

a.   "Losses" are defined as "damages, losses, liabilities, claims, demands, fines, judgments, arbitration awards, amounts paid in settlement, penalties, costs, expenses and fees of any kind including, but not limited to, reasonable attorneys' fees, expert fees, court costs, adjusters fees and any other expenses incurred in connection with any claim or proceeding (civil, criminal, administrative or investigative), arbitrations, governmental investigations or reviews."

b.   "Third Party" is defined as "any individual or entity other than [Schumann Tax] or [TCF]."

Ex. A, TM Services Agreement T&Cs, § 2.

57.    Zion is a "Third Party" to the TM Services Agreement T&Cs between Schumann Tax and TCF.  *Id.*

58.    Pursuant to her role as an agent of Schumann Tax, which provided tax services to Zion, S. Schumann was Administrator to the Zion BeB and the Schumann Tax BeB, and signer on the Zion Account.

59.    Schumann Tax did not comply with all "recommended and required Security Procedures" under the TM Services Agreement T&Cs in connection to the Zion Account.  *See* Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

60.    As such, pursuant to Part II, § 4.7 of the TM Services Agreement T&Cs, Schumann tax must "defend, indemnify, and hold harmless [TCF] and [TCF-Related

17

Parties] from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by" Zion in the Litigation.  *See id.*

Indemnity under Part II, § 10.4 of TM Services Agreement T&Cs

61.    Part II, § 10.4 of the TM Services Agreement T&Cs further requires, among other things, that Schumann Tax "indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses, which result directly or indirectly, in whole or in part, from: (i) disputes or legal actions by parties other than [Schumann Tax or TCF] concerning a Service . . . and/or (iv) [Schumann Tax]'s breach of any provision of the Agreement, including, but not limited to, any of the representations or warranties made by [Schumann Tax] in the Agreement. . . ."  Ex. A, TM Services Agreement T&Cs, Part II, § 10.4.

62.    Part I, §2 of the TM Services Agreement T&Cs, defines "Service" as:

> [T]he treasury management service or services described in these Terms and Conditions, which [TCF] may provide from time to time to its business customers and that [Schumann Tax] uses in connection with any of its Accounts.

*Id.* at Part I, § 2.

63.    The ACH origination service Zion and Schumann Tax received through TCF, is a "Service" under the indemnity provision at Part II, § 10.4 of the TM Services Agreement T&Cs.  *See id.*

64.     Zion's claims against TCF in the Litigation are "legal actions by parties other than [Schumann Tax or TCF]" under the indemnity provision at Part II, § 10.4 of the TM Services Agreement T&Cs.  *See id.*

65.     Further, Schumann Tax breached the "Agreement," as defined in the TM Services Agreement T&Cs, Part I, § 2, including, but not limited to, the following provisions:

a.  TM Services Agreement T&Cs, Part II, § 4.1 by failing to comply with the recommended and required Security Procedures; failing to maintain internal procedures to ensure that all Authorized signers, Administrators, Users, employees and agents of Schumann Tax comply with the Security Procedures; failing to monitor account transactions; failing to screen Schumann Tax's systems using anti-virus software; and/or failing to implement and follow procedures and safeguards to prevent unauthorized transactions;

b.  TM Services Agreement T&Cs Part II, § 4.5 by failing to provide TCF with reasonably sufficient and detailed advance Notice of the security compromise or loss or theft of the Access Codes;

c.  TM Services Agreement T&Cs, Part II, § 10.2 by filing the Litigation against TCF more than ninety days after the allegedly fraudulent transfers at issue from were made;

d.  BeB Agreement T&Cs, § 11 by failing to comply with the Security Procedures or by failing to ensure that its agent(s) and/or representative(s) comply with the Security Procedures; and/or

e.  BeB Agreement T&Cs, § 13 by failing to routinely scan and/or use a reliable virus detection software or other product to detect and remove any viruses or malware.

66.  As such, Schumann Tax must "indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses," in connection with Zion's claims in the Litigation pursuant to Part II, §10.4 of the TM Services Agreement T&Cs.

Indemnity Under Part IV, § 2.14 of TM Services Agreement T&Cs

67.  Pursuant to Part IV, § 2.14 of the TM Services Agreement T&Cs, Schumann Tax also agreed that if it fails to "maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures" Schumann Tax "shall defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by . . . any Third Party with respect to, caused by or growing out of [Schumann Tax]'s failure to maintain information security controls and standards that meet the

minimum requirements of the NACHA Security Requirements and the Security Procedures." Ex. A, TM Services Agreement T&Cs, Part IV, § 2.14.

68.    Upon information and belief, Zion's claims against TCF in the Litigation were, in whole or in part, "caused by or growing out of [Schumann Tax]'s failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures." *See* Ex. A, TM Services Agreement, Part IV, §2.14.

69.    By way of example, TCF offered and highly recommended dual authorization as an additional security measure for ACH entries, but Schumann Tax declined. *See id.* at Exhibit 2. Upon information and belief, Schumann Tax's failure to implement dual authorization for ACH entries made from Schumann Tax BeB caused Zion to suffer the alleged damages it claims against TCF in the Litigation.

70.    Schumann Tax also failed to comply with all of the General Security Procedures, Security Procedures for BeB, and/or Account Monitoring and Alert Services, identified in Security Procedures appended as Exhibit 2 to the TM Services Agreement T&Cs. *See* Ex. A, TM Services Agreement T&Cs, at Ex. 2, Security Procedures. Upon information and belief, Schumann Tax's failure to comply with all of the General Security Procedures, Security Procedures for BeB, and/or Account Monitoring and Alert Services, identified in the Security Procedures appended as

Exhibit 2 to the TM Services Agreement T&Cs caused Zion to suffer the alleged damages Zion claims against TCF in the Litigation.

71.     As such, Schumann Tax must "defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by" Zion in the Litigation pursuant to Part IV, §2.14 of the TM Services Agreement T&Cs.

WHEREFORE, TCF respectfully requests entry of a judgment in its favor and against Schumann Tax, awarding to TCF its costs, expenses and fees of any kind including, but not limited to its reasonable attorneys' fees, expert fees, court costs, adjusters fees and any other expenses incurred in connection with the Litigation, prejudgment interest and post judgment interest, and any other relief as is equitable and just.

## COUNT II – INDEMNITY AGAINST SCHUMANN TAX IN CONNECTION WITH ZION'S CLAIMS AGAINST TCF
### (BeB Agreement T&Cs, § 15)

72.     TCF incorporates by reference the allegations contained in the preceding paragraphs.

73.     For good and valuable consideration, Schumann Tax agreed to be bound by the BeB Agreement T&Cs.

74.     TCF performed its obligations under the BeB Agreement T&Cs.

75.     Section 15 of the BeB Agreement T&Cs provides, in pertinent part, that

Schumann Tax will:

> indemnify, defend and hold harmless [TCF] from and against any
> and all actions, suits, claims, damages, losses, liabilities,
> penalties, assessments, charges, taxes, costs and expenses
> (including reasonable attorneys' fees, costs of investigation and
> court costs at the trial level and in any appeal) (together, the
> 'Losses') directly or indirectly arising from or relating to . . . (iv)
> the failure of [Schumann Tax] (or its employees, agents,
> affiliates or representatives) to comply with its obligations in this
> Agreement or the Account Contract, including [Schumann
> Tax]'s failure to observe, maintain or comply with the Security
> Procedures, . . . (vii) other acts or omissions of [Schumann Tax]
> (including its affiliates, agents, employees and representatives)
> or any third party which create, lead to or result in claims,
> liability, damages, costs or expenses, . . . or (viii) any action taken
> or omitted to be taken . . . by anyone using the login credentials
> of Users; provided, however, that [Schumann Tax] shall not be
> obligated to indemnify [TCF] for any Losses that are caused
> directly by [TCF]'s gross negligence, willful misconduct or bad
> faith.

Ex. A, at Ex. 1, BeB Agreement, § 15.

76.     Section 2 of the BeB Agreement T&Cs includes the following

definitions relevant to § 15:

a.     "Administrator" means "the individual identified by [Schumann Tax]

as the person with authority to administer all aspects of [BeB] for

[Schumann Tax], including designating Users and managing each

User's access rights in [BeB]."

23

b.  "User" means "all individuals identified by [Schumann Tax], through the Administrator, as individuals authorized by [Schumann Tax] to use or access [BeB] or any Core Service on behalf of [Schumann Tax]. The term 'User' includes Administrators."

*Id.* at Exhibit 1, BeB Agreement, § 2.

77.    With respect to the Zion Account, Schumann Tax, through its agent, S. Schumann, was the Administrator and User of the Zion BeB and Schumann Tax BeB.

78.    Upon information and belief, Schumann Tax failed to comply with its obligations under the "Agreement or Account Contract," as defined in the BeB, including, but not limited to, the following provisions:

a.  TM Services Agreement T&Cs, Part II, § 4.1 by failing to comply with the recommended and required Security Procedures; failing to maintain internal procedures to ensure that all Authorized signers, Administrators, Users, employees and agents of Schumann Tax comply with the Security Procedures; failing to monitor account transactions; failing to screen Schumann Tax's systems using anti-virus software; and/or failing to implement and follow procedures and safeguards to prevent unauthorized transactions;

    b.   TM Services Agreement T&Cs, Part II, § 4.5 by failing to provide TCF with reasonably sufficient and detailed advance Notice of the security compromise or loss or theft of the Access Codes;

    c.   BeB Agreement T&Cs, § 11 by failing to implement, follow, and/or comply with the Security Procedures or by failing to ensure that its Users, employees and agents comply with the Security Procedures; and/or

    d.   BeB Agreement T&Cs, § 13 by failing to routinely scan and/or use a reliable virus detection software or other product to detect and remove any viruses or malware.

79.    For the foregoing reasons, the acts or omissions of Schumann Tax and/or its agents, employees, and/or representatives, created, led to, or resulted in the alleged damages Zion claims against TCF in the Litigation.

80.    Accordingly, Schumann Tax must "indemnify, defend and hold harmless [TCF] from and against any and all actions, suits, claims, damages, losses, liabilities, penalties, assessments, charges, taxes, costs and expenses (including reasonable attorneys' fees, costs of investigation and court costs at the trial level and in any appeal (together, the 'Losses')" in connection with Zion's claims in the Litigation pursuant to § 15 of the BeB Agreement T&Cs.

81.    The Losses as issue were not caused directly by TCF's gross negligence, willful misconduct or bad faith.

WHEREFORE, TCF respectfully requests entry of a judgment in its favor and against Schumann Tax, awarding to TCF its charges, taxes, costs, and expenses (including reasonably attorneys' fees, costs of investigation and court costs at the trial level and in any appeal), prejudgment interest and post judgment interest, and any other relief as is equitable and just.

## COUNT III – IDEMNITY AGAINST SCHUMANN TAX IN CONNECTION WITH SCHUMANN TAX'S CLAIMS AGAINST TCF
### (TM Services Agreement T&Cs, Part II, §§ 4.7, 10.4 and Part IV, §2.14)

82.    TCF incorporates by reference the allegations contained in the preceding paragraphs.

83.    Pursuant to the TM Services Agreement terms and conditions, TCF and Schumann Tax expressly agreed that in certain circumstances, Schumann Tax is required to indemnify TCF for direct claims between Schumann Tax and TCF.

Indemnity Under Part II, § 4.7 of TM Services Agreement T&Cs

84.    Pursuant to Part II, § 4.7 of the TM Services Agreement T&Cs, in the event Schumann Tax "does not comply with all recommended and required Security Procedures or this Section 4," Schumann Tax agrees to "defend, indemnify, and hold harmless [TCF] and [TCF-Related Parties] from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in

26

connection with any claim, allegation or assertion made by[Schumann Tax] . . . with respect to, caused by, or arising from [Schumann Tax's] failure to comply with the recommended and required Security Procedures."  Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

85.    As alleged herein, Schumann Tax did not comply with all "recommended and required Security Procedures" under the TM Services Agreement T&Cs in connection to the Schumann Tax Accounts.  *See* Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

86.    As such, pursuant to Part II, § 4.7 of the TM Services Agreement T&Cs, Schumann tax must "defend, indemnify, and hold harmless [TCF] and [TCF-Related Parties] from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by" Schumann Tax in the Litigation.  *See id.*

Indemnity under Part II, § 10.4 of TM Services Agreement T&Cs

87.    Part II, § 10.4 of the TM Services Agreement T&Cs, further requires Schumann Tax to "indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses, which result directly or indirectly, in whole or in part, from:. . . (ii) [TCF]'s providing of Service(s) to [Schumann Tax], which is in compliance with the Agreement;. . . and/or (iv) [Schumann Tax]'s breach of any provision of the Agreement, including,

but not limited to, any of the representations or warranties made by [Schumann Tax] in the Agreement. . . ."  Ex. A, TM Services Agreement T&Cs, Part II, § 10.4.

88.     The ACH origination service Schumann Tax received through TCF, is a "Service" under the indemnity provision at Part II, § 10.4 of the TM Services Agreement T&Cs.  *See id.*

89.     TCF provided ACH origination services to Schumann Tax in compliance with the "Agreement," as defined in the TM Services Agreement T&Cs, Part I, § 2.

90.     Further, Schumann Tax breached the "Agreement," as defined in the TM Services Agreement T&Cs, Part I, § 2, including, but not limited to, the following provisions:

a.  TM Services Agreement T&Cs, Part II, § 4.1 by failing to comply with the recommended and required Security Procedures; failing to maintain internal procedures to ensure that all Authorized signers, Administrators, Users, employees and agents of Schumann Tax comply with the Security Procedures; failing to monitor account transactions; failing to screen Schumann Tax's systems using anti-virus software; and/or failing to implement and follow procedures and safeguards to prevent unauthorized transactions;

     b.  TM Services Agreement T&Cs, Part II, § 4.5 by failing to provide TCF with reasonably sufficient and detailed advance Notice of the security compromise or loss or theft of the Access Codes;

     c.  TM Services Agreement T&Cs, Part II, § 10.2 by filing the Litigation against TCF more than ninety days after the allegedly fraudulent transfers to the Schumann Tax Accounts were made;

     d.  BeB Agreement T&Cs, § 11 by failing to comply with the Security Procedures or by failing to ensure that its agent(s) and/or representative(s) comply with the Security Procedures; and/or

     e.  BeB Agreement T&Cs, § 13 by failing to routinely scan and/or use a reliable virus detection software or other product to detect and remove any viruses or malware.

91.    As such, Schumann Tax must "indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses" in connection with Schumann Tax's claims in the Litigation pursuant to §10.4 of the TM Services Agreement T&Cs.

Indemnity Under Part IV, § 2.14 of TM Services Agreement T&Cs

92.    Further, pursuant to Part IV, § 2.14 of the TM Services Agreement T&Cs, Schumann Tax agreed that if it "fails to maintain information security controls and standards that meet the minimum requirements of the NACHA Security

Requirements and the Security Procedures" Schumann Tax "shall defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by [Schumann Tax]. . . with respect to, caused by or growing out of [Schumann Tax]'s failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures." Ex. A, TM Services Agreement T&Cs, Part IV, § 2.14.

93.     Upon information and belief, Schumann Tax's claims against TCF in the Litigation were in whole or in part, "caused by or growing out of [Schumann Tax]'s failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures." *See* Ex. A, TM Services Agreement, Part IV, § 2.14.

94.     By way of example, TCF offered and highly recommended dual authorization as an additional security measure for ACH entries, but Schumann Tax declined. *See id.* at Exhibit 2.  Upon information and belief, Schumann Tax's failure to implement dual authorization for ACH entries made from Schumann Tax BeB caused it to suffer the alleged damages it claims against TCF in the Litigation.

95.     Schumann Tax also failed to comply with all of the General Security Procedures, Security Procedures for BeB, and/or Account Monitoring and Alert

Services, identified in the Security Procedures appended as Exhibit 2 to the TM Services Agreement T&Cs. *See* Ex. A, TM Services Agreement T&Cs, at Exhibit 2, Security Procedures.   Upon information and belief, Schumann Tax's failure to comply with all of the General Security Procedures, Security Procedures for BeB, and/or Account Monitoring and Alert Services, identified in the Security Procedures appended as Exhibit 2 to the TM Services Agreement T&Cs, caused it to suffer the alleged damages it claims against TCF in the Litigation.

96.   As such, Schumann Tax must "defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by" Schumann Tax in the Litigation pursuant to Part IV, § 2.14 of the TM Services Agreement T&Cs.

WHEREFORE, TCF respectfully requests entry of a judgment in its favor and against Schumann Tax, awarding to TCF its costs, expenses and fees of any kind including, but not limited to its reasonable attorneys' fees, expert fees, court costs, adjusters fees and any other expenses incurred in connection with the Litigation, prejudgment interest and post judgment interest, and any other relief as is equitable and just.

## COUNT IV – IDEMNITY AGAINST ZION IN CONNECTION WITH ZION'S CLAIMS AGAINST TCF
### (TM Services Agreement T&Cs,
### Part II, §§ 4.7, 10.4 and Part IV, § 2.14)

97.     TCF incorporates by reference the allegations contained in the preceding paragraphs.

98.     For good and valuable consideration, Zion agreed to be bound by the TM Services Agreement terms and conditions.

99.     TCF performed its obligations under the TM Services Agreement T&Cs with Zion.

100.    Pursuant to the TM Services Agreement T&Cs, TCF and Zion expressly agreed that Zion is required to indemnify TCF for direct claims between Zion and TCF in certain circumstances.

Indemnity Under Part II, § 4.7 of TM Services Agreement T&Cs

101.    Pursuant to Part II, § 4.7 of the TM Services Agreement T&Cs, in the event Zion "does not comply with all recommended and required Security Procedures or this Section 4," Zion agrees to "defend, indemnify, and hold harmless [TCF] and [TCF-Related Parties] from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by [Zion] . . . with respect to, caused by, or arising from [Zion]'s failure to comply with the recommended and required Security Procedures." Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

32

102.   As alleged herein, Zion, individually and/or through its agent(s) and/or representative(s), did not comply with all "recommended and required Security Procedures" under the TM Services Agreement T&Cs in connection with the Zion Account. *See* Ex. A, TM Services Agreement T&Cs, Part II, § 4.7.

103.   As such, pursuant to Part II, § 4.7 of the TM Services Agreement T&Cs, Zion must "defend, indemnify, and hold harmless [TCF] and [TCF-Related Parties] from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by" Zion in the Litigation. *See id.*

Indemnity under Part II, § 10.4 of TM Services Agreement T&Cs

104.   Part II, § 10.4 of the TM Services Agreement T&Cs, further requires Zion to "indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses, which result directly or indirectly, in whole or in part, from:. . . (ii) [TCF]'s providing of Service(s) to [Zion], which is in compliance with the Agreement;. . . and/or (iv) [Zion]'s breach of any provision of the Agreement, including, but not limited to, any of the representations or warranties made by [Zion] in the Agreement. . . ." Ex. A, TM Services Agreement T&Cs, Part II, § 10.4.

105.   Part I, §2 of the TM Services Agreement T&Cs, defines "Service" as:

> [T]he treasury management service or services described in these
> Terms and Conditions, which [TCF] may provide from time to

33

> time to its business customers and that [Zion] uses in connection
> with any of its Accounts.

*Id.* at Part I, § 2.

106.    The ACH origination service Zion received through TCF, is a "Service"
under the indemnity provision at Part II, § 10.4 of the TM Services Agreement
T&Cs. *See id.*

107.    TCF provided ACH origination services to Zion in compliance with the
"Agreement," as defined in the TM Services Agreement T&Cs, Part I, § 2.

108.    Further, Zion, individually and/or through its agent(s) and/or
representative(s), breached the "Agreement," as defined in the TM Services
Agreement T&Cs, Part I, § 2, including, but not limited to, the following provisions:

a.    TM Services Agreement T&Cs, Part II, § 4.1 by failing to comply with
the recommended and required Security Procedures; failing to maintain
internal procedures to ensure that all Authorized signers,
Administrators, Users, employees and agents of Zion comply with the
Security Procedures; failing to monitor account transactions; failing to
screen Zion's, and or its agent(s) and/or representative(s)'s systems
using anti-virus software; and/or failing to implement and follow
procedures and safeguards to prevent unauthorized transactions;

b. TM Services Agreement T&Cs, Part II, § 4.5 by failing to provide TCF with reasonably sufficient and detailed advance Notice of the security compromise or loss or theft of the Access Codes;

c. TM Services Agreement T&Cs, Part II, § 10.2 by filing the Litigation against TCF more than ninety days after the allegedly fraudulent transfers at issue from were made;

d. BeB Agreement T&Cs, § 11 by failing to comply with the Security Procedures or by failing to ensure that its agent(s) and/or representative(s) comply with the Security Procedures; and/or

e. BeB Agreement T&Cs, § 13 by failing to routinely scan and/or use a reliable virus detection software or other product to detect and remove any viruses or malware.

109.   As such, Zion must "indemnify, defend and hold [TCF] and [TCF]-Related Parties, individually and collectively, harmless from and against all Losses," in connection with its claims in the Litigation pursuant to Part II, § 10.4 of the TM Services Agreement T&Cs.

Indemnity Under Part IV, § 2.14 of TM Services Agreement T&Cs

110.   Further, pursuant to Part IV, § 2.14 of the TM Services Agreement T&Cs, Zion agreed that if it fails to "maintain information security controls and standards that meet the minimum requirements of the NACHA Security

Requirements and the Security Procedures" Zion "shall defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by [Zion] . . . with respect to, caused by or growing out of [Zion]'s failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures." Ex. A, TM Services Agreement T&Cs, Part IV, § 2.14.

111.   Upon information and belief, Zion's claims against TCF in the Litigation were in whole or in part, "caused by or growing out of [Zion and/or its agent(s) and/or representative(s)]'s failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures."  *See* Ex. A, TM Services Agreement, Part IV, §2.14.

112.   By way of example, TCF offered and highly recommended dual authorization as an additional security measure for ACH entries, but Zion declined. *See id.* at Exhibit 2.  Upon information and belief, Zion's failure to implement dual authorization for ACH entries made from Zion BeB caused it to suffer the alleged damages it claims against TCF in the Litigation.

113.   Zion, and/or its agent(s) and/or representative(s), also failed to comply with all of the General Security Procedures, Security Procedures for BeB, and/or Account Monitoring and Alert Services, identified in the Security Procedures appended as Exhibit 2 to the TM Services Agreement T&Cs.  *See* Ex. A, TM Services Agreement T&Cs, at Exhibit 2, Security Procedures.  Upon information and belief, Zion's, and/or its agent(s) and/or representative(s), failure to comply with all of the General Security Procedures, Security Procedures for BeB, and/or Account Monitoring and Alert Services, identified in the Security Procedures appended as Exhibit 2 to the TM Services Agreement T&Cs, caused it to suffer the alleged damages it claims against TCF in the Litigation.

114.   As such, Zion must "defend, protect, indemnify and hold harmless [TCF] and [TCF]-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by" Zion in the Litigation pursuant to Part IV, §2.14 of the TM Services Agreement T&Cs.

WHEREFORE, TCF respectfully requests entry of a judgment in its favor and against Zion, awarding to TCF its costs, expenses and fees of any kind including, but not limited to its reasonable attorneys' fees, expert fees, court costs, adjusters fees and any other expenses incurred in connection with the Litigation, prejudgment interest and post judgment interest, and any other relief as is equitable and just.

Respectfully submitted,

Dated: September _ 2021

_____

WARNER NORCROSS + JUDD LLP

Andrea Bernard (P49209)
150 Ottawa Ave. NW, Suite 1500
Grand Rapids, MI 49503-2832
616-752-2000
abernard@wnj.com
Jonathan Lauderbach (P51313)
715 E. Main Street, Suite 110
Midland, MI 48640-5382
989-698-3700
jlauderbach@wnj.com
Katherine L. Pullen (P74511)
2715 Woodward Ave., Ste. 300
Detroit, MI 48201
313-546-6000
kpullen@wnj.com

*Counsel for Defendant/Counter-Plaintiff TCF National Bank*

# EXHIBIT A



# Treasury Management Services
# Terms and Conditions

Effective Date:  August 24, 2020

Thank you for choosing TCF National Bank ("Bank") for your treasury management needs.  We appreciate the opportunity to serve you. This document contains the terms and conditions under which Bank will provide you the treasury management services described in this document.

This document sets forth the rights and obligations of you and Bank with respect to these treasury management services. You are only bound by the terms and conditions covering a specific service if you use that service. Please read this document carefully and keep it for your records.

If you are an existing customer who already uses a service described in these terms and conditions pursuant to a prior agreement with TCF Bank, Chemical Bank or a predecessor of Chemical Bank, these terms and conditions supersede and replace all of the terms and conditions in that prior agreement with respect to your use of a service on and after the Effective Date of these Terms and Conditions, except that your prior agreement continues to apply for the following purposes: (i) serving as confirmation of your agreement to receive the applicable service; (ii) designating individuals and agents who are authorized to act on your behalf with respect to that service; (iii) providing setup directions for that service; and (iv) providing certain security designations and waivers for certain services (subject to the updated Security Procedures). In addition, for existing TCF customers, the following agreements continue to apply to the applicable Services: (i) Service Description for Remote Deposit Capture; (ii) Service Description for Lockbox and Remittance Processing; (iii) Money Handling Agreements (relating to armored courier services); and (iv) Loan Sweep Agreements, except that references in such agreements relating to general terms are modified to mean the general terms in the attached Terms and Conditions.

Whenever you use any of the treasury management services covered by this document, you agree to be bound by these Terms and Conditions, as amended from time to time, and to follow the procedures in the applicable documentation for a service.

If you have any questions about our services or about this document, please contact your treasury management sales advisor or relationship manager.

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................................................2
  1.  HOW BANK'S TREASURY MANAGEMENT SERVICES WORK...........................................................2
  2.  DEFINITIONS................................................................................................................................2
  3.  AGREEMENT STRUCTURE AND AMENDMENTS..............................................................................3

II.  TERMS APPLICABLE TO ALL TREASURY MANAGEMENT SERVICES ...............................................  4
  1.  SERVICES GENERALLY..................................................................................................................4
  2.  SERVICE FEES AND CHARGES.......................................................................................................5
  3.  MONETARY TRANSACTIONS.........................................................................................................5
  4.  SECURITY REQUIREMENTS AND PROCEDURES.............................................................................5
  5.  USA PATRIOT ACT AND OFAC.......................................................................................................6
  6.  SOFTWARE AND TECHNICAL SPECIFICATIONS.............................................................................6
  7.  CONFIDENTIALITY AND PROPRIETARY PROPERTY........................................................................7
  8.  WARRANTIES, REPRESENTATIONS AND ERRORS..........................................................................7
  9.  TERMINATION OF SERVICE...........................................................................................................8
  10. LIABILITY......................................................................................................................................8
  11. NOTICES AND GENERAL COMMUNICATIONS................................................................................9
  12. GOVERNING LAW, JURISDICTION, VENUE, ATTORNEY FEES .......................................................9
  13. JURY TRIAL WAIVER...................................................................................................................10
  14. GENERAL TERMS .......................................................................................................................10

III. TERMS APPLICABLE TO ALL DIGITAL BANKING SERVICES ...........................................................10
  1.  AGREEMENT...............................................................................................................................10
  2.  AUTHORIZED REPRESENTATIVES FOR DIGITAL BANKING...........................................................10
  3.  ACCESS TO SERVICES.......................................................  .........................................................11
  4.  AVAILABILITY AND MAINTENANCE.............................................................................................11
  5.  USER GUIDES..............................................................................................................................11

IV.  TERMS APPLICABLE TO SPECIFIC TREASURY MANAGEMENT SERVICES .....................................11
  1.  ACCOUNT RECONCILIATION PLAN..............................................................................................11
  2.  ACH ORIGINATION......................................................................................................................12
  3.  CASH VAULT...............................................................................................................................16
  4.  CONTROLLED DISBURSEMENT ACCOUNT ..................................................................................18
  5.  CREDIT SWEEP...........................................................................................................................18
  6.  DIRECT SEND .............................................................................................................................19
  7.  INFORMATION REPORTING.........................................................................................................20
  8.  INVESTMENT SWEEP...................................................................................................................20
  9.  LOCKBOX ...................................................................................................................................21
  10. POSITIVE PAY..............................................................................................................................25
  11. REMOTE DEPOSIT.......................................................................................................................28
  12. RETURNED DEPOSITED ITEMS....................................................................................................30
  13. WIRE TRANSFER .........................................................................................................................31
  14. ZERO BALANCE ACCOUNT .........................................................................................................33
EXHIBIT 1 – BUSINESS eBANKING AGREEMENT .................................................................................34
EXHIBIT 2 – SECURITY PROCEDURES .................................................................................................45

## I.  INTRODUCTION

*1.   HOW BANK'S TREASURY MANAGEMENT SERVICES WORK.*  These Terms and Conditions are part of the Agreement that sets forth the rights and obligations of Company and Bank with respect to the Services described herein. By using a Service, Company agrees to all provisions in **Sections I, II**, and **III** of these Terms and Conditions and also to the provisions in **Section IV** applicable to each Service used by Company. Company is not bound by provisions of these Terms and Conditions applicable only to Services that Company does not use.

*2.   DEFINITIONS.*  For purposes of these Terms and Conditions, the following terms have the definitions set forth below. Other capitalized terms used but not defined in the Agreement have the meanings given to them in the other Account Contract documents:

**"Access Codes"** means the identification codes, security devices, passwords, one-time security codes, and other access procedures used as a means of authenticating a User attempting to access and use Digital Banking or a Service.

**"Account"** means each deposit account maintained by Company with Bank that is eligible for and Company has designated for use with one or more Services. Bank reserves the right to restrict or disqualify any Account from eligibility for any Services. References to "Account" in connection with a specific Service means the Account using that Service unless otherwise indicated.

**"Account Contract"** means the Authorization, these Terms and Conditions (including the BeB Agreement), the Setup Forms, the Account Application and Agreement executed by Company for its Accounts and related authorizations and Authorized Signer information, and Bank's current Terms and Conditions for Checking and Savings Accounts, Terms and Conditions for Certificate of Deposit Accounts, the Fee Schedule; any additional agreements between Company and Bank and any additional disclosures that Bank may give Company; other forms to process or authenticate Company's Account transactions or supplement the Services, and all amendments or additions to any of the foregoing that Bank issues or posts from time to time.

**"ACH"** means Automated Clearing House.

**"ACH Network"** means the automated clearing house funds transfer system governed by the NACHA Rules that provides for the interbank clearing of electronic debit, credit and related Entries for participating financial institutions.

**"Administrator"** means the Administrator(s) for the Services designated by Company in writing from time to time.

**"Affiliate"** means each Company that is affiliated with another Company through common ownership or control and that is identified on documentation acceptable to Bank requesting that their accounts be linked and under a single profile in Digital Banking.

**"Agreement"** means the Authorization, these Terms and Conditions, and the Setup Forms, together with all addenda, exhibits, schedules, forms, waivers and other documents attached to or incorporated by reference into the Authorization, these Terms and Conditions or the Setup Forms, and all applicable amendments or additions to any of the foregoing.

**"Authorized Signer"** means each person designated by Company as an "Authorized Signer" for the applicable Account(s) in a resolution, certificate of authority, the Account Contract or other documentation provided by Company to Bank, as modified and/or supplemented by Company from time to time, in a written form acceptable to Bank.

**"Authorization"** means the Authorization and Agreement for Treasury Management Services executed by Company.

"**Available Balance**" and "**Available Funds**" have the meaning set forth in Bank's Terms and Conditions for Checking and Savings Accounts.

**"Bank"** means TCF National Bank and all predecessors in interest including Chemical Bank and all its predecessors in interest.

**"Bank-Related Parties"** means (1) Bank, (2) each company that owns Bank, is owned directly or indirectly by Bank, or is under common ownership with Bank, (3) employees, officers, and directors of Bank and Bank's affiliates; and (4) Bank's agents, licensors, independent contractors, and subcontractors.

**"Business eBanking"** and **"BeB"** mean Bank's primary Digital Banking platform through which most, but not all, Services are accessed.

**"BeB Agreement"** means the agreement attached to these Terms and Conditions as <u>Exhibit 1</u>, which is incorporated herein by reference, as updated by Bank from time to time, and located in BeB under the Admin tab/Forms and Documents.

**"Business Day"** means any portion of a day, other than a Saturday, Sunday, or a federal holiday in the U.S., on which Bank is open to the public for purposes of conducting substantially all business functions, including the applicable Service. Bank bases its Business Day and times on the Eastern Time zone. Bank reserves the right to modify its Business Day at any time without prior notice.

**"Check 21"** means the Check Clearing for the 21st Century Act, 12 U.S.C. §§5001-5018.

**"Company"** means the business entity, government entity, non-profit organization, trust, individual or other person that executed an Authorization or another agreement for a Service with Bank, and also each affiliate and related party that uses a Service, as identified on the applicable Service documentation.

**"Core Services"** means the services described in the BeB Agreement accessed through BeB.

**"Cutoff Time"** means the time by which a request related to a Service must be transmitted to Bank on a Business Day set forth at https://www.tcfbank.com/Agreements-And-Disclosures/Business-eBanking-Disclosure as updated by Bank in its discretion.

**"Digital Banking"** means Bank's internet banking platforms through which Company may access and use certain Services.  Bank's primary Digital Banking platforms currently are Business eBanking (BeB) and the Mobile Application.

**"Direct Send"** means the electronic transmission of data through a secure file transmission in connection with certain Services permitting this option, as more fully described in **Section IV.6** on Direct Send.

**"Entry or "Entries"** means an order or request for the transfer of money to or from an account through the ACH Network; and related non-monetary data.  Unless otherwise stated, the term Entry means both debit and credit Entries.

**"Fee Schedule"** means Bank's current Schedule of Fees for the Accounts and the additional document(s) from time to time provided to Company by Bank that set forth the fees and charges applicable to the Accounts and the Services.  Bank reserves the right in its sole discretion to change or modify the Fee Schedule at any time. Company's continued use of any Service after any change(s) in or to the Fee Schedule operates as its acceptance of those change(s).

**"Laws"** means all foreign, federal, state and local laws, including statutes, regulations, rules, codes, directives, ordinances, executive, administrative and court orders, regulatory guidelines and guidance, and official commentaries applicable to Company, Bank, the Accounts or any Services, including without limitation those administered by OFAC, as enacted and/or amended from time to time, provided that state and local laws are applicable to Bank only to the extent not preempted by federal law.

**"Legal Requirements"** means all applicable Laws and Rules.

**"Losses"** means all damages, losses, liabilities, claims, demands, fines, judgments, arbitration awards, amounts paid in settlement, penalties, costs, expenses and fees of any kind including, but not limited to, reasonable attorneys' fees, expert fees, court costs, adjusters fees and any other expenses incurred in connection with any claim or proceeding (civil, criminal, administrative or investigative), arbitrations, governmental investigations or reviews.

**"Mobile Application"** means the TCF Bank Business mobile banking application available for download to mobile devices through Google Play for Android devices and Apple's App Store for iPhone/iPad devices.

**"NACHA"** means the National Automated Clearing House Association.

**"NACHA Rules"** means NACHA Operating Rules & Guidelines, as they may be amended from time to time.

**"Notice" or "Notices"** means all instructions or communications provided by Bank to Company or by Company to Bank regarding the Agreement or any Service hereunder that comply with the requirements of **Section II.11** hereof.

**"OFAC"** means the Office of Foreign Assets Control of the U.S. Department of Treasury.

**"Protected Information"** means non-public personal information, including financial information, used to create or contained within Entries and any supplemental data contained in ACH Addenda Records.

**"Request"** means Company's request, by means permitted under the relevant Services, to transfer funds to a specified account or beneficiary (including standing instructions), or to amend or cancel a prior request to transfer funds.

**"Rules"** means any rule, regulation, order, directive or decision of any governing trade association, as enacted and amended from time to time, including, as applicable, NACHA, Electronic Check Clearing House Organization, card associations, clearinghouses, networks and/or other associations involved in transactions under the Agreement.

**"SDN List"** means OFAC's list of Specially Designated Nationals and Blocked Persons, which are organizations and individuals restricted from doing business with the U.S., American companies or Americans and includes terrorists and state sponsors of terrorism.

**"Security Procedures"** means the "Security Procedures" attached as Exhibit 2, incorporated by reference, and also located on the Forms and Documents page in Business eBanking, as supplemented by Company's current security designations, all other security procedures contained in the Account Contract, and all other measures implemented, recommended or required by Bank from time to time to help safeguard access to and use of Accounts, Services and Digital Banking.

**"Service" or "Services"** means the treasury management service or services described in these Terms and Conditions, which Bank may provide from time to time to its business customers and that Company uses in connection with any of its Accounts.

**"Setup Forms"** means the documents and other instructions provided by Company and accepted by Bank from time to time regarding Company's selection of Services for its Accounts and the optional designations related to those Services.

**"Software"** means software provided by Bank in conjunction with a Service.

**"Substitute Check"** means a paper reproduction of an original paper check that satisfies the requirements for a substitute check under Check 21, including that it is suitable for automated processing in the same manner as the original check; Substitute Checks also may be referred to as Image Replacement Documents.

**"Terms and Conditions"** means these Treasury Management Services Terms and Conditions, including all Exhibits, as updated by Bank from time to time.

**"Third Party"** means any individual or entity other than Company and Bank.

**"Third-Party Information"** means information about or from another person or entity.

**"UCC 3"** means the terms and provisions of Article 3 of the Uniform Commercial Code governing negotiable instruments.

**"UCC 4"** means the terms and provisions of Article 4 of the Uniform Commercial Code governing the relationship of a financial institution and its customers regarding the collection and payment of financial items.

**"UCC 4A"** means Article 4A of the Uniform Commercial Code governing certain funds transfers.

**"User"** means all individuals identified by Company or its Administrator as individuals authorized by Company to use or access a Service on behalf of Company.

**"User Guide"** means any paper or electronic document that Bank provides to Company from time to time which contains instructions and/or information regarding a Service or its use, as Bank may amend from time to time.

## 3. AGREEMENT STRUCTURE AND AMENDMENTS

**3.1   AGREEMENT.**  These Terms and Conditions govern Company and Bank as to each Service used by Company. If Company received a prior version of these Terms and Conditions or previously executed any other agreement with Bank governing the Services, these Terms and Conditions supersede and replace all prior Terms and Conditions and prior Service agreements on and after the Effective Date of these Terms and Conditions, except that prior agreements continue to apply for the following purposes: (i) serving as confirmation of Company's agreement to receive the applicable Services; (ii) designating the individual who is authorized to act as Company's Administrator; and (iii) providing setup directions and certain security designations for the applicable Services. In addition, if Company has received written notice from Bank that a prior agreement will continue to govern a specific Service described in these Terms and Conditions, that prior Agreement will continue to govern such Service until such time as Bank provides notice to Company that these Terms and Conditions will apply to that Service.

**3.2  PRIOR ADDENDUMS.** If Bank and Company have executed an addendum or amendment to a prior version of these Terms and Conditions (an **"Addendum"**), that Addendum will continue to apply to this version of the Terms and Conditions and any references to a specific section in that Addendum shall refer to the Section of these Terms and Conditions containing the same substantive content.

**3.3  ADDITIONAL DOCUMENTS.** If Bank approves Company for a Service, Company's use or continued use of each such Service will be conditioned on Company entering into, or completing and providing to Bank, all documentation Bank requests from time to time related to the Service in a form and substance satisfactory to Bank and, unless otherwise indicated, such documentation will be a part of the Agreement. Company agrees to execute, deliver, or otherwise acknowledge by affirmative action or passive acquiescence, any and all documents or materials required by Bank for Company to obtain and to continue to receive each Service.

**3.4  AMENDMENTS.** Bank may amend the Agreement from time to time by giving Notice to Company.  Bank may, when it determines it is practical to do so, give Company ten (10) days prior notice of the effective date of the amendment, unless a different notice or effective date is required by **Section IV** below or by any Legal Requirement. Using the Service(s) following the effective date of the amendment(s) shall be deemed evidence of Company's acceptance of and agreement to the amendment(s). If Company does not agree to the changes as set forth in an amendment, Company may choose to terminate the Service prior to the effective date of the amendment by discontinuing further use of the Service and following the procedures set forth in **Section II.9** (Termination of Service) below. The Agreement may not otherwise be amended unless agreed to in writing by Bank.

## II.  TERMS APPLICABLE TO ALL TREASURY MANAGEMENT SERVICES

*1.  SERVICES GENERALLY*

**1.1  USE OF SERVICES.**  Services may only be used in accordance with the Agreement. The decision to approve Company's use of any Service is within Bank's sole discretion. Bank's records will be conclusive as to whether Bank has approved Company's use of a Service and, if approved, the date of approval. For purposes of the Agreement, Bank will be deemed to have approved Company's use of a Service on the date Bank completes the activation of the Service for Company on Bank's systems. Bank provides Services to Company subject to Legal Requirements, which are hereby incorporated into and made part of the Agreement. All of Bank's agreements or obligations arising in connection with any Service shall be suspended if Bank's performance of any such agreement or obligation is determined by Bank to violate or be in conflict with any Legal Requirement, or if prohibited by any agency with supervisory or other authority over Bank.

**1.2  ACCOUNTS.** Company will at all times, during its use of any Service and until the period for ACH Return Entries (as defined in the NACHA Rules) has elapsed, maintain with Bank one or more Accounts in Company's name. Company will select the Account(s) to be used with each Service. If the Account is an IOLTA Account that cannot be charged fees per Legal Requirements and Company desires to use any Services on its IOLTA Account, Company also will maintain a separate Account for payment of all fees incurred on the IOLTA Account. Company's Accounts shall be subject to the terms of the Account Contract.

**1.3  APPROVALS AND AUTHORIZATIONS.**

**1.3.1      Underwriting Criteria.** Bank's approval for Company's use of certain Services may be subject to underwriting criteria established by Bank from time to time. Company agrees to provide Bank with such financial, business, and operating information as Bank may reasonably request from time to time in connection with Bank's underwriting review and approval process.

**1.3.2      Third-Party Agreements.** Some Services may require Company to obtain agreements from Third Parties. If Bank approves Company's use of any such Service, Company's use of the Service will be subject to Company obtaining and providing Bank with any agreement that Bank requests and Bank may require that the Third Party release Bank from any liability and indemnify Bank relative to the Service.

**1.3.3      Credit Reports.** Company authorizes Bank to obtain business and personal credit reports on Company and, to the extent applicable, on any Third Party that may guarantee Company's obligations to Bank (together with Company, any such Third Parties are collectively described as **"Obligors"**), as often as Bank deems it advisable to obtain such reports. Company agrees to submit current financial information on Obligors as often as Bank may request. Bank shall use such information to evaluate credit risks associated with Company's use of the Services.

**1.4  SECURITY INTEREST.**  To secure the prompt payment and performance of all of Company's obligations to Bank under the Agreement, Company grants Bank a security interest in all of Company's accounts maintained by Company with Bank, including all amounts held in the accounts at any time. If Company initiates insolvency or bankruptcy proceedings, Bank shall be a secured party for all purposes with respect to Company's accounts at Bank and all amounts held in those accounts. If Company is an individual, this provision shall not apply to an account (i) that is an IRA or a tax-deferred KEOGH retirement account; or (ii) where the right of withdrawal arises only in a representative capacity.

**1.5  IMPLEMENTATION COSTS.**  Company is responsible for its own costs incurred in connection with any Service including acquiring or enhancing any hardware, software, or other equipment and compensating any person or entity.

**1.6  CUTOFF TIMES.**  Any Request, exception decision, or other communication received by Bank after its established processing Cutoff Time therefore, or on a non-Business Day, will be treated as received on the next Business Day. Cutoff Times for applicable Services are in the Business eBanking Disclosure section of Bank's website, https://www.tcfbank.com/Agreements-And-Disclosures/Business-eBanking-Disclosure. Bank may change its Cutoff Times by sending Notice of the change to Company, publishing the change on Bank's website or posting it in Bank's banking centers, unless Legal Requirements require otherwise.

**1.7  USE OF THIRD-PARTY SERVICE PROVIDERS.**

**1.7.1      Use of Third-Party Service Providers by Bank.**  Company acknowledges and agrees that Bank may use Third-Party networks and service providers to provide or assist in the delivery of any Service. Bank may use alternate Third-Party networks or Third-Party service providers at its discretion and without notice to Company. The authorizations, limitations of liability and indemnities granted to Bank under the Agreement will be deemed to extend to each Third-Party service provider. Each Third-Party service provider shall be deemed a Third-Party beneficiary of the Agreement, entitled to rely on, and avail itself of, the provisions of the Agreement. Company agrees that it shall have no cause of action against any Third-Party service provider and that its sole and exclusive remedies shall be against Bank to the extent provided herein.

**1.7.2    Use of Third-Party Service Providers by Company.** Company shall not, without Bank's prior written consent, allow any Third-Party to use or access a Service that Company receives from Bank, whether to process transactions on Company's behalf or otherwise. If Bank allows Company to use a Third-Party service provider, the Third-Party service provider is Company's agent. Company will advise the Third-Party service provider of all requirements for the applicable Service and of the Agreement. If Bank requires, Company will obtain a written confidentiality agreement from the Third-Party service provider. Company is responsible for the acts and omissions of each of its Third-Party service providers, and Company shall indemnify and hold Bank and Bank-Related Parties harmless from and against any Losses incurred as a result of any act or omission of any of Company's Third-Party service providers. Company agrees that Bank may interact with and communicate directly with Company's Third-Party service providers on all matters relating to the Services and related Accounts until Company has provided Bank with written notice that Company has terminated the Third-Party service provider and Bank has a reasonable opportunity to act on such notice. Company agrees that security procedures established between the Third-Party service provider and Bank are commercially reasonable.

**1.8    RECORDING.** Company agrees that Bank may record or monitor any phone conversation regarding any Service. If state law requires Company's employee or agent to consent to Bank recording or monitoring such a conversation, Company will advise the employee or agent to do so. Bank has no duty to record or monitor phone conversations and the election to record and/or monitor is totally within Bank's discretion.

**1.9    COMPANY RECORDS.** No agreement between Company and Bank shall relieve either party from any obligation it has under the Legal Requirements, any Third-Party contract, or otherwise to keep records and employ its own adequate audit, accounting and review practices.

**1.10 AUDIT AND REVIEW.** Company agrees, upon reasonable Notice by Bank, to permit Bank to audit, inspect, and review its records, policies and processes for purposes of ensuring Company's compliance with the Agreement and/or applicable Legal Requirements.

## 2.    SERVICE FEES AND CHARGES

**2.1    FEES AND TAXES.** Company agrees to pay Bank all fees in effect from time to time for each Service used by Company, as set forth in Bank's most current Fee Schedule. Service fees typically are billed monthly in arrears.  If Company terminates the Agreement and/or any or all Services during a month, Company agrees to pay the full monthly fee for all Services in place at the beginning of such month.  The Service fees may be changed by Bank from time to time. In addition, Company shall pay all fees and charges not covered under the Fee Schedule for any requested or required special service or handling and for any actual expenses Bank may incur to effect or revoke any Services for Company. Certain Service fees may be subject to an account analysis pursuant to which Bank applies an earnings credit based on Company's Account balances to the Service fees owed and determines the net monthly Service fee due. The applicable earnings credit rate, if any, is established by Bank in its sole discretion and may be changed by Bank from time to time without advance notice to Company. If Company's earnings credit exceeds analyzed Service fees in any month, the analyzed Service fees will be $0.00 for that month.

**2.2    TAXES.** The fees and charges set forth in the Fee Schedule do not include sales, use, excise, value added, utility or other similar taxes that Company may be responsible to pay. Company shall pay all taxes and other governmental assessments related to any Services and the Agreement (excluding taxes based on Bank's net income).

## 3.    MONETARY TRANSACTIONS

**3.1    ACCOUNT BALANCES FOR FUNDING TRANSACTIONS AND FEES.** Company must ensure that each Account used with a Service has a sufficient Available Balance to cover Requests and all other debits to that Account and to pay all fees for Services when due. Bank may, without prior Notice or demand, debit the Account for all Requests and related adjustments and charges. If the Account does not have a sufficient Available Balance to cover Requests and to pay the fees due Bank, Bank may:

(a)   debit any other account of Company for amounts due to Bank;

(b)   dishonor any Request that would create a negative balance in the Account, even if Bank has paid overdrafts in the past;

(c)   allow the Account to become overdrawn in the amount of one or more Requests and/or the amount of the fees; and/or

(d)   require pre-funding of any or all Requests.

If Company has no accounts at Bank with a sufficient Available Balance to cover the amount due Bank, Company agrees to pay such amounts directly to Bank upon demand. If any amount due Bank under the Agreement is not paid when due, Bank may assess finance charges on the past due amount at a monthly rate of 1.5% or the maximum rate permitted by applicable Law, whichever is less, until paid. Bank may apply any payments on amounts owing to Bank in such order as Bank deems appropriate. In the event any amounts owed to Bank are not paid when due, Bank shall have no obligation to perform any Service for Company.

**3.2    NO OBLIGATION TO EXTEND CREDIT.** Nothing in the Agreement will constitute or be deemed a commitment by Bank to extend credit to Company, or to grant to Company overdraft privileges. Any obligation to extend credit to Company or otherwise make funds available to Company must be set out in a separate written agreement between Bank and Company.

**3.3    DISHONOR OF REQUESTS.** Bank may dishonor Requests or other transactions in its discretion and with no liability:

(a)   for the reasons set forth in **Section 3.1** above;

(b)   if Company is in breach of the Agreement; the Account Contract; or any loan agreement with Bank;

(c)   if the Request does not comply with the requirements for the related Service; or

(d)   if the Request involves funds subject to a hold, dispute or legal process preventing their withdrawal; violates, in the opinion of Bank or Bank's legal counsel, any Legal Requirements; or violates Bank's policies, procedures or practices.

## 4.    SECURITY REQUIREMENTS AND PROCEDURES

**4.1    SECURITY PROCEDURES GENERALLY**.  Company acknowledges that protecting its Accounts from unauthorized transactions depends on Company monitoring its Account transactions and following the Security Procedures. In this regard, Company agrees to comply with the recommended and required Security Procedures and to maintain internal procedures to ensure that all Authorized Signers, Administrators,

Users, employees and agents of Company comply with the Security Procedures applicable to such person. Without limiting the foregoing, Company agrees to monitor Account transactions, screen Company's systems using anti-virus software, and implement procedures and safeguards recommended in the Security Procedures to prevent any unauthorized transaction. Company further agrees to establish and maintain commercially reasonable procedures (i) to safeguard against unauthorized communications, transactions and/or transmissions to Bank; and (ii) to ensure the confidentiality and protection of the Security Procedures, including, but not limited to, Access Codes. If compliance with any Security Procedure is within Company's control, Bank will not audit Company's compliance with such Security Procedure. If Company fails to implement or follow the Security Procedures, Company assumes responsibility for all Losses which could have been avoided had they been implemented at or before the time the Loss occurred. Company agrees that Bank may change the Security Procedures.

**4.2   COMMERCIALLY REASONABLE.** Company acknowledges and agrees that the security protocol set forth in the Security Procedures for initiating any transfer from the Accounts provide Company with a commercially reasonable degree of protection against unauthorized transfers in light of Company's particular needs and circumstances. If Company chooses not to comply with Bank's standard and recommended Security Procedures for processing Requests and Bank processes Requests using security procedures chosen by Company, Company expressly agrees to be bound by any Request, whether or not authorized, issued in its name and accepted by Bank in compliance with the security procedures chosen by Company.

**4.3   LIMITED PURPOSE.** The purpose of the Security Procedures is to verify the authenticity of the communication, transaction and/or transmission and not to detect an error in the content of the communication, transaction and/or transmission.  If Bank receives a communication, transaction and/or transmission that complies with the Security Procedures, Company agrees that Bank may treat it as authorized by Company.

**4.4   ADEQUACY OF SECURITY PROCEDURES.**  If, at any time, Company believes that the Security Procedures are not adequate or commercially reasonable for any reason, or if Company believes that any Security Procedure has been compromised, Company will not use the Service to conduct Company's communication, transaction and/or transmission. Company's use of the Service shall be evidence of Company's acknowledgement and agreement that the applicable Security Procedure is adequate and commercially reasonable, and that Company is not aware of any compromise to the Security Procedure.  This acknowledgement continues so long as Company uses the Services.

**4.5   NOTIFICATION REGARDING SECURITY PROCEDURE COMPROMISE.** If Company believes or suspects that any Security Procedure has been compromised in any manner or that an unauthorized Third Party (**"Unauthorized Person"**) obtains access to any Service, whether or not such Unauthorized Person is employed by Company, Company agrees to notify Bank immediately by telephone at 855.336.9460, followed by confirmation via email to businessclientservices@tcfbank.com. Such compromise or unauthorized access will not affect any transfers and/or transactions Bank makes in good faith, in compliance with the Security Procedures, prior to Bank's receipt of Company's notification of a compromise or unauthorized access and for a reasonable time period thereafter. In addition, Bank will not be liable to Company, or any Third Party, in connection with any such compromise or unauthorized access, including, without limitation, for receiving information from or providing information to the Unauthorized Person or for relying upon, acting on, or following instructions from such Unauthorized Person, unless (i) Bank directly caused the compromise or unauthorized access; or (ii) Company provided Bank with reasonably sufficient and detailed advance Notice of the compromise or loss or theft of the Access Codes.

**4.6   EFFECT OF COMPROMISED SECURITY PROCEDURES.** If Company notifies Bank, or Bank has reason to believe, that Company's access to Digital Banking or a Service has been or may be compromised, Bank may, in its discretion: (i) modify an existing Security Procedure or require a new Security Procedure to be used; and/or (ii) temporarily suspend or permanently terminate Digital Banking or the affected Service. Bank may notify Company of a breach in security or a change in Security Procedures due to a breach in security in any manner Bank determines is the most expeditious. Such Notice shall be deemed effective immediately when given.

**4.7   LIABILITY FOR FAILURE TO MAINTAIN SECURITY PROCEDURES.** If Company does not comply with all recommended and required Security Procedures or this Section 4, Company agrees that Company: (1) accepts the entire risk of Loss due to Company's failure to implement such controls and standards and (2) shall defend, indemnify and hold harmless Bank and Bank-Related Parties from and against any and all Losses incurred by any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by Company or any Third Party with respect to, caused by or arising from Company's failure to comply with the recommended and required Security Procedures.  Bank also will not be liable to Company for substandard performance or failure of a Service if Company does not follow the Security Procedures.

**5.   USA PATRIOT ACT AND OFAC.** In compliance with the USA PATRIOT Act, Bank has adopted a Customer Identification Program for the verification of the identity of Bank's customers. Company agrees to provide all documents deemed necessary by Bank to adequately confirm Company's identity and the identity of any persons authorized to use or access any Service. Bank reserves the right to withhold any Service until Bank has, to its satisfaction, verified the identity of Company and any persons authorized to use or access any Service.  Company also acknowledges and agrees that Company's identity, and the identities of any persons authorized to use or access any Service, will be compared against the SDN List, and that Bank will not provide any Service to any person or entity that appears on that list. Company is responsible to obtain information regarding OFAC enforced sanctions (see the OFAC's website at https://www.treasury.gov/resource-center/sanctions).

**6.   SOFTWARE AND TECHNICAL SPECIFICATIONS**
   **6.1   SOFTWARE.**
      **6.1.1      General.** Bank claims and reserves all rights and benefits afforded under copyright law in all software programs and user materials that constitute the Software and in all system documentation related to the Software, as unpublished works. Company hereby authorizes Bank to enter Company's premises in order to inspect the Software in any reasonable manner during regular business hours.
      **6.1.2      Software with a Separate License Agreement.** If Bank provides Company with Software that comes with a separate license agreement, the terms of the Software license shall apply with respect to the Software. Company is responsible, at Company's cost, for the

correct set-up and installation of all Software.  Due to periodic upgrades in Software, new releases may be issued. If there is a fee associated with a new release, Company will pay this fee.  Company is responsible, at Company's cost, for the installation, maintenance, and support of any new releases of Software.  Company will immediately return to Bank any Software and associated documentation upon cancellation of the Service or termination of the Agreement, or earlier upon demand by Bank.

**6.1.3    Software Without a Separate License Agreement.**  If Bank provides Company with Software that does not come with a separate license agreement, the following provisions apply to the Software:

(a)    Company shall not decompile, disassemble or reverse engineer the Software or assign, sell, lease, disseminate or give the Software, Software documentation or Service documentation to any Third Party without Bank's prior written consent.

(b)    Copying of the Software and related documentation is limited to one (1) copy for archival and backup purposes only.

(c)    Company does not acquire any proprietary interest or rights in the Software, Bank systems or related documentation.

(d)    The Software may not be used in any country where the U.S. government prohibits such use.

(e)    If the Software is defective and Company reports the problem to Bank within sixty (60) days of receiving the Software, Bank may, at its option, provide Company with new Software or reimburse Company fees paid for the Software.

(f)    If Company paid for the Software and Service that Company was not able to use, the remedies set forth in this **Section 6.1** constitute Company's sole remedies, and Bank's sole obligations, in connection with errors or problems with the Software.

**6.2    TECHNICAL SPECIFICATIONS**

**6.2.1    Company's Responsibilities.**  Bank may recommend or require specific hardware and/or software to be used in connection with one or more Services.  Company will be responsible, at Company's cost, for providing, installing, operating, and maintaining computers and other systems capable of accessing and using Digital Banking. Company will conform Company's computers and systems to the requirements necessary to access and otherwise use Digital Banking. Bank may change these requirements from time to time.

**6.2.2    Disclaimer of Warranties and Limitation of Liability.**  Bank makes no representations or warranties in regard to, nor will it provide technical support for, such hardware and/or software. Bank will not be liable to Company for any claims by Company related to the use or quality of the Service if Company fails to make required or recommended upgrades to browsers, operating systems, equipment and/or software and/or to use such recommended browsers, operating systems, equipment and/or software. If software is installed and Company changes Company's hardware or operating system after installation, Bank will not be responsible if such change results in substandard performance or non-performance of the Service.

## 7.    CONFIDENTIALITY AND PROPRIETARY PROPERTY

**7.1    COMPANY'S INFORMATION.** Company authorizes Bank to disclose information concerning Company that comes into Bank's possession in connection with the Account(s) and Services with its affiliates and Third Parties if permitted by applicable Legal Requirements. Without limiting the foregoing, Company agrees that Bank may disclose Company information in order to provide Company with the Services, including, but not limited to, disclosure to Bank's vendors, Third-Party service providers and Bank's subsidiaries and affiliates.

**7.2    THIRD-PARTY INFORMATION.** If Company gains, through Company's use of one or more Services, access to any information relating to any person other than Bank, Company or any of Company's affiliates which have authorized Company's receipt of such information, Company agrees to promptly notify Bank and to treat such Third-Party information as confidential and not disclose it to any person outside Company or to any persons within Company except those who have a need to know. Further, Company shall ensure that adequate measures are taken to protect the unauthorized use of any such Third-Party information and shall not use any such Third-Party information for Company's own purposes. Company shall return such Third-Party Information to Bank at Bank's expense or destroy it at Bank's request.

**7.3    BANK'S PROPRIETARY PROPERTY.** The Agreement, Software, Services and User Guides are Bank's proprietary property with commercial value to Bank. Company agrees to keep such proprietary property confidential except to the extent disclosure is required by Laws or if Bank agrees in writing to Company's disclosure. If Company is required by Laws or court order to disclose Bank's proprietary property, Company must notify Bank as soon as possible before making the disclosure unless Laws or court order prohibit Company from doing so.

## 8.    WARRANTIES, REPRESENTATIONS AND ERRORS

**8.1    REPRESENTATIONS AND WARRANTIES.** Company represents and warrants to Bank that:

(a)    If not an individual, Company is either a duly incorporated or organized entity, validly existing, and in good standing in the state of Company's organization, or a legally valid trust created or established pursuant to applicable law.

(b)    The execution, delivery and performance by Company of the Agreement are duly and validly authorized by all necessary action and do not violate Company's charter or by-laws or any Legal Requirements or contractual restrictions.

(c)    Company's use of the Account(s) and Service(s) are for business and not for household purposes and Company is not a "consumer" as that term is commonly used in Laws governing consumer transactions.

(d)    The Agreement constitutes the legal, valid and binding obligation of Company and is enforceable against Company in accordance with the terms of the Agreement.

(e)    Company's execution, delivery and performance of the Agreement does not require authorization, approval or other action by; notice to; or filing with any governmental authority or regulatory body.

(f)    No information furnished by Company to Bank in connection with the Agreement is inaccurate in any material respect, contains any material misstatement of fact, or omits any fact necessary to make such statements not misleading.

(g)    Company's use of the Services and all transactions and communications that Company initiates using a Service comply with all Legal Requirements and do not include sending funds to, from, or on behalf of any person, business or country subject to U.S. sanctions.

(h)   No oral or written representation or statement, which is not expressly set forth in the Agreement or incorporated by reference, was relied upon to induce Company to enter into the Agreement.

**8.2   DISCLAIMER OF WARRANTIES.**  Any Service, Software, equipment and/or communication interface that Bank provides or licenses to Company is provided on an "as is" basis.  Except as required by Laws, Bank makes no representations, warranties, or guaranties, express or implied, and disclaims all warranties in connection with any Service, Software, equipment and communication interface including any warranty of merchantability, fitness for a particular purpose or suitability of the Service for Company, or as to the compatibility of Software, equipment or communication interfaces with those of Company.

**8.3   ERRORS**

    **8.3.1      Company's Responsibility.**  Company acknowledges that it is not possible for Services to be free of operator, program or equipment error, and that errors in processing and compiling account data may occur that require adjustments. As such, Company has sole responsibility for confirming the accuracy and validity of all information provided by Bank to Company in connection with its Accounts through Digital Banking, in periodic statements, or through other means.

    **8.3.2      Account Reconciliation.**  Company agrees to carefully review all records, periodic statements and other information provided to Company by Bank and to report any discrepancies within a reasonable time not to exceed thirty (30) days (except where applicable Laws provide otherwise) of Company's receipt of the record, periodic statement or other information. If Company fails to report to Bank the existence of any such discrepancies within the time provided in this Section, Company is deemed to have accepted the record or other information as valid and accurate and shall be precluded from asserting the discrepancy against Bank.

    **8.3.3      Limitation of Liability.**  Bank shall not be liable for any Losses resulting from Company's failure to give Notice with respect to any information, data, transaction, communication, transmission or processing service.  Unless otherwise required by Laws, Bank's sole responsibility for reporting errors caused by it will be to reprocess information and reports for the applicable period in question and to submit corrected reports at its own expense to Company.

## 9.   TERMINATION OF SERVICE

**9.1   TERMINATION BY COMPANY.**  Company may terminate the Agreement or any Service with or without cause, by giving thirty (30) days prior written Notice to Bank, unless a specific Service requires a longer notice period. If requested, Company and Bank will agree on an effective termination date following such notice and different Services may have different effective termination dates. If Company terminates the Agreement, all Services will terminate. If Bank requests, Company will execute required documentation relating to termination.

**9.2   TERMINATION BY BANK.**  Bank may terminate the Agreement and/or any Service at any time, with or without cause, effective upon providing telephonic notice of such termination (to be subsequently confirmed by written notice) to Company.  In addition, Bank may terminate any Service immediately, without prior notice, if: (i) Company breaches any agreement with Bank; (ii) any Security Procedure is compromised; (iii) Bank has reason to believe that an unauthorized transaction has taken or may take place involving Company's Account or a Service; (iv) Company becomes insolvent or the subject of a bankruptcy or dissolution proceeding; (v) Company makes any assignment for the benefit of creditors; or (vi) any material adverse change occurs in Company's financial conditions.

**9.3   RIGHTS AND OBLIGATIONS FOLLOWING TERMINATION.**  Upon the termination of the Agreement or any Service:

(a)   The rights and responsibilities of the parties shall continue through any applicable settlement period;

(b)   Company shall return all Software, hardware, and related documentation provided by Bank for each terminated Service, or, if applicable, physically destroy the Software and related documents and all copies, and provide Bank with a written certification from one of Company's senior officers certifying the destruction and/or removal of such Software and related documents, upon request;

(c)   Company remains responsible for all fees related to each terminated Service prior to the effective date of termination and all such fees are immediately due and payable;

(d)   Company's obligation with respect to any Request or item shall survive termination until any applicable statute of limitations has elapsed and termination shall not affect any other obligation owed by Company to Bank; and

(e)   Company shall maintain records related to its use of the Services for a reasonable period of time following termination of a Service.

## 10.   LIABILITY

**10.1 LIMITATION OF LIABILITY.**  Company acknowledges that Bank has established the fees and charges for each Service in contemplation of the limitations on liability described in the Agreement.  Except as stated otherwise in the Agreement or as applicable Laws may otherwise require, liability and the limitations on liability in regard to a Service, Software, and the Agreement shall be as follows:

(a)   Neither Company nor Bank will be liable to the other for any consequential, special, exemplary, punitive, incidental or indirect loss or damage incurred or suffered in connection with any Service or Software, the Agreement or any Setup Form, including, but not limited to, loss or damage from any negligent act by Bank or from any subsequent wrongful dishonor resulting from Bank's acts or omissions, regardless of either party's knowledge that such loss or damage might be incurred.

(b)   Bank liability, if any, to Company relating to any Service, Software the Agreement or any Setup Form shall be limited exclusively to actual, provable damages Company suffered arising directly from Bank's gross negligence or willful misconduct. If Bank has liability to Company, Bank's liability to Company shall not exceed the amount of fees and charges for the Service in connection with which Bank's liability arose for the twelve (12) month period prior to the events giving rise to the liability.

(c)   Without limiting the generality of the foregoing, Bank shall not be liable for any Losses or delays, arising directly or indirectly, in whole or in part, from (i) Company's actions or omissions, those of Third Parties or other causes, events and/or circumstances which are not within Bank's immediate and reasonable control including, but not limited to, any legal constraint (excluding constraint resulting from criminal conviction); (ii) Company's negligence or breach of any agreement with Bank; (iii) any ambiguity, inaccuracy,

or omission in any instruction or information provided to Bank; (iv) any error, failure, or delay in the transmission or delivery of data, records, or items due to a breakdown in any computer or communications facility or equipment failure not caused by Bank's willful misconduct; (v) accidents, strikes, lockouts or other labor disputes, civil unrest, war, emergency conditions, fire, flood, water damage (e.g., from fire suppression systems), earthquake, epidemics, or acts of God; (vi) the application of any government action, regulatory action, or Legal Requirement; (vii) the lack of an adequate Available Balance in any Account to complete a transaction; or (viii) Bank's inability to confirm to Bank's satisfaction the authority of any person to act on Company's behalf.

**10.2 TIME FOR BRINGING CLAIMS.**  Any claim, action, suit or proceeding brought by Company against Bank for damages arising out of or in connection with any Service or the Agreement must be brought within ninety (90) days, from the time the act or omission giving rise to the claim occurred, unless prohibited by Legal Requirements.  Notwithstanding the foregoing, this time period shall not apply to any act or omission involving fraud by the party against whom the claim is being brought.

**10.3 NOTIFICATION OF CLAIMS.** Company agrees to immediately notify Bank of any claim by Company, or any claim made to Company by a Third Party, where an act or omission by Bank related to any Service has allegedly caused Company or such Third Party any damages.

**10.4 INDEMNIFICATION.**  Company agrees to indemnify, defend and hold Bank and Bank-Related Parties, individually and collectively, harmless from and against all Losses, which result directly or indirectly, in whole or in part, from: (i) disputes or legal actions by parties other than Company and Bank concerning a Service; (ii) Bank's providing of the Service(s) to Company, which is in compliance with the Agreement; (iii) Company's failure to comply with applicable Legal Requirements; and/or (iv) Company's breach of any provision of the Agreement, including, but not limited to, any of the representations or warranties made by Company in the Agreement. The obligations in this **Section 10.4** will continue after termination of the Agreement and any Service.

**10.5 COOPERATION.**  If either party may have a Loss with respect to a Service, each party will undertake reasonable efforts to limit the amount of such Loss and to cooperate with each other (as permitted by applicable Laws) in performing Loss recovery efforts.

## 11. NOTICES AND GENERAL COMMUNICATIONS

**11.1 NOTICE TO BANK.**  Any Notice from Company to Bank relating to the Agreement or a Service must be in writing and delivered to Bank by first class U.S. Mail, overnight courier, hand-delivery, facsimile transmittal or email to the street or electronic address set forth below:

> TCF National Bank
> ATTN: Business Client Services
> 2301 W. Big Beaver Rd | Suite 525
> Troy, MI 48084
> Fax Number:  248.244.6946
> Email: BusinessClientServices@tcfbank.com

**11.2 NOTICE TO COMPANY.**  Except as otherwise set forth in the Agreement, any Notice from Bank to Company regarding the Agreement or a Service may be in writing delivered to Company by first class U.S. Mail, overnight courier, hand-delivery, facsimile transmittal, or email to one of Company's current addresses shown in Bank's records at the time notice is sent, or Bank may post the Notice in BeB or on its website.

**11.3 EFFECTIVE TIME.**  Any Notice to Company will be effective on the earliest of the date it is actually received, one Business Day after being sent by overnight courier for receipt next Business Day delivery, or 5 days after it is mailed by first class mail, and properly addressed, whichever is earlier.  If Bank posts a Notice on its website or in BeB, that Notice is deemed effective when posted. Any Notice to Bank will be effective only when Bank has actually received, and has had a reasonable time to act on, such Notice.

**11.4 ACCURACY OF INFORMATION.**  Company is responsible for the content and accuracy of every instruction and all information Company transmits or otherwise communicates to Bank.

**11.5 RELIANCE.**  Each party is entitled to rely on Notices, instructions and communications that are in writing, or other form agreed to by the parties, from a person the recipient reasonably and in good faith believes is authorized to give the instruction received.

**11.6 UNSECURED ELECTRONIC TRANSMISSIONS.**  If Company elects to send to or receive from Bank any information or instructions via unsecured electronic means, including, without limitation, facsimile transmission, voice mail, unsecured email, or other unsecured electronic or telephonic methods ("Electronic Transmission"), Company acknowledges that such Electronic Transmissions include the possibility of error, delay and observation or receipt by unauthorized personnel and Company assumes all risks and losses that result from the nonreceipt, disclosure, alteration or unauthorized access of any such unsecured Electronic Transmission. Bank may rely in good faith on Company's instructions regarding how and to what number or email address Electronic Transmissions should be sent and may rely on any Electronic Transmission that it reasonably believes to have been initiated by Company

## 12. GOVERNING LAW, JURISDICTION, VENUE, ATTORNEY FEES. Bank is a national bank with its main office in South Dakota. Therefore, all disputes relating in any way to the Agreement or the Services will be governed by federal law. Federal law includes the National Bank Act and regulations adopted by the Comptroller of the Currency. To the extent state law applies and is not preempted, the substantive and procedural law (but not the conflict of law rules) of the State of South Dakota will apply.  Unless any dispute is subject to arbitration as set forth in the Account Contract, both parties agree that all actions or proceedings arising in connection with the Agreement or with respect to any Service, shall be tried and litigated only in the federal or state courts located in Minnehaha County, South Dakota, in Hennepin County, Minnesota, or in Midland County, Michigan and each party submits to the jurisdiction of the selected court for purposes of any such proceeding.  Each party expressly waives any objection that it may have based on improper venue or forum non conveniens to the conduct of any such suit or action in any such court. If Bank is the prevailing party in any proceeding arising out of the Agreement or with respect to any Service, Bank shall recover from Company its attorneys' fees, court costs, and out-of-pocket expenses, including expert witness fees.

*13.  JURY TRIAL WAIVER.* Company and Bank, after consulting or having had the opportunity to consult with counsel, knowingly and voluntarily, and for their mutual benefit, each irrevocably waive any right to trial by jury in any judicial proceeding in any way arising out of, related to or connected with the Agreement or any Service.

*14.  GENERAL TERMS.*
**14.1 CONFLICTING TERMS.**
**14.1.1    Entire Agreement; Priority.** The Agreement represents the entire agreement between the parties with respect to its subject matter and supersedes all prior oral or written representations, agreements, or other communications, relating to the subject matter of the Agreement, provided that Service setup directions and the Administrator designation made by Company and implemented by Bank for Company's Services prior to the effective date of these Terms and Conditions will remain in effect unless and until Company provides Bank in writing with updated Service setup directions or an updated Administrator designation. The provisions of the various documents that make up the Agreement shall, to the extent possible, be interpreted so as to supplement each other and avoid any conflict between them. However, in the event of a conflict among the Agreement documents, the Agreement documents will have the following order of precedence as to a Service, unless and only to the extent expressly provided to the contrary elsewhere: (i) the provisions of **Section IV** of the Agreement for any Service covered by that Section and the provisions of the BeB Agreement for any Core Service; (ii) the provisions of **Sections I, II,** and **III** of the Agreement; (iii) the Fee Schedule for the Service(s); (iv) the Setup Forms; and (v) the Authorization.
**14.1.2    Other Agreements; Priority.** In addition to the Agreement, Company and Bank may enter into other agreements relating to the Services. In the event of a conflict between the Agreement and such other agreements, the following terms shall apply: (i) if the terms of the Agreement conflict with the terms of the other Account Contract documents, the conflicting term in the Agreement shall prevail, but only to the extent of the conflict and only as to the applicable Service; and (ii) if the Service requires Software, the terms of each Software license agreement shall supersede any conflicting terms regarding the Software and its use that are contained in the Agreement, if any.
**14.2 SEVERABILITY.** If there is a conflict between the Agreement and applicable non-waivable Legal Requirements, the Agreement will be considered changed to the extent necessary to comply with such Legal Requirement. If any provision in the Agreement is declared invalid, unenforceable or illegal by any adjudicatory body of competent jurisdiction or any governmental regulatory agency, such provision shall be construed as being severed from the Agreement and shall not affect the validity or enforceability of the remaining provisions. Any provision of the Agreement found invalid or unenforceable only in part or degree will remain in full force and effect to the extent not found invalid or unenforceable. If performance of any Service in accordance with the Agreement would result in violation of any Legal Requirement to which Bank is subject, the Agreement shall be deemed amended to the extent necessary to comply with such Legal Requirement.
**14.3 WAIVER.** A waiver by either Bank or Company of any term or provision in the Agreement shall not be construed as a waiver of such term or provision at any other time or in any other document.
**14.4 ASSIGNMENT.**  Company may not assign or transfer Company's rights or obligations under the Agreement without Bank's prior written consent.  Bank will give Company thirty (30) days prior notice if by contract Bank assigns Bank's rights and obligations of the Agreement to a Third Party who is not Bank's affiliate or subsidiary.  Such notice is not required if the assignment is a result of operation of law due to merger or acquisition and Bank is not the surviving entity/successor.
**14.5 BANK NOT A FIDUCIARY.** Nothing contained herein shall be deemed to create fiduciary status on the part of Bank in connection with the provision of any Service.  The foregoing notwithstanding, to the extent, if any, that Bank is deemed to be a fiduciary of Company in providing a Service, the Agreement is not intended to, nor shall it, relieve Bank of any fiduciary responsibility otherwise imposed on it by Law. Bank is not responsible for detecting errors by Company or others, even if Bank takes actions from time to time in an effort to detect errors.
**14.6 NO THIRD-PARTY BENEFICIARIES.**  Except as expressly provided herein, no other person or entity shall be deemed to be a Third-Party beneficiary of the Agreement.
**14.7 HEADINGS.** The section headings in the Agreement are intended to be for reference purposes only and shall in no way modify or restrict any of the terms or provisions of the Agreement.

## III.  TERMS APPLICABLE TO ALL DIGITAL BANKING SERVICES.

*1.  AGREEMENT.* Company's use of Digital Banking to access any Service is governed by the Agreement, including these Terms and Conditions and the BeB Agreement (each as updated from time to time). The provisions of these Terms and Conditions and the BeB Agreement shall, to the extent possible, be interpreted to supplement each other and avoid any conflict between them.  However, these Terms and Conditions will govern any conflict with the BeB Agreement, but only to the extent of the conflict.

*2.  AUTHORIZED REPRESENTATIVES FOR DIGITAL BANKING*
**2.1  SELECTION OF PRIMARY ADMINISTRATOR.** Company shall designate one (1) primary Administrator to serve as Company's primary contact with Bank for the Services. This Administrator may or may not be an Authorized Signer on the applicable Accounts, in Company's discretion, and Company acknowledges and agrees that the Administrator will have substantial authority with respect to the Accounts even if not an Authorized Signer. Until Bank has received notice of a change in Company's Administrator and has had a reasonable time to act thereon, Bank may continue to act pursuant to Company's most current Administrator designation on file at Bank.
**2.2  ADMINISTRATOR'S RESPONSIBILITIES.**  Company represents, warrants and agrees with Bank that the primary Administrator shall have authority to manage Services and Digital Banking on behalf of the Company for all its Accounts, including, without limitation:
(a)  add, delete or change any or all Services;
(b)  enter into agreements for Services;
(c)  execute documents and give Notices related to Services;

(d)   provide and change setup instructions and security designations for each Service, including requesting Direct Send access to applicable Services, and execute Setup Forms

(e)   select each Account to be used with each Service

(f)   initiate and approve transactions on the Account(s) in Digital Banking up to the Company's limits for the applicable transfer Services.

(g)   add, modify, and delete Users and other Administrators for the Services;

(h)   establish and modify Account and Service access, authority and limits of Users and Administrators, including but not limited to approval requirements and limits for Bill Pay, ACH, Online Wire Transfers, and Internal Transfers (if such Services are enabled);

(i)   add or remove dual control and change approval requirements for any Service with this functionality, including Bill Pay, ACH, Online Wire Transfers, and Internal Transfers;

(j)   disable Users and User's access rights;

(k)   re-set applicable Access Codes for Users

(l)   monitor all Services;

(m)   issue instructions and authorizations to Bank in connection with all Services,

(n)   exchange communications with Bank regarding Company, the Account(s) and the Services, and

(o)   take all other actions necessary or desirable for Bank's provision of and Company's receipt of each Service

**2.3   USERS.**   Company will manage its Users for Digital Banking and the Services through the Administrator. If permissioned by the Administrator, Users may access and conduct transactions on Accounts even if they are not Authorized Signers on such Accounts. Company also agrees that Users may make verbal or written instructions to Bank in connection with Services for which such User is authorized and Bank, in its discretion, may act on such instructions.  For example, a User of ACH Services may complete an ACH Reversal request form.

**2.4   ACCESS CODES.**   Bank will provide each Administrator with the necessary Access Codes to gain access to Digital Banking.  The Administrator will manage Access Codes for Users. Company represents and warrants that it will limit access to Digital Banking to those Administrators and Users who require access to perform their jobs.

**3.   ACCESS TO SERVICES.**   Except for Cash Vault, Investment Sweep, and Lockbox, all Services are accessed through Business eBanking and Company must enroll its Accounts in Business eBanking if using any Service accessed through Business eBanking.

**4.   AVAILABILITY AND MAINTENANCE.**   Subject to the terms of the Agreement, Bank will use commercially reasonable efforts to provide access to Services available through Digital Banking twenty-four (24) hours a day, seven (7) days a week. Company acknowledges that Digital Banking may be unavailable due to congestion on circuits supplied by Third Parties or due to downtime by Third Parties. Bank reserves the right to change the hours of availability by giving Company notice. Bank may schedule temporary interruptions of Digital Banking and may interrupt Digital Banking without prior notice for unscheduled maintenance when Bank deems it necessary to do so.

**5.   USER GUIDES.**   Company agrees to comply with the instructions for using the Services described in User Guides for the applicable Service and/or Digital Banking.

## IV.  TERMS APPLICABLE TO SPECIFIC TREASURY MANAGEMENT SERVICES

The following terms and conditions are applicable to specific Services offered by Bank.  The BeB Agreement contains the terms and conditions applicable to the Core Services. Certain Services may not be available or provided to all Bank customers at all times. Bank may change the number or type of Services offered at any time.  Company is bound by the terms and conditions for each Service described in this **Section IV** that Company uses for any of its Account(s). All capitalized terms used in this **Section IV** that are not defined in the context of each Service shall have the meanings ascribed to them in **Section I** above.

**1.   ACCOUNT RECONCILIATION PLAN ("ARP")**

**1.1   SERVICE OVERVIEW.**  Bank's ARP Service may be used to streamline Company's checking account balancing and reconciliation tasks. ARP service options can help Company achieve greater account accuracy, efficiency, and security, while at the same time realize cost reductions.  ARP Service options include:

**1.1.1   Full Reconciliation.**  Bank will make available for download through Business eBanking all activity posted to Company's Account(s) during the timeframe designated by Company.  Company may also upload to Bank through Business eBanking its checks issued for more accurate reconciliation.

**1.1.2   Partial Reconciliation.** Bank will make available for download through Business eBanking all deposit activity or checks posted to Company's Account(s) during the timeframe designated by Company.

**1.1.3   Deposit Reconciliation**.  Bank will make available for download through Business eBanking all deposit activity posted to Company's Account(s) during the timeframe designated by Company

**1.2   COMPANY'S OBLIGATIONS.**  Use of the ARP Service does not affect any of Company's obligations described in the Account Contract to discover and report with respect to Company's accounts: (a) unauthorized signatures, alterations or endorsements on checks; and (b) unauthorized transactions and other discrepancies.

**1.3   BANK'S OBLIGATIONS**.  Company's use of the ARP Service or Bank's receipt of information associated with the ARP Service does not impose on Bank any obligation or duty with respect to Company's accounts or the payment of checks, and Bank shall have no obligation to examine or inspect any check for completeness or authorization or to determine whether a check is properly payable.

*2.*   *ACH ORIGINATION*

**2.1   SERVICE OVERVIEW.**  Bank offers both standard and prefunded ACH Services. Standard ACH services require credit approval of Company by Bank. Unless otherwise noted, all provisions of this **Section 2** apply to both standard and prefunded ACH services. Prefunded ACH services permit only credit Entries so the provisions of this **Section 2** applicable to originating debit Entries do not apply to Company if it uses only prefunded ACH services. Company may be approved for prefunded ACH services for credit Entries and standard ACH services for debit Entries, in which case, all provisions of this **Section 2** apply to Company.

**2.2   DEFINITIONS.**  All capitalized terms used in this **Section 2** not defined in the Agreement shall have the meanings ascribed to them in the NACHA Rules.

**2.3   INITIATION OF ENTRIES.**  If approved for ACH Origination Services, Bank will permit Company to transmit Entries to Bank using the Standard Entry Class codes (**"SEC Codes"**) approved for Company by Bank. Bank is under no obligation to permit Company to initiate Entries using all SEC Codes and may, in its discretion, revoke, suspend or terminate Company's ability to use any SEC Code upon notice, with or without cause, or reject any ACH Entry or data, without advance notice, that seeks to effect an Entry type not offered or implemented by Bank for Company. Company agrees to populate Company Name, Originator Name, Origin Name or similarly titled field with the name by which Company is known and readily recognized by the Receiver of the Entry.

**2.4   FORM AND FORMAT.**  Company must conform all Entries to the format, content, data encryption, and other specifications contained in the NACHA Rules. Company shall submit Entries to Bank in the form of balanced or unbalanced files, as required by Bank. Any corresponding offset or settlement transaction must be to an Account designated for ACH Services and contained within the file supplied by Company. Bank will not create offset or settlement transactions on behalf of Company. Bank will not allow accounts held at other financial institutions to serve as the offset or settlement account within the file.

**2.5   TRANSMISSION OF ENTRIES.**  Company will transmit Entries to Bank through Business eBanking or, if approved by Bank, through the Direct Send Services.  If Direct Send is used, Company's ACH files must adhere to Bank's current naming conventions and file specifications. Company will transmit all Entries to Bank on or before the applicable Cutoff Time for the Entries. Except for Same-Day ACH Entries, ACH files must be transmitted to Bank before the Cutoff Time a minimum of one (1) Banking Day prior to the Effective Entry Date and are preferred at least two (2) Banking Days prior to the Effective Entry Date. Company authorizes Bank to transmit all Entries received from Company to the ACH Network and to credit or debit such Entries to the specified Accounts.

**2.6   BANK RIGHTS AND OBLIGATIONS.**  Bank will act as the originating depository financial institution with respect to Company's Entries and will process, transmit, and settle for the Entries received from Company which comply with the terms of the Agreement in accordance with the NACHA Rules.  Bank shall have no obligation to transmit Entries if Company is in default of any of its obligations under the Agreement or transaction(s) or file(s) are believed to be fraudulent or erroneous. In addition to its other rights, Bank reserves the right to limit the nature and amount of Entries or refuse to process any Entries if, in Bank's sole judgment (a) there is reasonable cause to believe that any Entry will be returned or will not settle for any reason; (b) to do otherwise would violate any limit set by the applicable clearing house association or any governmental authority or agency to control payment system risk; or (c) a credit Entry or the return of a debit Entry may create an overdraft of Company's Account. If Bank decides not to process an Entry, Bank will notify Company and such notification may occur through Digital Banking. Bank may engage Third Parties to provide any Service.  Bank shall have no obligation to disclose arrangements with Third Parties to Company or obtain Company's consent thereto. Company authorizes the transfer of information relating to Company to agents of Bank or Company for use in connection with any Service or as required by applicable Laws.

**2.7   ACH EXPOSURE LIMITS AND OVER LIMIT ENTRIES.**

**2.7.1   ACH Exposure Limits.**  Bank will establish for and communicate to Company an ACH exposure limit setting the maximum aggregate dollar amount for Entries initiated by Company and all Affiliates that have not yet settled (**"In-Process Entries"**) and during a Banking Day (separately and together, the "**ACH Exposure Limit**"). Company agrees not to initiate ACH Entries that would cause Company and the Affiliates to exceed the ACH Exposure Limit.  Bank's establishment of an ACH Exposure Limit should not be interpreted or construed by Company as a commitment or agreement to provide any credit or loans to Company and is subject to modification or termination by Bank at any time. Bank may monitor and periodically review Company's ACH Exposure Limit and compliance therewith and may, in Bank's sole discretion, cease processing Entries based on such review.

**2.7.2   Over Limit Entries.**  Company agrees that Bank may not process an Entry if it would cause the aggregate amount of permitted In-Process Entries or daily Entries to exceed the ACH Exposure Limit (**"Over Limit Entry"**).  If Company wishes to initiate an Over Limit Entry, Company may submit to Bank its request for a temporary increase to its ACH Exposure Limit.  Bank may grant or deny Company's request for a temporary increase to its ACH Exposure Limit at its sole discretion.  Once Bank rejects or processes Company's Over Limit Entry, Company is subject to its prior ACH Exposure Limit for all subsequent Entries.  Company must submit a new request for a temporary increase for any subsequent Over Limit Entry Company wishes to originate.

**2.8   NACHA RULES.**

**2.8.1 Company's Obligations.**  Company agrees to be bound by the NACHA Rules, as amended from time to time and is responsible for determining its obligations (as an Originator or Third-Party Sender/Service Provider of ACH Entries or otherwise) under the NACHA Rules and applicable Laws. Company shall not initiate any ACH Entries until Company familiarizes itself with the NACHA Rules and applicable Laws. The duties of Company in the Agreement in no way limit the requirements of complying with the NACHA Rules.

**2.8.2   Third-Party Service Providers.**  If Company uses any Third-Party vendor or processor in connection with its ACH Origination Services (a **"TPSP"**), this TPSP is acting as Company's agent and Company is responsible for its Third-Party Service Provider's compliance with the NACHA Rules and Company agrees to obtain an agreement with the TPSP that it will comply with all applicable NACHA Rules.

**2.8.3   Provision of NACHA Rules.** Company may access the current NACHA Rules through Business eBanking (see Administration tab and then select "ACH Rules Online"). Bank has no duty to continue to provide the NACHA Rules to Company and, if Bank does not do so,

Company may obtain copies of the NACHA Rules from www.NACHA.org. Costs associated with NACHA publications and/or association membership are the responsibility of Company. Bank shall have no obligation to educate Company on its specific obligations as an Originator of ACH Entries under the NACHA Rules or any other applicable Legal Requirements. Company shall have a continuing duty to check NACHA's website for ACH Rule updates or changes on a regular basis.

**2.9  U.S. LAWS.**   Company agrees and warrants to Bank that all actions by Company, including the preparation, transmittal, and settlement of Entries, shall comply with Legal Requirements, including all regulations, guidelines, and commentaries issued by the Board of Governors of the Federal Reserve and the Federal Banks Examination Council.  Company agrees not to originate Entries that violate any applicable Legal Requirement. Company agrees that the performance of any action by Bank to debit or credit an account or transfer funds otherwise required by the NACHA Rules is excused to the extent that the action is inconsistent with Legal Requirements.  Company agrees to indemnify Bank on demand for any fines or penalties assessed against Bank as a result of any violations of the NACHA Rules or other Legal Requirements by Company or any of its Third-Party Service Providers, and any such fines or penalties shall be immediately due and payable.

**2.10  AUTHORIZATIONS.**

**2.10.1    Receiver Authorizations.**  Before Company initiates any Entry, Company will obtain from the Receiver proper authorization for the Entry in accordance with the NACHA Rules and Legal Requirements.  An authorization must be readily identifiable as either an ACH credit or debit authorization and must clearly and conspicuously state the terms of the authorization in order that the Receiver understands the authorization. Company must specify in its Receiver authorizations the notification requirements to terminate the authorization. Company agrees that it will initiate no Entry to a Receiver's account after the termination or revocation of a Receiver's authorization.

**2.10.2    Consumer Authorizations.** All debit transactions to consumer accounts must be authorized by the consumer in writing and must be signed or similarly authenticated by the consumer, as permitted by the NACHA Rules, and applicable state laws, with the exception of Entries for RCK, ARC, TEL, and BOC, which are addressed below. For debit Entries, other than RCK, ARC, TEL and BOC Entries, Company must be able to provide the consumer with a hard copy of the consumer's authorization.  Except with respect to POP, TEL, and Single-Entry WEB entries, the authorization must (i) specify that the Receiver may revoke the authorization; and (ii) contain information regarding the manner in which the authorization can be revoked.

**2.10.3    TEL Entries.**  If Company is permitted to make TEL Entries, it must make an audio recording of the consumer's oral authorization or provide the Receiver with written notice confirming the oral authorization prior to the Settlement Date of the Entry. At Bank's request, Company must provide a copy of the written notice or duplicate audio recording of the oral authorization to Bank for its use or for the use of the RDFI requesting the information. The authorization must be readily identifiable as an authorization and its terms must be clear and readily understandable.  The authorization must contain the following minimum information: (i) the date on or after which the ACH debit to the Receiver's account will occur; (ii) the amount of the transaction; (iii) the Receiver's name; (iv) a telephone number for Receiver inquiries that is answered during normal business hours; (v) the date of the Receiver's oral authorization; and (vi) a statement by the Originator that the authorization obtained from the Receiver is for a Single-Entry ACH debit.

**2.10.4    ARC, BOC and RCK Entries.**  If Company is permitted to make ARC, BOC and RCK Entries, authorization consists of: (i) notice from Company to the Receiver, before Company's receipt of Receiver's source document or the item, that Company's receipt of the source document (for ARC and BOC Entries) or item (for RCK entries) constitutes authorization of the Entry in accordance with the terms of the source document or item; and (ii) Company's receipt of the source document or item.

**2.10.5    Retention and Presentment of Authorizations.**  Company must retain an original or copy of a signed or authenticated written authorization, and readily and accurately reproducible records evidencing any other form of authorization. The record of authorization must be retained by Company for a period of two (2) years following the termination or revocation of the authorization. Company, upon Bank's request, must present the original, copy, or other accurate record of the Receiver's authorization to Bank for its use or for use by the RDFI within five (5) Banking Days of Bank's request.

**2.11  PRENOTE ENTRIES.**  If Company chooses to originate a non-dollar Prenote Entry to verify the accuracy of a Receiver's routing and account numbers, Company agrees not to initiate live dollar Entries to that account until at least three (3) Banking Days following the Settlement Date of the Prenote Entry.  Prenotes will be provided to Bank in the format provided in the NACHA Rules.  If the Prenote results in a rejection, return or Notification of Change, Company will research the problem and make any necessary corrections before transmitting another Entry.  If Company chooses not to send Prenote Entries to verify the accuracy of a Receiver's account, Company is solely responsible for any Entries that are misrouted to incorrect accounts.  Bank may require Company at any time to use the Prenote option as a way to reduce their ACH Return Rates.  Bank will communicate directly to Company if the use of Prenotes is required

**2.12  NOTIFICATIONS OF CHANGE.**  If Bank receives a Notification of Change (**"NOC"**) Entry from the ACH Operator, Bank will notify Company no later than two (2) Banking Days after the Settlement Date of the NOC.  Company understands that the NACHA Rules require Bank to act on a NOC within three (3) Banking Days of the receipt of the NOC or before initiating another Entry to the same Receiver's account, whichever is later.  If the NOC is incorrect, Company will generate a refused NOC and deliver it to Bank within fifteen (15) calendar days. Company understands that by submitting an Entry to Bank with erroneous information that such Entry would not have otherwise contained had Company complied with the applicable NOC, Bank or Company may be subject to fines and other penalties under the NACHA Rules.

**2.13  ON-US ENTRIES.**  For any Entry within an ACH File submitted to Bank destined for a Receiver account at Bank (an **"On-Us Entry"**), Bank may debit or credit each Receiver's account at Bank from which or to which an ACH debit or credit Entry is to be made in the amount of such Entry on the date specified in the File for the Entry, without submitting the On-Us Entry data through an ACH Network.

**2.14  SECURITY PROCEDURES.**  Company agrees to follow applicable Security Requirements established by NACHA and the Security Procedures applicable to ACH originations. Without limiting the foregoing, Company should:

(a)  Establish, implement, and update, as appropriate, policies, procedures, and systems with respect to the initiation, processing, and storage of Entries that are designed to:  (i) protect the confidentiality and integrity of Protected Information until its destruction; (ii)

protect against anticipated threats or hazards to the security or integrity of Protected Information; and (iii) protect against unauthorized use of Protected Information.

(b)  Promptly notify the Bank if any unauthorized person may have gained access to Protected Information.

(c)  Ensure that information contained in or related to any ACH Entry is, at all times, from the point of data entry through transmission, encrypted or transmitted via a secure session, in either case using a commercially reasonable technology that provides a level of security that, at a minimum, is equivalent to current NACHA recommendations for encryption technology. Information required to be so protected includes ACH entries, routing numbers, account numbers, PINs or other identification symbols or information.

If Company fails to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures, Company acknowledges and agrees that Company: (1) accepts the entire risk of loss due to Company's failure to implement such controls and standards and (2) shall defend, protect, indemnify and hold harmless Bank and Bank-Related Parties from and against any and all Losses suffered, incurred by or made against any of them by reason of, arising directly or indirectly out of, or in connection with any claim, allegation or assertion made by Company or any Third Party with respect to, caused by or growing out of Company's failure to maintain information security controls and standards that meet the minimum requirements of the NACHA Security Requirements and the Security Procedures.

**2.15  MANDATED CONTROLS.**  Company acknowledges that Bank may from time to time require that Company maintain internal controls and processes related to ACH origination as a condition to Bank's agreement to continue providing ACH Services to Company.

**2.16  WARRANTIES.**  Company is deemed to make the same representations and warranties to Bank that Bank makes under the NACHA Rules and applicable Laws, to other participating financial institutions in the ACH Network with **respect** to Entries that Company originates. Without limiting the foregoing, Company warrants and represents that:

(a)  All Entries will be complete, accurate, and authorized, and comply in all respects with the NACHA Rules and applicable Laws;

(b)  Company shall obtain written authorizations from Receivers for credit and/or debit Entries to those Receivers' accounts at participating financial institutions;

(c)  Receiver authorizations shall comply with the NACHA Rules and specifically authorize Company to release to Bank all information concerning Receivers that may be required by Bank to enable Bank to recover erroneous funds transfers;

(d)  Company shall cease initiating Entries for a Receiver's account(s) immediately upon Company's receiving actual or constructive notice of the termination or revocation of the Receiver's authorization, and Bank shall not be liable for Company's unauthorized transmission of such Entries;

(e)  Company will retain all documentation as required by the NACHA Rules and applicable Laws; and

(f)  All Entries will comply with and be transmitted or otherwise delivered to Bank in accordance with, the formatting and other requirements Bank provides to Company.

**2.17  ADDITIONAL WARRANTIES FOR ORIGINATION OF WEB ENTRIES**.  If Company obtains authorization from a Receiver over the Internet, Company represents and warrants that:

(a)  Company utilizes a commercially reasonable fraudulent transaction detection system to screen each WEB Entry;

(b)  Company employs commercially reasonable methods of authentication to verify the identity of the Receiver;

(c)  Company takes commercially reasonable steps to verify that routing numbers are valid; and

(d)  Company conducts annual audits to ensure that the financial information it obtains from consumers is protected by security practices and procedures that include, at a minimum, adequate levels of: (i) physical security to protect against theft, tampering, or damage, (ii) personnel and access controls to protect against unauthorized access and use, and (iii) network security to ensure secure capture, storage, and distribution.

**2.18  DATA RETENTION.**  Company shall retain data on file adequate to permit remaking of Entries for one (1) year following the date of their transmittal by Bank as provided herein and shall provide such data to Bank upon its request.  Company is responsible to retain all items, source documents and records of authorization in accordance with the NACHA Rules.

**2.19  CORPORATE CREDIT ENTRIES SUBJECT TO UCC 4A.** Corporate ACH credit Entries are subject to UCC 4A. Under UCC 4A, credit given by the RDFI to the Receiver for an Entry is provisional until the RDFI receives final settlement through a Federal Reserve Bank or otherwise has received payment as provided for in Section 4A-403 of UCC 4A. If the RDFI does not receive final settlement for the Entry, the RDFI is entitled to a refund from the Receiver in the amount of the credit to the Receiver's account, and the Originator shall not be deemed to have paid the Receiver the amount of the credit Entry.

**2.20  SETTLMENT AND PREFUNDING.**

**2.20.1  Entry Settlement.** Company shall provide Bank with immediately available funds not later than the Cutoff Time on each Settlement Date sufficient to pay all Entries initiated by Company which are to be settled on that date.  Company hereby authorizes Bank to make deposits, withdrawals and transfers to and from Company's Accounts as appropriate or necessary in connection with any of the ACH Services provided by Bank.  Notwithstanding anything in the Agreement to the contrary, Bank reserves the right to require that a sufficient Available Balance be in Company's Account prior to the time any Entry is processed by Bank.

**2.20.2  Credit Entries and Prefunding.**  Even if Company has standard ACH services, Bank reserves the right to require that Company pay Bank in immediately available funds at the time of transmittal or at any time prior to settlement the amount of each credit Entry submitted by Company.  Bank will notify Company if such prefunding is required.  If Bank requires prefunding, Company's Account will be debited for the amount of the applicable credit Entries at the time the File is submitted to initiate such credit Entries.

**2.20.3  Debit Entries.**  Bank shall, on the applicable Settlement Date, credit the Account with the amount of each debit Entry transmitted to Bank.  In the event any Entry is returned in accordance with the NACHA Rules by a RDFI after Bank has provided credit, Company shall, upon demand, repay Bank the amount of the Return Entry.  Bank may require Company to maintain reserves.

**2.21    CANCELLATION OR AMENDMENT OF ENTRIES.**  Company has no right to cancel or change any Entry after Bank has received the Entry.  If Company does request that Bank cancel or change an Entry, Bank, in its discretion, may seek to act upon Company's request before transmitting it to the ACH Network or processing it for credit or debit to an account maintained at Bank.  Bank shall have no liability if it fails to make the cancellation or change.

**2.22   REJECTION OF ENTRIES.**  Bank reserves the right to Reject, without liability, any Entry with or without cause.  Bank shall notify Company of such rejection no later than the Business Day such Entry would otherwise have been transmitted by Bank to the ACH Network or, in the case of an On-Us Entry, its Effective Entry Date.

**2.23   RETURN ENTRIES.**  Bank shall notify Company of a Return Entry by the end of the first Business Day after Bank receives the Return. Bank shall have no obligation to re-transmit a Return Entry if Bank complied with the terms of the Agreement with respect to the original Entry.  Company authorizes Bank to redeposit or reverse the amount of a credit Entry Return to Company's Account as soon as information is made available to Bank.  Company will immediately reimburse Bank with immediately available funds to cover the amount of any debit Entry Return or if any adjustment memorandum that relates to such Entry is received by Bank.  Bank has no obligation to credit Company's Account with interest in the amount of any Return Bank has debited from the Account.

**2.24   REVERSALS.** Company may request that Bank initiate a Reversing Entry for an Erroneous Entry or a Reversing File for an Erroneous File, subject to all requirements of the NACHA Rules. Company must request, complete and deliver to Bank the required reversal request form for a Reversing Entry or Reversing File within four Business Days following the Settlement Date of the Erroneous Entry or File and, if a Reversing File, within twenty-four (24) hours of discovery of the error in the Erroneous File.  Company warrants that it has notified the Receiver of a Reversing Entry of the reversal, and the reason for the reversal, no later than the Settlement Date of the Reversing Entry. If Company timely completes the documents for a Reversing Entry or File, Bank will process such Reversing Entry or File but there is no guaranty that a Reversing Entry or File will result in the return of any funds to Company. For both Reversing Entries and Files, Company indemnifies all parties of the transaction(s) from and against any Losses regardless of whether the RDFI affects the Reversing Entry or File.

**2.25   NAME AND ACCOUNT NUMBER INCONSISTENCY.**  Payment of an Entry which describes the Receiver inconsistently by name and account number may be made on the basis of the account number only, even if it identifies a Person different from the named Receiver, and Company is obligated to pay the amount of the Entry to Bank.

**2.26   INSPECTION.**  Upon reasonable notice from Bank to Company, Bank shall have the right to inspect Company's books and records and to make on-site visits to any and all Company locations with regard to all information deemed by Bank to be necessary or pertinent to Company's use of ACH Services provided by Bank under the Agreement.  Information subject to Bank's right of inspection shall include all information maintained by Company with respect to Company's customers, clients, vendors and processors (including audits) if, in the opinion of Bank, Company's relationship with such customers and clients is materially related to Company's ACH transaction activity conducted through Bank under the Agreement.  Physical site visits may be conducted to ensure notification and communication processes and disclosure requirements are being followed with respect to those addressed in the NACHA Rules. Bank may also require from time to time Company to complete self-audit or assessment forms related to the NACHA rules and Security Requirements.  Failure to not complete the forms or have established practices which follow the NACHA Rules, Security Requirements, and other applicable Laws could result in the immediate suspension or termination of ACH services.

**2.27   INTERNATIONAL ACH TRANSACTIONS.**  Subject to and under the following additional terms and conditions set forth in this **Section 2.27**, Company may initiate international ACH transactions ("IAT" or "IATs") if indicated on its Setup Forms.

**2.27.1    All ACH Provisions Apply.** In addition to this **Section 2.27**, all other provisions in **Section IV.2** apply to IATs as well.

**2.27.2    IAT SEC Codes and User Guide Information.**  IATs are required to use the IAT Standard Entry Class (SEC) codes and provide all additional information set forth in any applicable user guide and the NACHA Rules, as updated from time to time.

**2. 27.3    Costs and Risk of Currency Exchanges.** Company assumes all costs, risks and liabilities associated with or caused by foreign currency exchange rates on all monetary transaction or conversions, including any returned IAT Entries.

**2.27.4    Compliance with International Law.** IATs are exchanged across national borders and are subject to non-U.S. Legal Requirements. These include, without limitation, settlement times that may vary by country; different holiday schedules; and varying rules with respect to the availability of reversals. Some receiving countries may not support reversals. In addition, time frames for return of IATs are determined by the payment system rules of the foreign country and may exceed the return times defined by the U.S. ACH system. Company warrants that each IAT has been authorized in compliance with the Laws and payment system rules of the receiving country.

**2.27.5    Unlawful IATs.** If a scan of an IAT by Bank indicates that it may violate Legal Requirements, Bank will suspend the IAT until the IAT is determined not to violate Legal Requirements or as otherwise directed by Legal Requirements or law enforcement authorities.

**2.28 SAME-DAY ACH.** If requested and approved by Bank, Company may originate qualified ACH Entries under the Rules with a same-day Effective Entry Date.  Same-Day Entries must be submitted by the Cutoff Time for Same Day ACH to be processed as a Same-Day Entry. Same-Day Entries cannot exceed $100,000 to any single Routing/Transit/ABA number and account number. If a Same-Day Entry exceeds $100,000, is received after the applicable Cutoff Time, or otherwise does not meet the requirements for same-day processing, such Entry will automatically be converted to next Business Day settlement. Company is responsible for managing its use and selection of the same day settlement option and Bank is under no obligation to confirm Company's intention for ACH transactions to settle same day. Further, Bank has no responsibility for Company selecting the same day settlement option in error even if Company's intention is to settle on the following Business Day or later. ACH Entries submitted to the ACH Network with stale or invalid Effective Entry Dates will be settled at the earliest opportunity, which could be the same day if received prior to the Bank's same day Cutoff Time. Company is responsible for payment of all fees for the same-day settlement option even if selected in error. Same-day settlement is not available for IAT Entries.

**2.29   PREFUNDED ACH SERVICES.**  If Company has pre-funded ACH services, Bank will permit Company, as the Originator under the NACHA Rules, to initiate eligible credit Entry Files in a total amount not to exceed the Available Funds in the Designated Account and subject

to Company's ACH Exposure Limit pursuant to the terms of the Agreement. Company may not initiate any debit Entries unless Company also is approved for standard ACH services for debit Entries.  Prefunded credit Entries shall be in the form of either (i) a prearranged payment and deposit ("PPD") entry initiated by Company transferring funds from Company's Account into the personal bank account of the Receiver (typically an employee of Company); or (ii) a credit entry initiated by Company transferring funds from Company's Account into the account of a corporate or governmental Receiver (typically a creditor of Company).  Bank requires that Company irrevocably make available to it funds from its Designated Account in the total amount of all credit Entries received by Bank in a File and Company authorizes Bank to debit its Designated Account for the amount of all credit Entries in a File received by Bank on the Business Day received (to "Prefund").  Bank will not transmit any credit Entries to an ACH Operator or make an On-Us Entry unless Company has Prefunded the Entries. Company must maintain sufficient Available Funds in its Designated Account to Prefund all credit Entries in each File. If Company submits a File to Bank and the amount of Available Funds in Company's Designated Account is less than the total credit Entries in the File, Bank will suspend the File and use reasonable efforts to notify Company of the File suspension so that Company may transfer additional funds to the Designated Account to Prefund the File.  Bank may permit Company to submit the File two additional times in the same Business Day.  If there are not adequate Available Funds in the Designated Account at the time of the third File submission or at the end of the Business Day (whichever occurs first) to Prefund the File, Bank will delete the suspended File and may charge a fee for doing so.  A credit Entry shall be deemed received by Bank on the Business Day in which submission of such Entry is completed by Company in compliance with (a) the terms of the Agreement and the Rules; (b) all File specifications, format, protocols and other instructions established by Bank and (c) all applicable Security Procedures.  If Company Prefunds a credit Entry Files, Company's obligation to settle for the Prefunded credit Entries contained in that File shall be satisfied and discharged and replaced by an obligation of Bank to settle for the Prefunded credit Entries on the applicable Settlement Date.  All terms applicable to ACH services in this **Section IV.2** apply to prefunded ACH services except to the extent that such terms are directly inconsistent with this **Section 2.29**.

**3.   *CASH VAULT***

**3.1   SERVICE OVERVIEW.**  With Cash Vault Services, Company can make deposits to its Accounts without going to a banking center by using a Third-Party armored car service (the **"Courier"**) that picks up sealed bags **("Shipments")** containing U.S. paper bills and coins (together, **"Cash"**) and non-cash items such as checks (**"Non-Cash Items"**) from locations designated by Company **("Company Locations")** and transports them to one or more locations maintained by Courier (**"Courier Locations"**), validates the amount in the Shipment, and provides Bank with a deposit report so Bank can credit the applicable amount to Company's Account (a **"Deposit"**).  Company also can request that Courier make Cash deliveries to Company Locations **("Cash Orders")** and Bank will debit Company's Account for each Cash Order.

**3.2   COURIER.**  All services performed by Courier for Company, including all transportation services, shall be described in and governed by a service agreement between Courier and Company (the **"Company-Courier Agreement"**). Company agrees that all Shipments will be picked-up from Company Locations at the prices and frequencies agreed to between Company and Courier and that all Cash Order deliveries will include the transportation charge agreed to between Company and Courier. Company is responsible for all its obligations under the Company-Courier Agreement, including timely payment of all amounts due Courier for its services. Bank makes no representations as to Courier's services for Company and is not responsible for any Losses in connection with such services. Courier is acting as an independent third-party service provider for Company when Courier is transporting property between Company Locations and Courier Locations or between Company Locations and Bank at Company's direction or when performing other services under the Company-Courier Agreement. Bank and Company agree that Courier is the agent of Company, and not of Bank. Under no circumstances shall Bank be liable for any loss or destruction of Cash or Non-Cash Items in connection with Courier's transportation of such Cash and Non-Cash Items.

**3.3   DESIGNATED ACCOUNT.**  Company will designate the Account to which Bank will credit Deposits and debit Cash Orders.  Company authorizes Bank to debit and credit the Account for Cash Orders, Deposits and all adjustments relating to Cash Vault Services.

**3.4   PREPARATION OF SHIPMENTS.**  As set forth in the Company-Courier Agreement, Courier will pick up Shipments from Company Locations and deliver them to a Courier Location or to Bank for processing for deposit to Company's Account.  Company agrees that Shipments will contain only U.S. Cash and permitted Non-Cash Items.  If any Shipment contains any foreign currency, Courier will deliver that foreign currency to Bank for processing pursuant to Bank's standard procedures or will return the foreign currency to Company, at Bank's direction. Company agrees to prepare its Shipments in compliance with the Company-Courier Agreement and Bank's directions for preparing shipments, as updated from time to time.  Without limiting the foregoing, Company agrees to do the following when preparing Shipments:

(a)   Verify the amount, condition and validity of all Cash.
(b)   If possible, strap bills in standard Federal denominations: 100s/$10,000, 50s/$5,000, 20s/$2,000, 10s/$1,000, 5s/$500 and 1s/$100.
(c)   Clip or reverse strap all partial straps with the amount easily identified.
(d)   Stamp all full and partial straps with Company's name, address, number, dated and initialed.
(e)   Place the Cash in a plastic tamper proof bag;
(f)   Place all Non-Cash Items in a separate plastic tamper proof bag;
(g)   Create a deposit slip for each bag and place within the bag.
(h)   Seal the bag and identify the bag with Company's name.

**3.5   NON-CASH ITEMS.**  At its option, Company may elect to include Non-Cash Items in Shipments to be picked up and processed by Courier.  Company agrees and warrants that it will maintain a complete and accurate photocopy of all Non-Cash Items in any Shipment given to Courier and in the event any Non-Cash Item is lost or destroyed prior to deposit to Company's Account, Company agrees to promptly, diligently and completely cooperate with Bank in the identification and replacement of such lost or destroyed Non-Cash Item included in any Shipment. Complete cooperation shall include but not be limited to requests by Company to makers of the missing items to issue duplicates and, if the makers refuse to do so, then to assert all its legal and equitable right against said makers.  Company agrees that Bank, Courier, and

their insurance companies shall not be liable for damages directly or approximately flowing from Company's breach of this provision. Company agrees to maintain all photocopies of Non-Cash Items in a secure location.

**3.6   DEPOSITS TO COMPANY'S ACCOUNT.**  Courier will count the Cash and Non-Cash Items in each Shipment and prepare and send to Bank a deposit report showing the amount of Cash and Non-Cash Items in the Shipment (the **"Deposit Report"**).  Courier typically will send Bank a Deposit Report for a Shipment on the day that the Shipment is received if received on a Business Day prior to Courier's processing cutoff time and on the next Business Day if received after the cutoff time or on a non-Business Day, but Courier may take up to two Business Days to provide Bank with a Deposit Report.  Company understands and agrees that Shipments under the Company-Courier Agreement are not deposited with Bank when they are picked up by Courier. Shipments are deposited at Bank only when Bank receives the Deposit Report from Courier meeting Bank's specifications and containing all information required to process Company's Shipment for deposit to Company's Account and Bank processes the Deposit Report.  Bank typically will process each Deposit Report and credit Company's Account for the reported amount (the "**Credited Amount**") on the Business Day following the day that Bank receives a Deposit Report from Courier if received prior to Bank's cutoff time for processing Deposit Reports, as established by Bank in its discretion.  Company acknowledges and agrees that the posting of Non-Cash Items may be delayed until such time as they are physically delivered to Bank for processing, that different cutoff times may be applicable to Cash and to Non-Cash Items, and that Bank's funds availability schedule set forth in the Account Contract will be applicable to all Non-Cash Items. If Company directs Courier to deliver a Shipment directly to a Bank banking center rather than to Courier's facility, these Shipments will be deposited to Company's Account(s) only after Courier delivers the bags to the Bank banking center and the bags are processed for deposit.

**3.7   DEPOSIT DISCREPANCIES AND ADJUSTMENTS.**  Bank reserves all rights to make adjustments to the Credited Amount based on any subsequent physical count of the Cash in a Shipment, or for other reasons related to the actual value of the Cash in a Shipment, including but not limited to the identification of counterfeit or contraband funds. Bank also reserves the right to adjust the Credited Amount for Non-Cash Items as a result of any errors in the Deposit Report and for all other reasons that Bank may adjust the amount of a deposited Item under the Account Contract. Company agrees that Bank may debit or credit the Account, as applicable, to make the adjustments described above, and Company agrees to indemnify and hold Bank harmless from any and all Losses associated with authorized adjustments in the event of an insufficiency of funds in the Account.  Without limiting the foregoing, Company acknowledges that Bank may sell Company's Cash straps and coins to the Federal Reserve Bank.  If the Federal Reserve Bank identifies a discrepancy in any Cash straps or wrapped coins marked with Company's name, the Federal Reserve Bank will adjust Bank's Fed Account and send supporting documentation to Bank. Company agrees that Bank may, in turn, adjust Company's Account for the amount of the discrepancy identified by the Federal Reserve Bank in Cash straps and coin bags marked with Company's name.  Bank or Courier will provide Company with notification of any deposit discrepancy and respective deposit adjustments along with supporting documentation for the adjustment.  All final counts of Shipments will be deemed to be accurate, final and conclusive, subject to Company's right to pursue discrepancy resolution procedures described in **Section 3.9** below.

**3.8   CASH ORDERS.**  Company may place Cash Orders with Bank for delivery to Company Locations by Courier. Company must provide Bank with reasonable advance notice of each Cash Order pursuant to procedures established by Bank from time to time and made available to Company. Typically, Company must place a Cash Order no later than the cutoff time set by Bank on the Business Day prior to the requested delivery date (the **"Order Cutoff Time"**). Bank will authorize the delivery of the Cash Order if there are adequate Available Funds in Company's Account.  If there are insufficient Available Funds in Company's Account to cover a requested Cash Order, Bank, in its sole discretion, may (i) refuse to authorize the delivery, or (ii) authorize the delivery.  If Bank authorizes a Cash Order, Bank will notify Courier to make the delivery on the requested delivery date, but Bank does not guaranty that Courier will make the delivery on such date.  If Company places a Cash Order after the Order Cutoff Time and Bank, in its discretion, authorizes delivery of such Cash Order, Bank may charge Company a late order fee. Company agrees that Bank may debit its Account for the amount of each Cash Order during nightly processing on the evening prior to the scheduled delivery date or on the scheduled delivery date, in Bank's discretion.  In addition, once Bank authorizes the Courier to deliver the Cash Order, Bank may, in its discretion, place a hold on the Account in the amount of the authorized, pending Cash Order. If Bank authorizes delivery of a Cash Order and Company does not have Available Funds in its Account to cover the Cash Order at the time Bank seeks to debit the Account for the Cash Order, Bank may transfer to the designated Account from any other Account of Company, funds sufficient to cover the deficiency in the designated Account.  Company shall immediately pay the amount by which any Account is overdrawn as the result of Bank's honoring a Cash Order request, together with any fees and charges resulting from the overdraft. No course of dealing or conduct on any prior occasion shall give Company the right to expect or rely on Bank's honoring a Cash Order request from an Account if it lacks sufficient Available Funds. If Company does not receive a Cash Order on the scheduled delivery date or if Company believes that the amount of the Cash Order received does not match the amount requested, Company must promptly notify Bank and follow the discrepancy resolution procedures in **Section 3.9**.

**3.9   DISCREPANCY RESOLUTION PROCEDURES.**  If Company disputes any Deposit adjustment, Company will provide written notice to Bank stating its reason for the dispute within two (2) Business Days of receipt of notice of such adjustment.  If Company believes there is an error in a Cash Order or does not receive a Cash Order debited to Company's Account, Company will provide Bank with written notice of such issue within two (2) Business Days of the date of Company's receipt of the Cash Order (or scheduled delivery date if the Cash Order was not received). Company will preserve all physical evidence substantiating a discrepancy in the amount of a Cash Order, including but not limited to all straps or other containers used to prepare the Cash Order.  Upon Bank's receipt of Company's notice of a dispute or perceived error, Bank will work with Courier to investigate the dispute or error and will provide Company with the results of such investigation.  If Bank determines that an error has occurred, it will process a corrective entry to the Account for the amount of the error.

**3.10   LIMITATION OF LIABILITY.**  Bank is not liable to Company for any Losses which occur before Bank has received a Deposit or Non-Cash Item or in connection with Courier's delivery of Cash Order(s) to Company.  Company agrees to indemnify and hold Bank harmless from

and against all Losses which Bank may incur as a result of Company's use of Courier except to the extent that Bank's gross negligence or intentional misconduct directly contributed to such Loss.

## 4.   CONTROLLED DISBURSEMENT ACCOUNT

**4.1   SERVICE OVERVIEW.**  A Controlled Disbursement Account (**"CDA"**) allows Company to transfer sufficient funds each day to cover checks that will be presented to the CDA for payment that day.  CDAs are deposit accounts subject to the Account Contract.

**4.2   DUTIES OF COMPANY.**  Company agrees to the following:

(a)   Company will open one or more Controlled Disbursement Accounts and enroll its Accounts in BeB.

(b)   Company will maintain a separate Account with Bank to facilitate funding of each CDA (the **"Funding Account"**). Bank, in its discretion, may agree that Company will maintain its Funding Account at another financial institution.

(c)   Company will maintain a balance in the Funding Account sufficient to offset the total amount of all checks drawn on and other debits (if any) to each CDA that are presented for payment against the CDA each Business Day (the **"Item Total"**) and will transfer funds from the Funding Account to each CDA in the amount of such Item Total prior to the Cutoff Time for the applicable transfer service used by Company on each Business Day.

(d)   Company will use CDAs exclusively for issuing and clearing checks payable to third parties and will not issue checks on any CDA to itself, related or subsidiary companies that may be included in Company's overall account analysis or to Bank (including loan payments) and will not issue checks from CDAs that Company expects will be presented for payment over the counter at a Bank banking center.

(e)   Company will not use any CDA for or permit any ACH debit transactions, wire transfers, debit memos, credit memos, telephone transfers or other electronic transfers from a CDA.

(f)   Company will provide Bank with a sample of 10 voided checks for testing and quality assurance of each CDA for purposes of checking and verifying accuracy, validity, and quality of the Magnetic Ink Character Recognition (MICR) fields on the checks and paper quality.

(g)   Company will monitor the CDAs to verify that all presented checks are authorized and timely notify Bank of any unauthorized activity.

(h)   Company will follow any and all CDA Service procedures established by Bank and provided to Company from time to time.

(i)   Company will hold Bank harmless for any Losses incurred by Company as a result of its failure to redirect any ACH transactions to Accounts that permit Automated Clearing House (ACH) transactions and not to a CDA.

**4.3   DUTIES AND RIGHTS OF BANK.**  Bank and Company agree to the following:

(a)   Bank will determine and make the Item Total for each CDA available for viewing by Customer on BeB each Business Day by the Controlled Disbursement reporting Cutoff Time (the "**Reporting Time**"). Bank expects that it will know most checks that will be presented for nightly processing at the end of such Business Day by the Reporting Time.  Bank will not know if any checks will be presented at a Bank teller for immediate payment over the counter (**"Teller Presented Checks"**) after the Reporting Time on a Business Day. If Bank receives any Teller Presented Checks after the Reporting Time, Bank may pay those checks from the CDA, causing the CDA to have a negative balance. However, Bank reserves its right to not pay a Teller Presented Check due to lack of Available Funds. Teller Presented Checks received after the Reporting Time on a Business Day that are paid by Bank will be included in Customer's Item Total on the following Business Day.

(b)   If Company fails to timely fund its CDAs, Bank, in its sole discretion, may transfer funds from the Funding Account to the CDAs in an amount sufficient to cover the Item Total and, if the Item Total exceeds the Available Balance in the Funding Account at the time Bank attempts to transfer funds to a CDA, Bank may transfer such funds as are available, if any, to the CDA and either: (1) transfer to the CDA the amount of any shortfall in the Available Balance needed to pay the Item Total, which would cause the Funding Account to be overdrawn or add to the amount by which it is overdrawn; or (2) decline to transfer more than the current Available Funds in the Funding Account, in which case one or more checks drawn on the CDA will be returned for insufficient funds. Bank may take either of these actions without notifying Company beforehand.  Overdraft or returned item (NSF) fees will apply. No course of dealing or conduct on any prior occasion or occasions shall give Company the right to expect or rely on Bank making a transfer from the Funding Account to the CDAs.  Company shall immediately pay the amount by which any CDA or the Funding Account is short sufficient Available Funds to cover all Item Totals, together with any fees and charges resulting from the overdraft.

(c)   Bank reserves the right to return unpaid any check presented for payment against the CDA if: (i) the Available Balance is not sufficient to cover the Item Total, (ii) debits cannot be posted because the CDA is closed or because of any other condition that prevents debits, or (iii) any communications failure or other condition prevents Bank  from monitoring the checks presented for payment.

## 5.   CREDIT SWEEP

**5.1   SERVICE OVERVIEW.**  The Credit Sweep Service allows Company and Bank to agree upon a minimum target balance to maintain in Company's Account (**"Target Balance"**).  After each Business Day, Bank will either draw funds from Company's selected commercial revolving line of credit with Bank (**"Loan Account"**), to bring Company's Account back to its Target Balance, or transfer funds in excess of Company's Target Balance to Company's Loan Account.

**5.2   ACCOUNTS.** Company shall select its Account and Loan Account and agree with Bank upon a Target Balance on the Setup Forms.

**5.3   AUTHORIZATIONS.** On each Business Day after all transactions from that Business Day have posted to the Account, Bank will determine the amount by which the Available Balance exceeds the Target Balance (**"Excess Funds"**) or the amount by which the Target Balance exceeds the Available Balance (**"Deficiency Amount"**) in the Account.

**5.3.1    Loan Payment.** If Bank determines that there are Excess Funds, Company authorizes Bank to automatically transfer the Excess Funds from the Account to the Loan Account. Bank will debit the Account and credit the Loan Account in an amount equal to the lesser of: (i) the amount of Excess Funds; or (ii) the outstanding principal balance of the Loan Account plus all interest, fees and charges then outstanding under the Loan Account (**"Loan Payment"**), provided, however, that Bank will not be required to initiate any Loan Payment in an amount less than a minimum sum mutually agreeable to Bank and Company as set forth on the Setup Forms.

**5.3.2    Loan Advance.** If Bank determines that there is a Deficiency Amount, Company authorizes Bank to automatically transfer funds from the Loan Account to the Account.  Bank will advance funds from the Loan Account in an amount equal to the lesser of: (i) the Deficiency Amount; or (ii) the amount which is available to be borrowed under the Loan Account, if any (the lesser of such amounts being referred to as the **"Loan Advance"**), plus the amount of any fees and charges under the Loan Account, and credit the Account in an amount equal to the Loan Advance; provided, however, that Bank will not be required to initiate any Loan Advance in excess of the amount available for advances under the Loan Account agreement, if any default exists under any Loan Account agreement or the Agreement, or if Bank is otherwise excused or prohibited under any Loan Account agreement or applicable Laws from making a Loan Advance to Company.

**5.4    COMPANY MONITORING RESPONSIBILITIES.** Company assumes full responsibility for managing the Loan Account within its credit limits and compliance with all other conditions and limitations specified in such Loan Account agreement.  Company also assumes full responsibility for making such minimum payments upon the Loan Account as are due from time to time, if automated Loan Payments are not sufficient to meet such obligations. Company further acknowledges having been advised that, pursuant to the terms of the Account Contract, Authorized Signers for the Account have unrestricted access to funds from the Loan Account transferred to the Account and Company assumes full responsibility for the acts and omissions of its agents and employees who are designated as Authorized Signers for such Account.

**5.5    FDIC INSURANCE DISCLOSURE.**   UNDER THE CREDIT SWEEP ARRANGEMENT, ALL TRANSFERS WILL BE DEEMED TO HAVE BEEN COMPLETED BY THE END OF THE BUSINESS DAY.  THEREFORE, ALL AMOUNTS IN THE DESIGNATED DEPOSIT ACCOUNT AFTER PROCESSING OF THE CREDIT SWEEP ARE CONSIDERED A DEPOSIT AND SUBJECT TO THE FDIC INSURANCE GUIDELINES.

## 6.    *DIRECT SEND*

**6.1    SERVICE OVERVIEW.**  Direct Send permits the electronic transmission of data to Company (or Company's agent) from Bank or to Bank from Company (or Company's agent) through a secure method of file transmission meeting Bank's current requirements, as established between Bank and Company, in connection with other Services that permit this option for exchanging data.  Company and Bank will complete Setup Forms designating the Services used with Direct Send and the setup instructions for Direct Send. Bank may change the Services that permit the use of Direct Send at any time in its discretion.

**6.2    ACCESS.** Company's use of Direct Send is subject to the Agreement, all instructions and guidelines established from time to time by Bank, all applicable software and user documentation terms and conditions, and all applicable Legal Requirements. Company may use only Direct Send if Bank has agreed to provide and implemented it for Company for any applicable Services.

**6.3    SECURITY PROCEDURES.** To use Direct Send, Bank and Company or a Third-Party agent of Company designated in the Setup Forms will carry out the confirmation and authentication processes necessary for the applicable protocol (FTPS, SFTP, or any other agreed upon communication protocol). Company's Administrator and other authorized users designated on the Setup Forms will receive Company's user identification ("User ID"), a user password ("User Password") and any other information required to use Direct Send. The Administrator or other person designated on the Setup Forms will be responsible for providing all information to Bank necessary to use Direct Send. Company shall be responsible for initiating, undertaking and supervising all safety and security precautions and programs under its control, dominion or supervision in connection with Direct Send. Company shall implement and maintain adequate information security measures to protect against unauthorized access to or use of Direct Send, which measures shall meet or exceed the Security Procedures. If Company uses a Third-Party agent in connection with Direct Send, Company is responsible for this Third-Party agent complying with all security requirements.

**6.4    RISK OF LOSS.** Company acknowledges that while Bank will attempt to ensure that all electronic communications using Direct Send are encrypted, scrambled or otherwise protected against interception by unauthorized persons, Company nonetheless accepts and assumes all risk of loss or dissemination of information attributable to the electronic communications through Direct Send.

**6.5    NOTICE OF UNAUTHORIZED ACCESS.** If Company or any agent for Company believes that one or more Access Codes have become known or obtained by unauthorized persons (whether or not employed by Company), Company shall immediately notify Bank to enable Bank to disable the affected Access Code(s). Additionally, Bank may change or disable any Access Code at any time and for any reason. If Bank takes such action, Bank will make reasonable efforts to notify Company promptly. Bank assumes no responsibility to discover, audit, or report to Company any possible breach of security or unauthorized disclosure or use of Access Codes by Company's agents or any Third Party. Company acknowledges that the security procedures in this Section constitute commercially reasonable security procedures for Company.

**6.6    UNAVAILABLE SERVICES.** If Company is unable to access Direct Send or transact business through Direct Send, Company shall immediately notify Bank. In the meantime, Company may transact business through other Bank platforms or means available to Company.

**6.7    AUTHORIZED TRANSACTIONS.** Bank may rely upon any Services transacted or conducted by use of Direct Send and any instructions or information that Bank receives through Direct Send as properly authorized by Company. Each Administrator and User to whom Bank has provided an Access Code or who has otherwise obtained an Access Code for Direct Send is deemed an authorized representative of Company for purposes of all Services transacted or conducted through or by use of Direct Send, whether or not such person is authorized by the Agreement or any other agreement between Bank and Company.

**6.8    COMPANY RESPONSIBILITY.** Notwithstanding any other term of the Account Contract, once Company accesses Direct Send to transact or conduct any Service, Bank will not verify that the transaction is authorized and Company is solely responsible for the accuracy and completeness of any data or information received by Bank through Direct Send. Bank is authorized by Company to process transactions in accordance with information Bank receives from Company through Direct Send. Company shall be solely responsible for the information

contained in the instructions and Bank shall have no responsibility for erroneous data provided by Company. Bank shall have no liability for Losses resulting from or related to Company's failure to limit access to Direct Send, failure to comply with Bank's file naming conventions or specifications or maintain the confidentiality of the Access Codes. At the sole discretion of Bank, Bank may also require the use of other identifying information or other security procedures for use of Direct Send. For a period of at least one (1) year following the date of their transmittal by Bank as provided herein, Company shall retain data and records on file adequate to permit recreating of any transaction completed or attempted using Direct Send. Company shall provide such data to Bank upon its request.

**7.    *INFORMATION REPORTING***

**7.1   SERVICE OVERVIEW.**  Information Reporting Services make certain Account, Service, transaction and related information available to Company, which may include information that Bank receives from another financial institution designated by Company. Company also may have the option to have Bank report certain information directly to a financial institution or other Third Party designated by Company.

**7.2   ACCOUNTS OF OTHER ENTITIES.** Company may elect to have accounts of another entity reported to Company with any of Bank's Information Reporting Services. Company agrees that, for each such account, the entity will provide Bank with its written authorization, in a form acceptable to Bank, for Bank to make that entity's account information available to Company. However, Company does not need to provide Bank such written authorization if the other entity is a U.S. subsidiary of Company and its accounts are domiciled in the United States. In that case, Company represents and warrants that such other entity is a U.S. subsidiary of Company and that it has authorized Bank to make its information available to Company.

**7.3   ACCOUNTS AT OTHER BANKS.** Company may elect to have information related to Company accounts, or accounts of another entity, maintained at a Third-Party financial institution reported through Bank's Information Reporting Services or to have Bank report information related to Company's Accounts to a Third Party designated by Company. If reported to Bank, Company agrees that Company and the other entity will authorize the Third Party to make the reporting information available to Bank.  If reported by Bank, Company authorizes Bank to share its information with the Third Party that Company designates on the Setup Forms. Company agrees to take all actions necessary for Bank to provide the requested Information Reporting Services to Company. Bank reserves the right to decline to receive from or share information with any Third Party through the Information Reporting Service.

**7.4   MULTI-BANK STATEMENT SERVICES.** Periodically, other Third-Party banks or financial institutions may provide balance and statement reports to Company and Bank may arrange for these reports to be made available to Company through Digital Banking. By signing up for Information Reporting Services, Company agrees that Bank and its affiliates shall not be liable or responsible for, and makes no representation as to the accuracy, reliability or completeness of, any information contained in any such multi-bank statement reports provided by a Third-Party bank or financial institution. The terms and conditions of the Agreement apply without limitation to the provision of such multi-bank statement services, including (for the avoidance of doubt) the right of Bank to terminate such service at any time at its discretion as permitted by the Agreement.

**8.    *INVESTMENT SWEEP***

**8.1   SERVICE OVERVIEW**.  The Investment Sweep Service allows Company and Bank to agree upon a target balance to maintain in Company's Account (**"Account Target Balance"**).  On each Business Day after all transactions from that Business Day have posted to the Account, Bank will determine the amount by which the Available Balance exceeds the Account Target Balance (**"Excess Funds"**) or the amount by which the Account Target Balance exceeds the Available Balance (**"Deficiency Amount"**) in the Account. If there are Excess Funds, Bank will automatically transfer into an overnight investment in the form of a repurchase agreement with Bank or **"Repo"** (as described below) the amount of the Excess Funds. If there is a Deficiency Amount, Bank will replenish the Account by reducing the amount due Company under the Repo.  Any funds that are not used to replenish the Account, will remain in the Repo.  Each Repo has a term that matures on the Business Day immediately following the day on which the Repo was created.  When the Repo matures, Bank will place the funds remaining in the Repo into a new Repo.

**8.2   CREATION OF SWEEP ARRANGEMENT.** Company authorizes Bank to create an investment sweep arrangement in Company's name. The arrangement shall consist of: (i) an Account that Company will select in a Sweep Setup Form; and (ii) a Repo investment account.  Except as herein provided, the Account shall operate in all respects as a conventional bank deposit account and shall be subject to service charges under Bank's Fee Schedule. Company may continue to make deposits to the Account at any time and by any accepted means and may write checks or drafts upon, or otherwise withdraw funds from, the Account.

**8.3   REPURCHASE AGREEMENTS; PLEDGED SECURITIES**.  Repos are Bank's short-term debt obligations. Bank pledges securities that are the direct obligation of, or the principal and interest of which are guaranteed by, the U.S., one of its agencies or one of its government-sponsored enterprises (**"Securities"**) as collateral to secure Bank's obligation to pay the amount due to Company under the Repos. Company's interest in the Securities that act as collateral for Repo obligations hereunder may be a fractional interest in such Securities. Bank will not substitute other securities for the pledged Securities during the term of the Repo and waives its right to do so. The terms of this Section, as supplemented by the Confirmations (see **Section 8.8** below), shall be the agreement between Company and Bank for each Repo completed in connection with the Investment Sweep Services.

**8.4   INVESTMENT SWEEP.** Bank, as agent for Company, shall seek to maintain the Account Target Balance as outlined herein.  The initial Account Target Balance shall be determined by Bank and Company and be set forth in the Sweep Setup Form.  Bank can change the Account Target Balance by giving written notice to Company.  Such change will become effective two (2) days after the effective date of Bank's notice. On each Business Day after all transactions from that Business Day have posted to the Account, Bank will determine if the Account contains Excess Funds or a Deficiency Amount.

**8.4.1    Account Balance in Excess of Target Balance.**  If Bank determines that the Account has Excess Funds, Bank, acting as Company's agent, will withdraw from the Account an amount equal to the difference between the Account Target Balance and the Available Balance and invest such amount in Repos (**"Sweep Amount"**).

**8.4.2    Account Balance Below Target Balance.**  If Bank determines that the Account has a Deficiency Amount, Bank, acting as Company's agent, will pay and deposit into the Account: (i) an amount of  Bank's Repo obligation sufficient to return the balance of the Account to the Account Target Balance; or (ii) if the total amount of Repos held by Company under the Agreement is not sufficient to return the Account balance to the Target Balance, all such Repo amounts shall be placed in the Account.

**8.4.3    Increase in Account Balance**.  Company agrees to provide Bank with not less than two (2) Business Days advance written notice if Company expects the Excess Funds in the Account to increase by more than the greater of (a) $1,000,000 or (b) 5% of the prior Excess Funds.  If Company fails to provide this advance notice, Bank will use commercially reasonable efforts to pledge Securities to Company for the full amount of the Repo, but cannot guaranty that it will be able to pledge Securities to Customer for the full amount of the increased Repo on the day such increase in Excess Funds occurs.

**8.5   REPO INTEREST.**  Funds in Repos will earn interest. **Bank will determine, in its discretion, the applicable interest rate on Repos each day and the rate may rise or fall on a day to day basis**. The interest rate on Repos may depend upon the amount that is invested on a given day. The interest rate on the Repo is not the same as the interest rate on the Securities which act as collateral. Company may find out the current interest rate on the Repos by contacting the Bank and also on the monthly Account statement.

**8.6   COMPANY'S INTEREST AND CUSTODIAN OF SECURITIES.**  In order for Company to perfect its security interest in the Securities that are collateral for Bank's Repo obligations hereunder, Bank has transferred such Securities to Bank's chosen Custodian Agent (the **"Custodian"**). Bank and Company hereby agree that the Custodian shall be Company's agent for the purposes of possessing said Securities.  A copy of the Custodial Agreement by and between Bank and Custodian is available for examination by Company upon request. Company's interest in the pledged Securities will be evidenced by the Confirmation sent to Company and by Bank's books and records. With respect to the Securities pledged to Company and held by the Custodian, Company hereby appoints Bank as its agent to carry out Company's orders with respect to the Securities in the event of a Bank Default and Bank hereby agrees to act as Company's agent with respect thereto and effect such orders as directed by Company. In the event of a Bank Default, Company will have the right to direct Bank, as its agent, to sell the Securities that are then subject to Company's security interest and to apply the proceeds of such Securities to Bank's repurchase obligations under the Repos or direct Bank to transfer the Securities to Company.  For purposes of this provision, **"Bank Default"** means: (i) Bank fails, (ii) any other act of insolvency with respect to Bank, or (iii) Bank fails to pay any of its Repo obligations to Company under this Section.

**8.7   REPO TERM.**  Repo obligations under the Agreement will be deemed to have a term that matures on the Business Day immediately following the day on which such Repo was created. Upon maturity of the Repo obligations, Bank will repay the amount of its Repo obligation needed to replenish the Account if there is a Deficiency Amount, as described in **Section 8.4.2**. Company directs Bank to place into a new Repo any amounts that are not used to replenish the Account and such new Repo will mature on the next Business Day following such placement.

**8.8   NOTICES AND CONFIRMATIONS TO COMPANY.**  Company will receive monthly statements from Bank which include information regarding each Investment Sweep Service transaction performed by Bank on behalf of Company, the balance of the Account, the amount Company holds in Repos under the Agreement, and the average interest rate paid on Company's funds in Repos during the statement period. On each Business Day, Bank also will send Company a written confirmation (via facsimile, U.S. Mail, electronic mail, courier or otherwise, as determined by Bank) of the specific Securities that are the collateral for each Repo.  Such confirmations will specify the Security's issuer, maturity date, coupon rate, par amount, market value, Committee on Uniform Securities Identification Procedures Number (**"CUSIP"**) or mortgage-backed security pool number, as appropriate, and Company's fractional interest, if applicable.

**8.9   BANK'S GUARANTEE.** Bank hereby unconditionally guarantees to repay the Repo obligations as provided herein. As stated above, those obligations are secured by Securities pledged as collateral. The principal amount payable on the Repos is fixed, and will not fluctuate, even though the market value of the Securities may rise or fall. If and to the extent that the market value of the Securities pledged to Company falls below Bank's Repo obligation to Company, Company will become an unsecured creditor of Bank. The Repo obligation will in most cases be paid from general banking assets of Bank, rather than from proceeds from the sale of the Securities.

**8.10  NO TRANSFER OF REPOS BY COMPANY.**  Company shall not assign or transfer in any way whatsoever any of its rights under this Section of the Agreement, and shall not assign, pledge, or transfer in any way whatsoever any rights to repayment of Repos issued hereunder or in the Securities pledged to Company. Any violation of the provisions of this **Section 8.10** regarding non-transfer of rights shall trigger the placement of any amounts held in the Account and any Repo amounts, in a non-interest bearing demand deposit account in Company's name in Bank, and Bank will give Company notice that such has occurred.

**8.11  REQUIRED DISCLOSURE.**  UNDER THE INVESTMENT SWEEP SERVICE, PROVIDED THAT A REPO IS PROPERLY EXECUTED, COMPANY'S SWEPT FUNDS ARE NOT A DEPOSIT AND NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION. IN THE EVENT OF BANK'S FAILURE, COMPANY WOULD HAVE A PERFECTED SECURITY INTEREST IN THE SECURITIES THAT BANK HAS ALLOCATED TO COMPANY TO SECURE BANK'S REPURCHASE OBLIGATIONS AS IDENTIFIED IN THE DAILY CONFIRMATION. THE FUNDS REMAINING IN COMPANY'S DESIGNATED ACCOUNT AT BANK WOULD BE CONSIDERED A DEPOSIT AND MAY BE ELIGIBLE FOR FDIC INSURANCE UNDER CURRENT GUIDELINES. IN THE EVENT THAT A REPO IS NOT PROPERLY EXECUTED, THE SWEPT FUNDS WILL BE TREATED AS IF THEY HAD NOT LEFT THE DESIGNATED ACCOUNT FROM WHICH THEY ORIGINATED AND WILL NOT BE INSURED BY THE FDIC IF COMPANY'S AGGREGATE ACCOUNT BALANCES EXCEED THE CURRENT MAXIMUM FDIC INSURED AMOUNT.

## 9.   LOCKBOX

**9.1   SERVICE OVERVIEW.**  The Lockbox Service is a collection and processing service provided by Bank which consists of collecting mail from a U.S. Post Office box specified in a Lockbox Setup Form (**"Lockbox"**); sorting, totaling, and recording payments; processing checks,

drafts or similar items (**"Items"**) and making deposits as more fully described in this Section. Company may receive remittance data either by hard copy or through an electronic format. The Lockbox Service provides Company with the following options:

      **9.1.1**    **Wholesale Lockbox Service.**  The Wholesale Lockbox Service involves the processing of invoice documents and payments. Processing and optional services can include the use of image capture of Items, remittance detail, and other documents; data entry of key remittance information; transmission of payment and data information; and special handling.  Company may select optional Lockbox Services, described below, in the Lockbox Setup Form. The associated fees are in the applicable Fee Schedule.  Traditionally, Wholesale Lockbox Service is suited for high-dollar, low-volume remittances.  These remittance payments are typically business-to-business payments.

      **9.1.2**    **Retail Lockbox Service.**  The Retail Lockbox Service involves machine-readable remittance documents for high speed, automated processing through optical character recognition equipment. The Retail Lockbox Service is best suited for low-to-moderate dollar, high-volume transactions.  These remittance payments are usually consumer-to-business payments.

      **9.1.3**    **Wholetail Lockbox Service.**  The Wholetail Lockbox Service is a hybrid of both the Wholesale and Retail Lockbox Services. Wholetail Lockbox Service is suited for low-to-moderate dollar, moderately high-volume remittances.  These remittance payments are usually consumer-to-business payments.

      **9.1.4**    **eLockbox Service.**  The eLockbox Service permits Company to receive payments originated by its customers electronically through their online bill pay services and transmitted to Company's Account via ACH payment. If Company selects this Service on its Lockbox Setup Form, Company agrees that the ACH entries to its Account are subject to the NACHA Rules and agrees to comply with these Rules.

      **9.1.5**    **Optional Service Features.**  Company may select the following optional services on its Lockbox Setup Form.  Some optional services may not be available for some Lockbox customers.

(a)  Web Access.  Web Access provides Digital access to view, print and query the data and images of remittances through a secure Lockbox website (and not through BeB). Summary and detail reports of activity make it easy to review lockbox account activity. Company may conduct a search for images of Items based on the various search criteria available.  Images will be available only after Bank processes the Items.  When an Item image is retrieved, the related document images will also be available for viewing.

(b)  Data Output File.  A daily file of processed Items can be created to Company's specifications.  Sample files and testing is required. Requires Web Access to download the file. The Lockbox Setup Form also may provide an SFTP transfer option.

(c)  Stop File Processing.  A Stop File is used to identify the items that should not be accepted for payment.  The Stop File must include the Lockbox number, entity name or identification and the specific account number or identification.  This must match exactly with the information contained on the coupon scan line.  If elected on the Lockbox Setup Form, Company may reject Items using Digital Decisions (see below) via Web Access for review and decisioning by selecting Soft Stop File Processing on the Lockbox Setup Form. Requires Web Access and Digital Decisions to utilize Stop File Processing.

(d)  Payor Lookup Processing.  The billing File from Company's accounting system can be used to perform "Value Added Keying" (VAK) for payments that are missing the required information for processing.  The billing file enables a higher percentage of accepted payment activity by matching the account number from the remitter and utilizing the billing files as a look-up tool for any missing information.  Requires Web Access to utilize Payor Lookup Processing.

(e)  Monthly CD ROM.  Images of the Items and documents processed during the time requested will be stored on a CD ROM and delivered to Company.

(f)  Image File Transmission. Images of processed Items can be provided daily. Requires Web Access to download the file.  The Lockbox Setup Form also may provide an SFTP transfer option.

(g)  Digital Decisions.  Exceptions to items not following Company's processing instructions can be decisioned online.  By selecting "Reject to Web", Company understands that Bank will not process the item, but will hold the item for up to 5 business days for Company to submit its instructions via the Digital Decisions page. If Bank does not receive these instructions by the fifth (5th) business day, the item will default to "Auto Reject to Client".  Items that go to Auto Reject to Client will be returned to Company unprocessed.  Requires Web Access to utilize Digital Decisions.

(h)  Credit Card Processing.  Credit Card payments may be processed. Company must currently be established with an approved credit card provider. This is a separate process from the Lockbox implementation and must be handled by Company with the card provider of its choice and can take up to sixty (60 days) to implement.

(i)  Notes.  A Notes field is available for Company use to record information related to the payment. Requires Web Access and Digital Decisions to utilize the Notes feature.

(j)  PDF Image Downloads.  Images of processed Items can be provided daily. Requires Web Access to download the file.

**9.2**  **AUTHORIZATIONS AND POWER OF ATTORNEY.**  Company grants to Bank a Power of Attorney, which power shall be deemed coupled with an interest, to perform all functions and tasks necessary for Bank to provide the Lockbox Services provided herein.  Without limiting the powers Company grants to Bank, Company specifically authorizes Bank to:

(a)  Arrange for a Lockbox to be established and maintained on behalf of Company for receipt of Company's mail.

(b)  Collect mail received in a Lockbox and addressed to Company at least once each Business Day.

(c)  Open mail received in a Lockbox and remove and inspect contents of all envelopes.

(d)  Process remittances according to the instructions set forth in the Lockbox Setup Form.

(e)  Endorse for deposit any Items delivered to the Lockbox in accordance with its then current practices.  Company agrees to indemnify and hold Bank harmless against any Losses incurred by or asserted against Bank as a result of its endorsing and depositing any Item in compliance with the terms and conditions of the Agreement.

(f)  Handle and administer all Items delivered to the Lockbox and the Account.

(g)   Transport mail and any Items to any location of Bank, any Third-Party service provider, any affiliate bank thereof, or a local clearing bank for the purpose of providing the Lockbox Services.

**9.3   LOCKBOX ADMINISTRATION.** Lockboxes may be shared with other customers of Bank or its Third-Party service provider, subject to selections made available to Company on the Lockbox Setup Form.  The assigned Lockbox is the property of Bank or its Third-Party service provider.  Company acknowledges that if Company terminates the Lockbox Service, Bank will forward mail for a period of up to ninety (90) days.  Company is responsible for the postage fees.  After ninety (90) days, mail will be returned to sender.  At no time can Company submit a postal forwarding request with the U.S. Postal Service for a Lockbox.  Company agrees to instruct its customers to remit payments to the applicable department and/or box number and the address provided by Bank in the Lockbox Setup Form.  Bank reserves the right to change such address upon prior written notice to Company.  Company acknowledges that it is important to include the department and/or box number in such address as this expedites mail processing through the postal system.

**9.4   ACCOUNT ADMINISTRATION.**  Company shall maintain an Account(s), to be specified in the Lockbox Setup Form, as the account for the deposit of all Items directed by Company to the Lockbox. Bank shall process and deposit Items into the Account according to the process described in the Agreement and Lockbox Setup Form.  Bank and Company agree to the following:

(a)   Company shall mail invoices to its customers in a prompt, businesslike manner, directing them to mail payments and remittances to the Lockbox at the specific post office box address that Bank will provide to Company.

(b)   Bank is entitled to exclusive and unrestricted access to the Lockbox contents and has the sole right to direct the deposit of Items from the Lockbox to the Account(s).

(c)   Prior to deposit into the Account, the Lockbox contents will not be available to Company except upon request to Bank and only with Bank's consent.

(d)   Bank shall not be deemed to have received an Item until it has received the same from the Lockbox and has processed the Item for deposit according to its regular procedures. Any Items received by Bank directly from Company may, in Bank's sole discretion, be treated as if they were received in the appropriate Lockbox.

(e)   Bank will endorse all Items accepted by Bank for deposit without the signature of payee.

(f)   Bank will use commercially reasonable efforts to process for deposit into the Account all Items received in the Lockbox, except any exception Items. The day of deposit for Items accepted for deposit will depend on the time the Item is retrieved from the Lockbox and received at Bank's processing facility. If an accepted Item is received at Bank's processing facility on a Business Day with sufficient time to process it prior to Bank's cutoff time, the day the Item is received at the processing facility will be the day of deposit of such Item.  If an accepted Item is received at Bank's processing facility on a non-Business Day or after the time needed to process such Item prior to the cutoff time, the day of deposit will be the next Business Day. In certain circumstances, such as the occurrence of force majeure events, the day of deposit of an accepted Item may be delayed. The availability of funds from Items deposited into the Account from the Lockbox is subject to Bank's current availability schedule set forth in the Account Contract.

(g)   Company is responsible for instructing all of its customers about the requirements of the Lockbox Service.

**9.5   REMITTANCE PROCESSING PROCEDURES.** Bank will process the Lockbox contents in accordance with its current processing procedures and the instructions in the Lockbox Setup Form.  Without limiting the preceding, Company acknowledges and agrees as follows:

**9.5.1      Instruments Payable in Foreign Funds.**  Instruments payable in foreign money will be sent to Bank as an exception item to be processed for collection or deposit, in Bank's discretion, according to Bank's current standard procedures for such instruments.

**9.5.2      Missing Date.**  If an Item is not dated, Bank may insert the current date with a date stamp and process the Item, unless Company elects not to process according to the instructions in the Lockbox Setup Form.

**9.5.3      Stale Dated Checks.** Bank may deposit Items with any date. Items received which are six (6) months or older, or postdated may, at Bank's option, either be processed for collection (even though they may subsequently be dishonored), or forwarded to Company for handling, unless Company elects not to process according to the instructions in the Lockbox Setup Form.

**9.5.4      Postdated Checks.**  Items postdated will be deposited in the same manner as Items not postdated.  Bank will have no liability for processing and depositing postdated Items into the Account, unless Company elects not to process according to the instructions in the Lockbox Setup Form.

**9.5.5      Signature Missing.**  If the drawer's signature is missing and the Item contains no indication of the identity of the drawer, the Item will be sent as an exception item back to Company and not deposited into the Account. If the drawer's signature is missing but the Item bears a notation that the drawer has authorized the Item, Bank may in its discretion, either process such Item for collection or forward it to Company for handling, unless Company elects not to process according to the instructions in the Lockbox Setup Form.

**9.5.6      Amounts Missing, Inconsistent or Incorrect.**  Checks missing both script and numeral (courtesy) amounts will not be deposited.  Checks missing either script or numeral (courtesy) amounts may be deposited.  Differences between the written amount and the numerical amount of any Item may be resolved by Bank, before forwarding for collection, in favor of either amount, or may be forwarded to Company for handling.  Bank shall not be liable for any Losses caused by a good faith, reasonable decision as to the correct amount of any Item.  Bank shall have no duty to confirm that the amount of any Item is consistent with the amount of any invoice or notice.

**9.5.7      Restrictive Endorsements.**  Items bearing typewritten or handwritten notations such as "Payment in Full" or words of similar import, or any other restrictive legends or endorsements may at Bank's option, either be processed for collection or forwarded to Company for handling.  Bank shall not be responsible or liable in any respect for processing such Items. Company must inform its customers to address any disagreements regarding payments to a location other than the Lockbox.

**9.5.8      Payment Methods.**  Bank will recognize Items as acceptable methods of payment for deposit. Company assumes all such risks and agrees that Bank has no liability for remittances made in cash, and any cash received will be returned to Company or, in Bank's discretion, processed for deposit to the Account.

**9.5.9    Returned Checks.**  In the event that an Item deposited into an Account is returned unpaid because of insufficient funds or uncollected funds, Bank may either redeposit the Item or return the Item to Company and will debit the Account for the amount of such Item as permitted under the Account Contract.

**9.5.10    Acceptable, Incorrect and Missing Payees.**  Company will provide Bank with a list of acceptable payees in the Lockbox Setup Form (**"Acceptable Payees"**).  An Item will only be processed if it is made payable to an Acceptable Payee and if the Item is otherwise negotiable and processable.  If the payee name is incorrect or not reasonably related to an Acceptable Payee, then Bank, in its discretion, may decide not to deposit the Item.  Company warrants that each Acceptable Payee is either Company or Company's affiliate.  If an Acceptable Payee is Company's affiliate, then Company also warrants that such Acceptable Payee has authorized Items payable to it to be credited to the Account.  If Bank decides to deposit an Item with a payee name that is not correct or not reasonably related to an Acceptable Payee, Company agrees that Bank may subsequently debit Company's Account for the amount of any Item deposited but not properly payable to an Acceptable Payee, even if such debit creates an overdraft in the Account. Bank shall not be responsible for processing for collection any Item sent to Company via a Lockbox established pursuant to the Agreement including, without limitation, Items with incorrect or missing payees.

**9.5.11    Retention and Destruction of Remittance Documents.**  Bank will capture electronic images of the Items and such other remittance documents specified in the Lockbox Setup Form (the **"Images"**) and electronically store such Images for a reasonable period (not to exceed seven (7) years).  Except for original remittance documents sent to Company pursuant to the Setup Form (if any), Bank will securely store physical remittance documents and Items for a reasonable period following receipt in accordance with generally accepted industry procedures and then destroy. If an original remittance document has not yet been destroyed, Bank will use reasonable efforts to provide the original remittance document to Company upon written request and at Company's expense.

**9.5.12    Changes to Processing Procedures.** Company may request changes to the processing procedures set forth in this Section. However, such changes will not be effective unless or until they are approved by Bank by written Notice.

**9.6  RIGHT TO REFUSE TO PROCESS MAIL.**  If mail is received for Company or in the Lockbox that is deemed hazardous or hostile by Bank, Bank reserves the right to suspend all processing of Company's mail until action is taken to resolve the threat. Bank is not responsible for any Losses incurred by Company as a result of the suspension of processing in compliance with this **Section 9.6**.

**9.7  LIMITATION OF LIABILITY AND INDEMNIFICATION.**  Bank shall not incur any liability whatsoever and Company agrees to indemnify and hold Bank harmless from and against any claims or Losses relating to the receipt or alleged receipt by Bank of any cash or other property received in any Lockbox or any Account.  Bank shall have no liability for mail not bearing the complete address designated by Bank to Company.  The provisions of this **Section 9.7** shall survive the termination of the Agreement.

**9.8  LOCKBOX INTERNET SERVICES.**

**9.8.1    Terms of Service.**  If Company elects to receive the Lockbox Internet Services (Web Access), this **Section 9.8** shall apply to Company's use of such Services.

**9.8.2    Use License.**  Subject to, and in accordance with, the terms of the Agreement, Company is hereby granted, and Company hereby accepts, a personal, nonexclusive and nontransferable license (**"License"**) to use certain software on the Lockbox Internet Services website (**"System"**).  This License shall be effective while such System is in use by Company.  Company:

(a)  acknowledges and agrees that it will not have any ownership or other proprietary rights in the System, or any other documents or materials supplied to or available for access by Company under the Agreement (collectively, the **"Materials"**);

(b)  acknowledges that the System and Materials are protected by the patent and copyright Laws of the U.S. and that Bank's products and security relating thereto are confidential and proprietary trade secrets, and of substantial value to the owner thereof, and their use and disclosure must be carefully and continuously controlled;

(c)  will include all copyright, trade secret and any other proprietary notices and legends that are on the initial copy of the Materials on each copy thereof that Company is permitted to make;

(d)  will not remove, alter or obscure any trademark, trade names, logos, copyright or other notice contained or included in any of the System or Materials, transfer or license the System or any portion thereof, change or modify the System (or the source code) or create derivative works from them, or reverse engineer or attempt to reverse engineer the System, or attempt to discern the source code residing on the server on which the System is run;

(e)  agrees that, unless otherwise agreed by the parties in writing, the System and Materials will be used by Company and its authorized representatives only (or, with Bank's consent, Company's affiliates in accordance with the terms of the Agreement) and will not be used for, or on behalf of, others and that Company will not disclose, publish, release, transfer or otherwise make the System or Materials available in any form to, or for the use or benefit of, any other person or entity, other than as provided above;

(f)  agrees to be fully responsible for compliance with all of the terms and conditions of the Agreement by its employees, authorized representatives, as well as affiliates (and their respective authorized representatives) to which it may make the System available (as provided above); and

(g)  will not, and will not permit others to, directly or indirectly copy, duplicate, or furnish to others any physical or magnetic version of the Materials or any portion thereof.

Company acknowledges that breach by it or by any of its employees, representatives, agents, and affiliates (or their respective employees, agents and representatives) of the terms of this **Section 9.8** would cause immediate and irreparable harm to Bank for which money damages could not compensate Bank.  Therefore, Bank shall be entitled to injunctive relief for any such breach of any provision of this **Section 9.8** without proof of actual damages and without the posting of bond or other security.  Such remedy shall not be deemed to be the exclusive remedy for such breach but shall be in addition to all other remedies available at law or in equity.

**10.   POSITIVE PAY**

**10.1 ACH POSITIVE PAY.**

**10.1.1   Service Overview**. The ACH Positive Pay Service allows Company to direct Bank to pay or return debit Entries to Company's designated Account(s) through Business eBanking.

**10.1.2   Default Direction**. Company will establish a default direction on its Setup Form for Bank either to pay or return debit Entries for each Account. Bank recommends that Company set its default direction to return debit Entries. If set for return, Company may override this default direction by establishing payment rules for debit Entries that Company wants to pay and by choosing to pay exception items. If the default direction is set for pay, the Service permits Company to return specific debit Entries if Company timely directs Bank to return exception debit Entries through the Service. If Company does not establish a default direction, Bank will set the default direction to return. Bank will follow the default direction for debit Entries except as set forth below.

**10.1.3   Payment Rules**. Company will need to setup any pre-approved debit Entries through the Service. Even if the Service default direction is to return debit Entries, Bank will pay pre-approved debit Entries and deduct the amount of the debit Entry from the Account. The Service requires Company to specify the applicable Account and Originator (both Company Name and ID) for pre-approved debit Entries and permits Company also to specify other optional parameters for payment rules such as maximum amount, SEC Code and expiration date (together, the **"Payment Rules"**). Company may choose to use any or all of the optional parameters when it sets up Payment Rules for pre-approved debit Entries. Company is solely responsible for the accuracy of the information it enters into the Service to identify pre-approved debit Entries. Company may update its Payment Rules through the Service, including adding, changing, and deleting pre-approved debit Entries. Any change to a Payment Rule must be completed by the ACH Positive Pay Cutoff Time to be effective during nightly processing following the Business Day in which the change is made. Company is solely responsible for ensuring that it has created Payment Rules for all debit Entries it has authorized under the NACHA Rules.

**10.1.4   Exceptions and Daily Decisioning**. Company can view in BeB all debit Entries received each Business Day that do not match a Payment Rule (each, an **"Exception"**). Company may elect to pay or return each Exception prior to the applicable Cutoff Time on the Business Day the debit Entry was received. If Company fails to complete its decision on an Exception through the Service prior to the Cutoff Time, Company will be deemed to have selected its Service default direction for the Exception. If Company elects to pay an Exception item, the Service will permit Company to add future debit Entries from that same ACH Originator to the Payment Rules and Company must select whether to create a new Payment Rule for that Originator.

**10.1.5   Alerts.** The Service generates alerts when there are Exceptions that require attention. These alerts are sent by the Service to Users via email, SMS text message, or both. Company's Users must subscribe to these alerts through Business eBanking.

**10.1.6   Compliance with NACHA Rules**. Company must comply with the NACHA Rules in connection with all returned debit Entries. If the NACHA Rules require a written statement of the reasons for a return, Company shall notify Bank and cooperate with Bank to complete the required written statement.

**10.1.7   Bank's Rights and Duties**. Company acknowledges and agrees that Bank will follow the pay and return directions provided by Company on its Setup Form as updated and modified by Company through the Service. Company agrees that Bank shall not be liable to Company or any Third Party for following Company's directions. If Company does not maintain accurate and current Payment Rules and timely and accurately decision Exceptions through the Service, unauthorized debit Entries may be paid and authorized debit Entries may be returned, and Company shall bear any and all responsibility for any Losses or other consequences that may occur in either event. Any debit Entry that is paid in accordance with the Service shall be considered properly payable and Company agrees that Bank shall have no liability to Company or any other party for paying debit Entries in accordance with the Service. Company acknowledges that the return of a debit Entry is subject to dispute by the Originator and, in the event of such a dispute, Bank must act according to applicable Legal Requirements. Company waives any claim of wrongful dishonor against Bank associated with any debit Entry that Bank returns in accordance with Company's directions. Notwithstanding anything to the contrary stated herein, this Service does not limit Bank's right to return an ACH transaction unpaid if otherwise permitted under the Account Contract or Legal Requirements.

**10.2 FULL CHECK POSITIVE PAY.**

**10.2.1   Service Overview.** The Full Check Positive Pay Service allows Company to reduce the chance of fraudulent checks being paid from Accounts. With this Service, Company provides Bank with its check issue files and Bank compares presented checks against the issue files and identifies exception checks that Company can choose to pay or return, as more fully set forth below.

**10.2.2   Check Issue File.** Company will transmit to Bank electronic files that identify checks that have been validly issued by Company payable against an Account (the **"Check Issue Files"**). Check Issue Files shall accurately state the check number, date of issue, payee name (if applicable), and the exact amount of each check issued or to be issued on each Account since the previous Check Issue File was submitted to Bank. A Check Issue File also may include checks originally identified in a prior Check Issue File that Company has determined was inaccurate and wants to delete from the Check Issue Files **("Deleted Checks"**). Company may submit Check Issue Files to Bank by entering the check information into Business eBanking, through importing a Check Issue File into Business eBanking, or through Direct Send (if implemented for Company). Check Issue Files must comply with all Bank's requirements. If Direct Send is used, Check Issue Files must adhere to the format definitions within BeB, Bank's current naming conventions, and control card information. Company may create and submit Check Issue Files to Bank one or more times each day. Bank recommends that Company submit Check Issue Files prior to 6:00 p.m. (ET) on a Business Day if Company wants to ensure that a Check Issue File is used for exception analysis during nightly check processing on that Business Day. However, Bank may include Check Issue Files submitted after that time and up to 11:00 p.m. (ET) on a Business Day in the check exception analysis on that Business Day. The cumulative Check Issue Files used by Bank for identifying exceptions (the **"Issue File Database"**) typically will be updated immediately after Bank's receipt of a new Check Issue File from Company except that Issue Files received via Direct

Send may have some delay prior to being added to the Issue File Database. Check Issue Files that are not received by Bank in time for exception analysis during nightly check processing or received on a non-Business Day will be included in the Issue File Database by the opening of business on the next Business Day. Once a Check Issue File is added to the Issue File Database, it is available for teller inquiry for checks presented for immediate cash payment at a Bank banking center ("**Teller Presented Checks**"). Company must provide Bank with Issue Files in a timely manner. Company issued checks that are not in the Issue File Database will become exception items when presented for payment and will be denied payment at a Bank banking center.

**10.2.3      Exceptions and Daily Decisioning**.  Bank will compare the check number and amount on checks drawn on an Account and presented for payment through its customary check collection system and processed through Bank's nightly check processing **("Standard Presented Checks")** against the Issue File Database.  Bank will create an **"Exception File"** containing Standard Presented Checks that do not match one or more of the checks in the Issue File Database based on check number, amount and for other reasons such as duplicate checks and stale dated checks  (each, an "**Exception Check**").  Company can view the current Exception File in BeB each Business Day and must elect to pay or return each Exception Check prior to the Check Positive Pay Exception Cutoff Time on that Business Day through BeB.

**10.2.4      Payee Positive Pay**. If Payee Positive Pay is selected by Company on its Setup Form, the Service also will attempt to match the payee name on Standard Present Checks and Teller Presented Checks against the payee name for that check in the Check Issue File Database and checks that do not match will be treated as exception items. Payee names on checks must meet the requirements set forth in the User Guide for Payee Positive Pay and cannot be handwritten.

**10.2.5      Stale Checks.** A Stale Check received as a Standard Presented Check will be included as an Exception Check on Company's Exception File.  A check is a Stale Check if the issue date is more than the number of days prior to presentment selected by Company on its Setup Form or more than 180 days if Company has not specified a different number on its Setup Form.  If a Stale Check is received as a Teller Presented Check but the check matches a check in the Check Issue Database, Bank may, but is not required to, deny payment of such check.

**10.2.6      Changed and Deleted Checks.**  Company may change the details of or delete a check contained in a prior Check Issue File through the Service. Prior to Company changing or deleting a check in a Check Issue File, Company has the responsibility to first verify that the check has not already been posted to its Account. No changed or deleted check is considered received by Bank until the Check Issue File containing such changed or deleted check is properly submitted to Bank and uploaded to the Issue File Database.  If a changed or deleted check has already been paid or returned prior to the time the Check Issue File containing the change or deletion is uploaded to Company's Issue File Database, Bank shall not be liable for any loss incurred by Company arising from paying or returning the check based on the information in the Issue File Database.

**10.2.7      Default Decision.**  If Company's decision on an Exception Check is not transmitted to Bank by the Cutoff Time, Company will be deemed to have selected and Bank will process the Exception File following Company's default decision of either pay or return as designated on its Setup Form (the **"Default Decision"**). In addition, Company may request on its Setup Form that checks below a specified amount not appear in the Exception File and are just paid or returned pursuant to Company's Default Decision.  If an Exception Check decision is not made by the Exception Cutoff Time, Company assumes liability for any paid Exception Check. Notwithstanding anything to the contrary stated herein, this Service does not limit Bank's right to return a check unpaid on any Account if otherwise permitted under the Account Contract or Legal Requirements.

**10.2.8      Teller Presented Checks.** Teller Presented Checks identified as an exception to the Issue File Database will be subject to denial of payment at the teller line. Teller Presented Checks not identified as an exception to the Issue File Database will be processed pursuant to Bank's standard procedures, as set forth in the Account Contract.

**10.2.9      Bill Pay Checks.**  If a check is issued from an Account pursuant to Company's use of the Bill Pay Service (a **"Bill Pay Check"**), Company shall add that Bill Pay Check to its Check Issue File when the issue date and check number are known by Company.  If the Bill Pay Check is presented for payment as a Standard Presented Check prior to being added to the Issue File Database, the Bill Pay Check will appear in the Exception File for decisioning by Company and, if not timely decisioned, will be subject to Company's Default Decision. If a Bill Pay Check is presented for payment as a Teller Presented Check before it is added to the Issue File Database, it will be denied payment.

**10.2.10    Alerts.**  The Service generates alerts when there are Exception Checks that require attention.  These alerts are sent by the Service to Users via email, SMS text message, or both. Company's Users must subscribe to these alerts through Business eBanking.

**10.2.11    No Substitute for Stop Payment Services**.  Company shall make its Exception Check decisions only in response to Exceptions shown in Exception Files. Company may not use the Services as a substitute for "stop payment" services provided by Bank to customers who wish to place a stop payment order on an issued check.

**10.2.12    Authorization to Pay.**  Bank is authorized to pay, and will be deemed to have exercised ordinary care, if it pays items MICR-encoded with Company's Account information, whether or not authorized by Company and whether the item is an original, is a copy, is in a carrier, or bears a repair strip. Company agrees that Bank may compare Company's Issue File with information that is encoded on the checks presented for payment through an automated process and that Bank will not manually examine checks to confirm that they are properly signed, completed, or match an Issue File. Company agrees that this process is an acceptable standard of care for the Service and Company's Accounts.  Company understands that the Service may not identify counterfeit or duplicate checks. Company agrees to promptly review all check transaction information made available to it by Bank through BeB and paper statements.

**10.2.13    Liability Limits.**  In addition to other liability limits in the Account Contract, Company and Bank agree as follows:

(a)    UCC Liability. The liability and defenses to liability provisions of UCC Articles 3 and 4 shall govern the Service, except as modified below. Bank retains the right to and may assert as a defense to liability, Company's failure to exercise reasonable care under UCC Sections 3-406(a) and 4-406(c). Company agrees that Bank exercises reasonable ordinary care when it honors a check matching checks described in Company's Issue File Database and when it pays or returns an Exception Check consistent with this Section

(b) Wrongful Honor. It shall not constitute wrongful honor if Bank pays an Exception Check listed in an Exception File if (i) Company issued a direction for its payment; (ii) Company's failure to comply with the requirements of this Section resulted in Bank's failure to honor Company's intentions; or (iii) Bank has a defense of a kind recognized as a defense to payment over a stop order under UCC Section 4-403.

(c) Waiver of Claims – Directed Honor. If Bank honors an Exception Check in accordance with a pay direction issued by Company or honors a Standard Presented Check or Teller Presented Check that matches the specifications of Company's Check Issue File, such honor shall be deemed rightful for all purposes, and Company waives any right it may have to assert that such check was not properly payable under UCC Section 4-401 or any other section of the UCC, including for staleness, being altered, bearing a forged endorsement or bearing a forged drawer's signature.

(d) Wrongful Dishonor. Bank shall have no liability to Company for wrongful dishonor when Bank, acting in good faith, returns a Standard Presented Check or refuses to cash a Teller Presented Check: (i) that does not match the current Issue File Database; (ii) that is a Stale Check; (iii) that Bank reasonably believed was not properly payable; (iv) if there are insufficient Available Funds in the Account; (v) if required to do so by the service of legal process on Bank or the instructions of regulatory or government authorities or courts; or (vi) for other valid legal reasons, including reasons specified in the U.S. Patriot Act or by OFAC.

(e) Waiver of Claims – Directed Dishonor. If Bank dishonors an Exception Check in accordance with this Section, which includes, but is not limited to, dishonor in accordance with a return default option or with a return decision on an Exception Check, the dishonor shall be rightful, and Company waives any right it may have to assert that the dishonor was wrongful under UCC Section 4-402 or any other provision or principle of law.

(f) Limit on Liability. In no event shall Bank be liable to Company for more than the lesser of the amount of a wrongfully paid Exception Check or the portion of Company's actual damages resulting from Bank's payment of the Exception Check and not due to Company's lack of ordinary care. Bank shall not be liable for violating its duties under this Section or otherwise if Company has sustained no actual damages because Bank's honor of an Exception Check discharged for value an indebtedness of Company.

(g) Subrogation/Mitigation. Company has a duty to mitigate its damages and to cooperate with Bank in recovery or avoidance of any Losses. Company assigns to Bank all claims and rights of recovery on account of the wrongful payment of Exception Checks to the extent Bank reimburses Company for such payment.

## 10.3 REVERSE CHECK POSITIVE PAY

**10.3.1    Service Overview**. The Reverse Check Positive Pay Service provides a tool for check fraud reduction.  Customer receives an exception file on each Business Day showing checks drawn on an Account and presented for payment through Bank's customary check collection system and processed through Bank's nightly check processing **("Standard Presented Checks")**.  Customer must review the exception file and direct Bank to return unauthorized or altered checks by the cutoff time.

**10.3.2    Standard Presented Checks; Exception File.** For each Account subject to this Service, Bank will prepare an "Exception File" that contains the following information on all Standard Presented Checks presented to Bank for nightly processing on the prior Business Day: (a) Check number; (b) Check amount; (c) such other information as determined by Bank. Each Exception File also will include an electronic image of the front and back of each Check included in that Exception File. The Exception File typically will be available to Company through Business eBanking by approximately 9:00 a.m. (ET) on each Business Day. Should Bank be unable for any reason to provide Company with an Exception File through Business eBanking, Bank is authorized to send to Company an Exception File by facsimile, telephone, or e-mail transmission, but its failure to do so or to do so timely, shall not result in any liability of Bank to Company or any other party.

**10.3.3    Return Requests.**  Company has until the Check Positive Pay Exception Cutoff Time each Business Day to request through Business eBanking that Bank return and not pay any Check listed in the Exception File for that day (a **"Return Request"**). Each Return Request submitted to Bank shall authorize and direct Bank to return the check described in the Return Request. Company's failure to timely make a Return Request for a Check will result in the Check being paid and charged to the applicable Account (subject to Bank's other rights to return presented checks such as insufficient Available Funds). Bank may, in its sole discretion, act upon a Return Request received after the cutoff time or by a means other than Business eBanking. Company may provide written confirmation of any Return Request upon request by Bank. Bank shall have no liability for failing to act upon a Return Request that does not comply with the requirements of this Section and any other requirements Bank establishes from time to time.

**10.3.4    Authorization to Pay Checks.** Should (a) Bank be unable to timely transmit to Company through Business eBanking an Exception File, whether due to a communications failure, a force majeure event, or any other reason; or (b) Company fails to timely or properly transmit to Bank a Return Request for a Check listed on an Exception File, Bank is authorized and instructed to pay each applicable Check. Notwithstanding anything to the contrary stated herein, this Service does not limit Bank's right to return a check unpaid on any Account if otherwise permitted under the Account Contract or Legal Requirements.

**10.3.5    Teller Presented Checks Cashed.**  Company acknowledges and agrees that (i) this Service does not protect Company from fraud in connection with checks presented for immediate cash payment at a Bank banking center **("Teller Presented Checks")**; and (ii) Bank may accept and cash Teller Presented Checks pursuant to its standard procedures as set forth in Bank's current Terms and Conditions for Checking and Savings Accounts unless Company has made a timely stop payment request with respect to a Check. Company waives any claims against Bank for cashing any unauthorized, altered, counterfeit or other fraudulent Teller Presented Check, and agrees that Bank will not be required to re-credit Company's Account or otherwise have any liability for paying Teller Presented Checks except to the extent Bank failed to exercise ordinary care in connection with such payment or unless Bank's willful misconduct directly contributed to such loss.

**10.3.6    Not Substitute for Stop Payment Services.**  Company should not use this Service as a substitute for "stop payment" services provided by Bank to customers who wish to stop payment on a check actually issued by Company.

**10.3.7    Liability Limits.** In addition to other liability limits in the Account Contract, Company and Bank agree as follows:

(a)    UCC Liability. The liability and defenses to liability provisions of UCC Articles 3 and 4 shall govern this Service, except as modified below. Bank retains the right to and may assert as a defense to its liability, Company's failure to exercise reasonable care under UCC Sections 3-406(a) and 4-406(c). Company agrees that Bank exercises reasonable ordinary care when it pays or returns a Check consistent with this Section.

(b)    Waiver – Directed Honor. If Bank pays a Check in accordance with the terms of this Section, Company waives any right it may have to assert that such Check was not properly payable under UCC Section 4-401 or any other section of the UCC, including for staleness, being altered, bearing a forged endorsement or bearing a forged drawer's signature.

(c)    Wrongful Dishonor. Bank shall have no liability to Company for wrongful dishonor when Bank, acting in good faith, returns a Standard Presented Check or refuses to cash a Teller Presented Check: (i) that Bank reasonably believed was not properly payable; (ii) if there are insufficient Available Funds in the Account; (iii) if required to do so by the service of legal process on Bank or the instructions of regulatory or government authorities or courts; or (iv) for other valid legal reasons, including reasons specified in the U.S. Patriot Act or by OFAC.

(d)    Waiver – Directed Dishonor. If Bank dishonors a Check in accordance with a Return Request, the dishonor shall be rightful, and Company waives any right it may have to assert that the dishonor was wrongful under UCC 4-402 or other applicable Law.

(e)    Limit on Liability.  In no event shall Bank be liable to Company for more than the lesser of the amount of the wrongfully paid Check or the portion of Company's actual damages resulting from Bank's payment of the Check and not due to Company's lack of ordinary care. Bank shall not be liable for violating its duties under this Section or otherwise if Company has sustained no actual damages because Bank's honor of a Check discharged for value an indebtedness of Company.

(f)    Subrogation/Mitigation. Company has a duty to mitigate its damages and to cooperate with Bank in recovery or avoidance of any Losses. Company assigns to Bank all claims and rights of recovery on account of the wrongful payment of a Check to the extent Bank reimburses Company for such payment.

**10.3.8    Limitations.** This Service assists Company in detecting unauthorized checks presented for nightly check processing, but the benefits of this Service require Company to diligently and timely review the Exception Files each Business Day. In addition, the Services provide no benefit from unauthorized Teller Presented Checks. If Company desires enhanced check fraud detection services, Bank highly recommends that Company subscribe to Full Check Positive Pay Services and submit Check Issue Files to Bank.

## 11.  REMOTE DEPOSIT

**11.1  SERVICE OVERVIEW.**  The Remote Deposit Service permits Company to deposit eligible checks to its Accounts from off-site locations by imaging the Check using a scanner to create an electronic check image (a **"Check Image"**) and processing it for deposit through this Service using Business eBanking or as a Direct Send X9 file.  **Section IV.6** also applies if Direct Send is used.

**11.2  ELIGIBLE CHECKS.**  Only checks payable on demand and drawn on or payable through a United States financial institution with a valid U.S. ABA routing number **(each, a "Check")** are eligible for Remote Deposit. In addition, the following check types are not eligible for Remote Deposit:

- Checks payable on the Check front to any person or entity other than Company or a registered assumed name of Company;
- Federal Home Loan Bank Checks;
- Savings bonds;
- Travelers Checks;
- Checks payable in a foreign currency (i.e. not payable in United States currency);
- Checks written on an account at a financial institution located outside the United States;
- Checks that are missing information or have been altered;
- Checks future dated or stale dated (180 days old) at the time of the deposit;
- Checks that have been returned unpaid or uncollected;
- Checks that have been previously cashed or deposited;
- Checks drawn on accounts of Company or affiliates of Company.
- Checks not including a restrictive endorsement indicating the Check is for Bank deposit only.

Bank's failure to identify an ineligible check through Remote Deposit does not limit Company's liability or Bank's ability to return the Check unpaid if Bank also is the payor bank. Any Check deposited using Remote Deposit is subject to verification by Bank.  Bank may reject a Check for Remote Deposit for any reason and will not be liable to Company.  Company must bring any paper Check which is ineligible for or rejected for Remote Deposit to a Bank banking center for processing.

**11.3  ENDORSEMENTS.** Company agrees that all Checks submitted for Remote Deposit will contain Company's endorsement on the back of the Check and also will include a restrictive endorsement on the back of the paper Check indicating that the Check is for Bank deposit only, such as "For TCF Bank Deposit Only."  Company may acquire a scanner that will print this endorsement on the physical Check, or a User may endorse the original Check in writing or with a stamp.  Notwithstanding the above, Bank shall have no liability to Company or any third party for accepting a Check for deposit without this restrictive endorsement. In addition to the physical Check endorsement, the Remote Deposit System will print an endorsement on each Check Image submitted for Remote Deposit (**a "Virtual Endorsement"**).  This Virtual Endorsement appears only on the Check Image and not on the scanned physical Check. The Virtual Endorsement will be in Bank's standard format unless Company has requested and set up a custom Virtual Endorsement.

**11.4  CHECK IMAGING.**  Company must use a Check scanner and associated software approved by Bank to create Check Images files to send to Bank. All Check Images must meet the standards for image quality established from time to time by the American National Standards

Institute, the Board of Governors of the Federal Reserve and any other applicable regulatory agency, clearing house or association, including, but not limited to, the ANSI "X9" standards (or any amendment or substitute for such standards). Before submitting any Check for Remote Deposit, Company shall review the Check Image displayed on Company's computer screen and confirm that it legibly and accurately depicts all information on the Check and that each Check complies with the requirements listed in **Section 11.2** above. Company is responsible for the image quality of all Checks transmitted to Bank for processing. In the event the condition of a paper Check precludes a complete automated scan, Bank, in its discretion, may authorize Company to repair the Check's MICR data using the Remote Deposit Service. Company agrees to insert all MICR data accurately. Bank will not be responsible for the consequences of any bank failing or refusing to process a Check as a result of poor image quality or incorrect MICR data. Company acknowledges that current image technology may not capture all security features (e.g. watermarks) contained in original paper Checks and agrees to assume all Losses resulting from claims based on security features that do not survive the image process.

**11.5 CHECK PROCESSING AND EXCEPTION ITEMS.** Bank shall not be deemed to have received a Remote Deposit of a Check and shall not be liable or responsible therefore until the entire Remote Deposit transmission in which such Check is contained is received by Bank's server and such Remote Deposit entry complies with the requirements for data, image quality and other specifications set forth in the Agreement as updated from time to time. Bank is not responsible for Checks that it does not receive. Processing and/or errors may occur after Bank acknowledges receipt that may impact deposit completion. Bank will not examine Checks to verify any dates or dates. Bank will process the Check according to the amount entered by Company, if applicable, or by the numeric amount shown. If the numeric amount is unclear, Bank may process the Check according to the written amount, and Bank may correct the amount entered by Company. If the Check is ambiguous, Bank may reject the Check as an exception. If a Check does not have the necessary information to be processed by Bank, then Bank will treat the Check as an exception. If a Check is treated as an exception, Bank will notify Company and will not process the Check for deposit to Company's Account unless and until the exception issue is resolved. Bank will disregard any notation on a Check containing "paid in full" or other restrictive notation, whether preprinted or handwritten, and treat any such Check as though such notation did not appear thereon. Company should only stamp Checks with applicable notations after the Check has been imaged. Bank may, in its discretion, determine the manner in which Bank will seek to collect a deposited Check including, without limitation, (i) by presenting or transferring the Check Image to the paying bank, a Federal Reserve Bank, check clearinghouse, image share/exchange network, or other bank; (ii) creating a Substitute Check from the Check Image and then collecting such item, or (iii) requesting that Company provide to Bank the original paper Check from which the Check Image was created and then collecting the original paper Check.

**11.6 FUNDS AVAILABILITY.** The availability of funds represented by any Check and any requirements regarding final payment and collected funds shall be governed by the terms of the Account Contract. Subject to the other sections of the Agreement, a Check properly submitted and received by Bank for Remote Deposit (i) prior to the applicable Cutoff Time on a Business Day will be treated as received for deposit to the designated Account on that same Business Day; and (ii) after the applicable Cutoff Time on a Business Day or on a non-Business Day will be treated as received for deposit to the designated Account on the next Business Day. See Bank's Funds Availability Schedule in the Terms and Conditions for Checking and Savings Accounts for details on when Checks are available for withdrawal.

**11.7 TRANSACTION LIMITS AND RESERVES.** Bank may place per item, daily, and other periodic limits on Remote Deposits for Company and for each User. Bank may modify these limits at any time. Bank will use best efforts to provide Company with advance notice if it lowers Company's Remote Deposit limits. If an attempted Remote Deposit exceeds a current limit, it will be rejected. At Bank's request, Company shall maintain reserves in an account maintained at Bank to cover any charges, costs, expenses, or Losses incurred by Bank in connection with the Remote Deposit Services. Bank shall communicate to Company from time to time the amount of reserves Bank shall require, if any, in connection with the Remote Deposit Services.

**11.8 HARDWARE AND SOFTWARE.** Company shall use a Bank-approved image scanner and related hardware (**"Authorized Equipment"**) and software to use the Remote Deposit Service, which Company may purchase from Bank or a Third Party. All Authorized Equipment and software that Company uses with the Remote Deposit Service shall comply with the written requirements that Bank provides to Company. Bank is not a party to agreements between Company and Third Parties for Company's purchase of Authorized Equipment and software and Bank shall have no responsibility or liability arising out of such agreements. If Company purchases the Authorized Equipment from Bank, Bank will pass through to Company the manufacturer's warranties and if the Authorized Equipment fails while under these warranties, Company must contact the manufacturer directly. If Company chooses Bank's premium Remote Deposit Service, Bank will provide and maintain the Authorized Equipment during the term of this Service, but Bank does not guaranty that the Authorized Equipment will function continuously without errors or failures. Bank is not responsible for any errors or failures relating to any malfunction of the Authorized Equipment or for any computer virus or related problems that may be associated with the use of the Authorized Equipment. Unless Company uses Bank's premium Remote Deposit Service, Company shall pay all costs and charges to acquire and maintain the Authorized Equipment. Bank has the right, in its discretion, from time to time to make changes to the Remote Deposit Service that may result in Authorized Equipment becoming no longer compatible with the Service. Bank will have no obligation to update or replace any Authorized Equipment purchased by Company. Bank, however, will notify Company when such a change will occur in order for Company to replace the Authorized Equipment in use with compatible Authorized Equipment. Company must install any updates to the software within thirty (30) days of their release. Company will be responsible for training its employees in the use of the Remote Deposit Service, and for supervising and auditing their use of the Remote Deposit Service. If Bank provides the Authorized Equipment through the premium Service, Company must timely return the Authorized Equipment to Bank at Company's expense upon termination of the Service.

**11.9 SECURITY, CONFIDENTIALITY AND AUDITS.** Company must establish internal controls and processes that comply with the Remote Deposit processing guidelines that Bank provides to Company from time to time to safeguard Checks, Authorized Equipment and software to prevent the risk of theft, reproduction, unauthorized use or the possibility of any fraudulent activity. Company must limit access to both physical Checks and Check Images to those with a specific reason for such access. Company must securely store and safeguard all original

Checks converted to Check Images until destruction so that unauthorized persons do not have access to the paper Checks.  Company agrees to keep confidential all information contained in Checks of a nonpublic nature to the same extent that Bank would be required by applicable Laws to keep confidential the same information. Company agrees to conduct at least annually an audit of its Remote Deposit operations and processes, including its information technology infrastructure supporting its Remote Deposit operations using criteria reviewed and approved by Bank. If Bank requests, Company shall forward to Bank the results of all audits immediately upon completion of the audit. Company further agrees, upon reasonable notice by Bank, to permit Bank to audit, inspect, and review its Remote Deposit operations and processes.

**11.10 RETENTION AND DESTRUCTION OF CHECKS.**  Company should keep paper Checks processed for Remote Deposit in a secure location for at least 60 days prior to destruction and longer if there are any issues with the Check deposit.  After this time and provided Company has confirmed the Check has been correctly processed for deposit, Company may destroy the Check. Company shall retain an original Check for a longer period upon Bank's written request.  Company shall keep a log of destroyed Checks and, upon request, provide Bank with a copy of such log.  If an original Check has not been destroyed, Company shall provide the original Check to Bank at Bank's request.

**11.11 WARRANTIES AND COVENANTS.**  Company represents, warrants and covenants to Bank that with respect to each Check processed by Company hereunder:

(a)  The Check accurately represents all of the information on the front and back of the original Check at the time Company converted the original Check to the Check Image and the Check has not been altered.

(b)  The original Check and Check Image are authentic, authorized and are not counterfeit, forged, altered or fraudulent.

(c)  The Check Image contains all endorsements applied by parties that previously handled the Check for forward collection or return.

(d)  The original Check and Check Image comply with all transfer and presentment warranties set forth in applicable Laws and the Account Contract and all standards required by ANSI Standards, Federal Reserve Operating Circulars, and other applicable Rules.

(e)  The Check Image contains all MICR and other information required to create a Substitute Check and meets Bank's quality standards.

(f)  The Check satisfies all requirements for eligible Checks under **Section 11.2** above.

(g)  The original Check will not be deposited after it has been imaged for Remote Deposit, no duplicate Checks or files will be submitted to Bank for processing, and Bank will not sustain a loss if Company has deposited previously imaged Checks.

(h)  All Checks and the related transaction that generated the Check comply with all applicable Laws.

(i)  Files submitted to Bank do not contain viruses.

**11.12 INDEMNITY.**  In addition to all other indemnities in the Account Contract, Company agrees to reimburse and indemnify Bank for all Losses incurred as a result of any claims (i) that a Check deposited with Remote Deposit is invalid or fraudulent; (ii) that any recipient of a Substitute Check corresponding to a Remote Deposit Check incurred a Loss due to the receipt of the Substitute Check instead of an original Check; (iii) relating to any duplicate deposit of a Check deposited with Remote Deposit; or (iv) relating to any incorrect MICR information entered or edited by any User.  Without limiting the foregoing, Company agrees that it will promptly reimburse Bank if Bank is required to indemnify any other financial institution or Third Party because any Check deposited using Remote Deposit also is deposited as a paper Check and is returned unpaid, regardless of whether or not the paper Check contained a restrictive endorsement and regardless of whether or not Company had any fault in connection with the deposit of the paper Check.

**11.13 CONTINGENCY.**  In the event Company receives Remote Deposit Services from Bank but cannot use Remote Deposit to process its Checks for deposit (unable to capture or transmit Checks), Company may deliver or send the original Checks by overnight delivery, at Company's expense, to Bank at the address specified in **Section II.11.1** above.

**11.14 RETURNED CHECKS.**  In addition to its rights in this Section, Bank shall have the same rights with respect to Checks deposited with Remote Deposit as it has with checks submitted for deposit at a Bank banking center under the Account Contract and applicable Legal Requirements. Bank will notify Company of the receipt of a returned Check in the same manner as Company receives return notices for standard check deposits. Bank shall have no obligation to re-present a returned Check if Bank complied with the terms of the Agreement with respect to the original Check. Company authorizes Bank to reverse the amount Bank credited to Company's Account as soon as information relating to the returned Check is made available to Bank. Company will immediately reimburse Bank with immediately available funds to cover the amount of any returned Check or for any amount in an adjustment memorandum Bank receives relating to such Check.

**11.15 PERFORMANCE STANDARDS.**  Company agrees that applicable Legal Requirements, including UCC 3 and 4, as modified by the Account Contract, shall supplement the terms of the Agreement.

**11.16 CHECK CONVERSION TO ACH ENTRIES.**  If Company requests Check conversion to ACH entries, Company must enroll in Bank's ACH Services and obtain ACH credit approval. See **Section IV.2** on ACH Origination Services for terms applicable to Check conversion to ACH Entries.

## 12.  *RETURNED DEPOSITED ITEMS*

**12.1  Service Overview.**  The Returned Deposited Items service permits Company to designate on its Setup Form a variety of special handling services for Returned Checks that alter Bank's standard Returned Check processes.  These options are explained more fully below.

**12.2  Definitions.**  The following terms have the following meanings in this Section.

"Advice" means a notice of one or more Returned Checks provided to Company containing information regarding the Returned Check(s), including the amount, the payor, and the reason for the return.

"Extended Advice" means a notice of a Returned Check provided to Company containing the same information regarding the Returned Check that is included in an Advice and also including a copy of the Returned Check.

"Payor Bank" means the bank or other financial institution on which a Returned Check is drawn.

"Returned Check" means a check or other non-cash Item deposited by Company to an Account and returned by the Payor Bank unpaid due to nonsufficient or unavailable funds or for any other reason; Returned Checks also may be referred to as Deposited Items Returned.

**12.3  Automatic Re-presentment.** Company may request that Bank automatically re-present Returned Checks to the Payor Bank one additional time after the initial return.  If the Payor Bank makes final settlement for the re-presented Returned Check, any provisional credit provided to Company on such check will become final.  If the Payor Bank returns the re-presented check a second time, any provisional credit provided to Company's Account for such check will be charged back.  Company has the option of designating an alternative Account for the charge back on its Setup Form.  No Advice is sent to Company on Returned Checks subject to re-presentment unless the Payor Bank returns the check again following re-presentment.

**12.4  Threshold Amounts.**  Company can set a maximum or minimum dollar amount for Returned Checks subject to automatic re-presentment.  In addition, Bank reserves the right to limit the amount of Returned Checks that may be re-presented each day.

**12.5  Advices.**  Company will receive Advices on Returned Checks (following any re-presentment) via U.S. mail and also through BeB. Company may request either standard Advices or Extended Advices that include a copy of the Returned Check(s) referenced on the Advice. If Company requests an Extended Advice, a copy of the Returned Check will be included in the Advice received through the mail, but it will not be available on BeB. Advices typically will be available on BeB on the Business Day that Bank processes the related Returned Checks and an image of the original deposited check (without the return information) will be available on BeB on the following Business Day.

**12.6  Fees.**  Company must pay Bank's current Deposited Item Returned fee in addition to the fee for these Services.

**12.7  Substitute Checks.**  Bank will mail to Company a Substitute Check for each Returned Check provided that such Returned Check is not subject to re-presentment and there are no fraud issues with the Returned Check. Typically, the Substitute Check will be mailed with the paper Advice to Company.

**12.8  Second and Alternate Address.** Bank will mail Advices to Company's primary address and to a second address if Company selects this option and designates a second address on its Setup Form. Bank will mail each Advice and the related Substitute Check to an alternate address rather than Company's primary address if Company selects this option on its Setup Form and designates an alternate address.

**12.9  Alert Services.**  The Service generates alerts when there are Returned Check Advices available for viewing in BeB.  These alerts are sent to Users via email, SMS text message, or both. Company's Users must subscribe to these alerts through BeB.

*13.  WIRE TRANSFER*

**13.1  SERVICE OVERVIEW.**  The Wire Transfer Service allows Company to transfer funds from an Account via Wire Transfer. A **"Wire Transfer"** means an electronic transfer of funds from an Account to a designated beneficiary **(the "Beneficiary")** with an account at another financial institution (the **"Beneficiary Bank"**) using Fedwire or other wire transfer system and excludes ACH transactions. A Wire Transfer typically provides immediately available funds or same day settlement to the Beneficiary.

**13.2  DAILY LIMITS.**  Daily limits on Wire Transfers initiated through BeB are established at enrollment on the Setup Form and may not be exceeded without prior written authorization from Bank. All Wire Transfers initiated through BeB from all Accounts of Company and the accounts of Affiliates linked to Company in BeB are applied against the daily limit.

**13.3  AUTHORIZATION.**  Company may issue, and Bank is authorized to execute, Wire Requests directing Wire Transfers from Accounts to accounts of Company or third parties at domestic or foreign financial institutions. Company authorizes Bank (i) to execute Wire Transfers on behalf of Company upon Bank's receipt of Wire Requests, and (ii) to charge Company's Accounts for each Wire Request that Bank executes. Company's Wire Request is considered accepted by Bank when Bank executes it.

**13.4  FORM OF REQUEST.** Wire Requests may be initiated through one or more of the methods authorized by Bank. Bank recommends that all Wire Requests be originated electronically through Business eBanking pursuant to the recommended Security Procedures. Bank, in its discretion, may permit Company to make Wire Requests via phone, email or facsimile (a **"Remote Wire Request"**) provided that Company follows the Security Procedures for Remote Wire Requests. Bank discourages Remote Wire Requests. If Company insists on initiating Remote Wire Requests, it assumes all responsibility for Losses that could have been avoided had the recommended Security Procedures for Business eBanking Wire Requests been followed.

**13.5  NETWORKS.**  Bank may complete any portion of a Wire Transfer using any Wire Transfer network, cable or wireless transfer system Bank or its Third-Party processors determine appropriate including, but not limited to, Fedwire, Telex or SWIFT.  In addition, if the Beneficiary's account is maintained at Bank, Bank may make an internal transfer on its systems to complete the Request rather than processing a Wire Transfer through a Third-Party network/system. Each Wire Transfer will be governed by the rules of the applicable network/system, whether or not Bank is a member of the network/system.

**13.6  ACTING ON REQUESTS; CUTOFF TIME.**  Company may not place any additional instructions or restrictions on Wire Requests other than designating the amount, Beneficiary, Beneficiary Bank, Company's Account to be debited, and applicable currency if a Foreign Currency Wire. However, if Company does place any additional instructions or restrictions on a Wire Request, Bank, in its sole discretion, may elect to act on such instructions or other restrictions, which it believes in good faith, were made by Company. Any Wire Request received by Bank after the applicable Wire Cutoff Time or on a non-Business Day may be treated as received by Bank on the next Business Day. Bank's ability to process a Wire Request also is subject to the business day schedule of any intermediary and Beneficiary Bank.

**13.7  REJECTION OF REQUESTS.**  Bank reserves the right, with or without cause, to refuse to execute any Wire Request. Bank will give Company notice of rejection by telephone and/or email. Without limiting the foregoing, Bank may reject any Request:

(a)  that exceeds the Available Balance in the Account and may make an offsetting reversal if a debit is made before Bank ascertains there is not a sufficient Available Balance in the Account.

(b)  that does not conform in form and substance with the requirements of the Agreement, the Security Procedures and Setup Forms, including the previously supplied information regarding Users.

(c)  if Bank is unable to verify the authenticity of the Request to Bank's satisfaction.

(d)  for any reason under the applicable national payment system rules of the receiving country of the transaction.

(e)   if Bank has reason to believe the request is fraudulent or erroneous.

**13.8 CANCELLATION OR AMENDMENT OF REQUESTS.**  Bank has no obligation to cancel or amend a Wire Request after its receipt by Bank. If Bank receives a Wire Request from Company instructing Bank to cancel or amend a prior Wire Request that Bank has not yet executed and Bank is able to verify the authenticity of the cancellation or amendment Request, Bank may make a reasonable effort to act on that Request.  After a Request has been executed, cancellation or amendment of the Request is not effective.  Bank has no liability to Company if such Request is not effective and Company agrees to indemnify and hold Bank harmless from any and all Losses Bank may incur as a result of the cancellation or amendment of the Request or in the attempt to cancel or amend the Request.

**13.9  INCONSISTENT NAME AND ACCOUNT NUMBER.**  Bank is not responsible for detecting errors in any Wire Request. Company agrees that when Company provides Bank with a Beneficiary's name and account number when making a Request, the Request may be processed solely on the basis of the account number even if the account number identifies a Beneficiary different from the Beneficiary named by Company. Company further agrees that its obligation to pay the amount of the Wire Transfer to Bank is not excused in such circumstances. Likewise, Bank may pay Wire Transfers received by Bank for Company's benefit solely on the basis of the account number. Company agrees that Bank is not responsible for any delay arising out of Bank's attempt to reconcile inconsistencies between name and account number or investigate suspected irregularities. Bank has no obligation to determine whether the name and account number refer to the same person.

**13.10  WARRANTIES.**  Company represents and warrants to Bank that each Wire Request is accurate, has been duly authorized, and complies with applicable Laws, UCC 4A and Federal Reserve Board Regulation J, as and if applicable.

**13.11  FOREIGN CURRENCY WIRES.**

(a)   Company may request a Wire Transfer to a Beneficiary with an account at a Beneficiary Bank outside of the United States and in a currency other than U.S. dollars (a **"Foreign Currency Wire Request"**). Company may receive a quoted exchange rate for Foreign Currency Wires through BeB, but Bank reserves the right to modify the quoted exchange rate. Bank will contact Company via phone if the available exchange rate is less favorable from the BeB quoted rate and Company may verbally accept or reject any updated exchange rate. If Company accepts the quoted rate through BeB or accepts the rate quoted by Bank via a phone call (each, an **"Accepted Quote"**), Company agrees to complete the related Foreign Currency Wire Request in BeB (if not already completed). Following an Accepted Quote, if Company (i) fails to complete the Foreign Currency Wire Request through BeB prior to the international Wire Cutoff Time on the day of the Accepted Quote or (ii) timely completes the Foreign Currency Wire Request but the Wire Transfer Request is not accepted or not executed for any reason (including that such Wire Transfer is prohibited by Laws administered by OFAC); and Bank has converted (or is committed to convert) US dollars to the applicable Foreign Currency, (i) Company shall reimburse Bank for any exchange rate loss resulting from converting such Foreign Currency back to US Dollars and agrees that Bank may deduct the amount of such exchange rate loss from Company's Account(s); and (ii) Bank shall pay to Company any exchange rate gain resulting from converting such Foreign Currency back to US dollars received by Bank from its Third-Party processor (after deduction of all applicable fees, costs and charges). Bank will use commercially reasonable efforts to re-convert any purchased Foreign Currency to US dollars within one Business Day of Bank determining that the Foreign Currency Wire Request will not or cannot be executed. Following an Accepted Quote, Company agrees that Bank may (but is not required to) place a hold on the funds in Company's Account in the amount of US dollars required to purchase the Foreign Currency as per the Accepted Quote plus an additional commercially reasonable amount to cover the potential exchange rate loss if the purchased Foreign Currency must be re-converted to US dollars. Bank will release this hold upon its execution of the Foreign Currency Wire Request. Bank also will release this hold after deducting any applicable exchange rate loss if the Wire Request is not executed for any reason and the purchased Foreign Currency is reconverted to US dollars. Notwithstanding the foregoing, Company will have no duty to compensate Bank for any exchange rate loss occurring as the direct result of the gross negligence or intentional misconduct of Bank.

(b)   Bank may and does use Third-Party processors to effect currency conversions for both incoming and outgoing Foreign Currency Wire Transfers. Bank or its Third-Party processor may convert US dollars to or from the applicable Foreign Currency at the exchange rate used by Bank or its Third-Party processor and in effect at any point in the processing of a Wire Transfer and the exchange rate received by Bank and/or its Third-Party processors may differ from the quoted exchange rate provided to Company. The quoted exchange rate provided by Bank to Company may include a spread or markup as additional compensation to Bank and its Third-Party processors for providing the Foreign Currency Wire Transfer services.

(c)   Wire Transfers to a foreign country are subject to the Laws of that country. Bank assumes no liability for delays, non-delivery or other events resulting from causes beyond Bank's control. In refunding executed Wire Transfers to foreign countries, Bank shall be liable to Company only to the extent it receives payment back from any Third-Party processing the Wire Request or the Beneficiary's Bank (as applicable). Bank shall not be liable for any Losses arising from currency conversions effected by Bank in good faith.

(d)   Company agrees to pay all fees, costs and charges assessed by Bank or any Third-Party processor for processing any currency conversions or foreign Wire Transfers.  In addition, Company agrees to pay all fees charged by any intermediary bank and the Beneficiary's Bank and all taxes and other governmental charges (foreign or domestic) associated with the Wire Transfer. Company agrees that all fees, charges, and other amounts for which Company is liable may be deducted from the amount of the Wire Transfer or from Company's Account(s), in Bank's discretion, and any amount owed to Company by Bank as a result of a foreign exchange gain hereunder will be credited by Bank to Company's Account.

**13.12  INCOMING WIRES.**  All credits to any account of Company for incoming Wire Transfers are provisional until Bank receives final settlement for the funds according to the rules of the Wire Transfer system by which such funds have been transmitted. Company agrees that if Bank does not receive such final settlement, or a Wire Transfer has, in Bank's judgment, been mistakenly, negligently or fraudulently credited to Company's Account, Bank is entitled without notice to debit the amount so credited to Company's Account or to debit or offset that amount against any other accounts of Company at Bank. Company agrees that Bank does not need to provide Company with written

notice when Bank receives an incoming Wire Transfer. Company will receive notice of incoming Wire Transfers on its monthly account statement and through Business eBanking.

## 14.  ZERO BALANCE ACCOUNT

**14.1  SERVICE OVERVIEW.**  The Zero Balance Account ("**ZBA**") Service allows Company to eliminate excess balances in its designated Accounts.  At the end of each Business Day, Bank's system will tabulate all account transactions and automatically transfer funds into or out of each Subordinate Account, bringing it to the designated target balance ("**Target Balance**").

**14.2  ACCOUNT DESIGNATIONS.** Company must select: (i) one or more of its Accounts at Bank as master accounts ("**Master Account(s)**"); (ii) one or more of its accounts at Bank as Subordinate Accounts ("**Subordinate Account(s)**") to be linked to a corresponding Master Account; and (iii) a Target Balance for the Subordinate Account(s).  The default Target Balance is zero ($0.0) unless Company and Bank have agreed upon a different Target Balance for the Subordinated Account(s).  A Master Account may be linked to multiple Subordinate Accounts and may, itself, be a Subordinate Account linked to another Master Account. If a Master Account is not a Subordinate Account, it is the "**Ultimate Master Account.**"  The Ultimate Master Account is the final Master Account in any chain of linked Subordinate Accounts and Master Accounts. All Master Accounts, including the Ultimate Master Account, that are linked to one or more Subordinate Accounts are collectively referred to herein as the "Master Account."  The Master Account(s) and Subordinate Account(s) are Accounts under the Agreement.

**14.3  SUFFICIENT FUNDS.**  Company must ensure the Master Account(s) has an adequate Available Balance for all daily activity.

**14.4  AUTHORIZATION.**  Company authorizes Bank to transfer funds to and from Company's Master Account(s) and Subordinate Account(s) in accordance with this **Section 14.**

**14.4.1  Debits from Subordinate Accounts.** When a Subordinate Account does not have a sufficient Available Balance to cover Checks, transfers and other debits (collectively "**Debits**") from such Account, Bank will automatically transfer to such Subordinate Account from the Master Account an amount sufficient to pay such Debits if the Master Account has a sufficient Available Balance. If the Master Account does not have a sufficient Available Balance to pay any such Debits, Bank reserves the right, in its sole discretion, to pay or return any Debits. If Bank pays any Debit that overdraws a Subordinate Account (because the Available Balance in the linked Master Account(s) is not adequate to cover the Debit), the payment of such Debit will result in a negative balance in the linked Master Account(s).

**14.4.2  Funds Below Target Balance.** If, after payment of all Debits from a Subordinate Account, the Available Balance in such Subordinate Account is less than the Target Balance, Bank will automatically transfer to such Subordinate Account any Available Funds in the linked Master Account(s) in an amount sufficient to bring the Subordinate Account to its Target Balance. If there are insufficient Available Funds in the Master Account(s) to restore such Subordinate Account's Target Balance, Bank reserves the right, in its sole discretion, to advance funds to restore such Account's Target Balance, and, any such advance of funds will result in a negative balance in a linked Master Account(s).

**14.4.3  Funds in Excess of Target Balance.**  At the close of each Business Day, Bank will automatically transfer to a linked Master Account(s) the amount by which the Available Balance in a Subordinate Account exceeds the Target Balance.  In addition, Company may select on its Setup Form whether or not to transfer the Available Float from the Subordinate Accounts to the Master Account. Available Float means deposited checks that are not yet Available Funds under the Funds Availability Schedule in the Account Terms and Conditions.

**14.4.4  Multiple Subordinate Accounts.**  If more than one Subordinate Account is linked to a Master Account or chain of Master Accounts, Bank will transfer Available Funds from such Master Accounts to cover the Debits from all linked Subordinate Accounts prior to making transfers from such Master Accounts to restore the Target Balance in such Subordinate Accounts. If there are insufficient Available Funds in such Master Account to cover all Debits from all linked Subordinate Accounts, Bank reserves the right, in its sole discretion, to (i) pay or return any such Debit, and (ii) advance funds to pay all Debits and/or restore the Target Balance of any one (1) or more of such Subordinate Accounts.

**14.5  HOLDS.** Bank may apply any holds on funds applicable to a Subordinate Account to any linked Master Account(s).

**14.6  REQUIRED DISCLOSURE.**  UNDER COMPANY'S ZBA SWEEP ARRANGEMENT, THE INSURABILITY OF COMPANY'S DEPOSITS MAY BE AFFECTED IN THE EVENT THAT BANK FAILS. UNDER THE TERMS OF THE AGREEMENT, ALL FUNDS IN THE SUBORDINATE ACCOUNTS ABOVE THE TARGET BALANCE AT THE END OF THE DAY ARE TRANSFERRED TO THE MASTER ACCOUNTS. THE DETERMINATION OF THE INSURABLE AMOUNT WILL BE DETERMINED BASED ON THE AMOUNT OF FUNDS HELD IN THE ACCOUNTS AFTER THIS TRANSFER. THESE FUNDS ARE A DEPOSIT AND THE AMOUNT COVERED BY FDIC INSURANCE WILL BE DETERMINED BASED ON CURRENT GUIDELINES.

# EXHIBIT 1
# Business eBanking Agreement
# (Terms and Conditions)

**1.   INTRODUCTION.**  This Business eBanking Agreement (this "<u>Agreement</u>") sets forth the terms and conditions applicable to Company's use of Digital Banking (defined below) and the Services described in this Agreement provided by TCF National Bank. **By using Digital Banking, Company agrees to all terms of this Agreement.  If Company does not agree with any of the terms of this Agreement or to the other terms, conditions, amendments or rules for Digital Banking from time to time posted by Bank, then Company should immediately cease all use of Digital Banking.** Please read this Agreement carefully and keep a copy for Company's records.

**2.   DEFINITIONS.**  For purposes of this Agreement, the following terms have the definitions set forth below.  Other capitalized terms used but not defined herein have the meanings given to them in the other Account Contract documents:

"<u>Account</u>" means each deposit account maintained by Company with Bank that is eligible for and enrolled in Digital Banking, as designated by Bank from time to time.  Bank reserves the right to restrict any Account from eligibility for Digital Banking.

"<u>Account Contract</u>" means this Agreement, the Account Application and Agreement executed by Company for its Accounts, the TM Service Agreement (if applicable), the Business Mobile Terms and Conditions (if applicable), Bank's current Terms and Conditions for Checking and Savings Accounts and Terms and Conditions for Certificates of Deposit (as applicable), Bank's Schedule of Fees and any other pricing disclosures; any additional agreements between Company and Bank and any additional disclosures that Bank may give Company; other forms to process or authenticate Company's Account transactions or supplement Digital Banking, and all amendments or additions to any of the foregoing that Bank issues or posts from time to time.

"<u>Administrator</u>" means the individual identified by Company as the person with authority to administer all aspects of Digital Banking for the Company, including designating Users and managing each User's access rights in Digital Banking.

"<u>Affiliate</u>" means each entity that is affiliated with Company through common ownership or control and that is identified on documentation acceptable to Bank that permits their accounts to be linked in Digital Banking for purposes of funds transfers between their accounts and a single Administrator for all accounts.

"<u>Alerts</u>" means electronic messages and eNotices sent by email, text message, and/or push notification, and/or displayed through Digital Banking to alert and remind Company about certain activity on the Account(s).

"<u>Available Balance</u>" and "<u>Available Funds</u>" have the meaning stated in Bank's Terms and Conditions for Checking and Savings Accounts.

"<u>Bank</u>" means TCF National Bank and all predecessors in interest, including Chemical Bank and its predecessors in interest.

"<u>Business Day</u>" means any portion of a day, other than Saturday, Sunday, or a federal holiday in the U.S., on which Bank is open to the public for purposes of conducting substantially all business functions. Bank bases its Business Day and times on the Eastern Time zone.  Bank reserves the right to modify its Business Day at any time without prior notice.

"<u>Communications</u>" means Account disclosures, notices, messages, records, change in terms notices, changes to Company's Account Contract, overdraft notices, tax notices, Alerts, and other information that Bank may deliver to Company concerning Company's Account(s) or the Services.

"<u>Company</u>" means the business entity, governmental entity, non-profit organization, trust, individual or other person identified as the owner of the Accounts enrolled in Digital Banking.

"<u>Core Services</u>" means the services described in this Agreement accessed through Digital Banking.

"<u>Cutoff Time</u>" means the time by which a request related to a Service must be completed and received by Bank on a Business Day as set forth at https://www.tcfbank.com/Agreements-And-Disclosures/Business-eBanking-Disclosure. Cutoff Times are subject to change by Bank in its discretion.

"<u>Digital Banking</u>" means Bank's business online banking system currently known as "Business eBanking" or "BeB" and the Mobile Application.

"<u>Loan</u>" means any outstanding loans made by Bank to Company for business purposes which Bank designates as eligible for the Loan Services (described below).

"<u>Mobile Application</u>" means the TCF Bank Business mobile banking application available for download to Mobile Devices through Google Play for Android devices and Apple's App Store for iPhone/iPad devices.

"<u>Mobile Device</u>" means the wireless receiving equipment used to access the Mobile Application and that meets the hardware and software requirements specified by Bank from time to time including internet connectivity, the ability to download applications from either the Google Play or Apple App store, and the ability to receive either voice or SMS text messages.

"<u>Payment Order</u>" means any instruction to transfer funds from an Account (i) through a wire transfer; (ii) through the ACH Network; or (iii) through a bill payment request or other transfer initiated through Digital Banking.

"<u>Processor</u>" means a third-party that provides processing, technology, or related services or software to Bank to assist Bank in providing Digital Banking or any Core Service.

"<u>Security Procedures</u>" means the "Security Procedures" located on the Forms and Documents page in Digital Banking as supplemented by any security designations completed by Company and any security procedures contained in the Account

Contract, and all other measures implemented, recommended or required by Bank from time to time to help safeguard access to and use of Accounts, the Services and Digital Banking.

"Services" means the Core Services and the Treasury Management Services except when the term is used to reference a specific Service or Services.

"TM Service Agreement" means the Authorization and Agreement for Treasury Management Services and Bank's Treasury Management Services Terms and Conditions if agreed to by Company and also any prior agreement executed by Company covering Company's use of Bank's Treasury Management Services to the extent such prior agreement has not been superseded.

"Treasury Management Services" means optional treasury management services provided by Bank and described in the TM Service Agreement or in other agreements separate from this Agreement.

"User" means all individuals identified by Company, through the Administrator, as individuals authorized by the Company to use or access Digital Banking or any Core Service on behalf of the Company.  The term "User" includes Administrators.

**3.   ENROLLMENT.**  Access to Digital Banking requires that Company complete the enrollment process for its Accounts. As part of the enrollment process, Company must designate an Administrator.  Enrollment in Digital Banking provides Company with access to the Core Services.  If Company requests Treasury Management Services, Company must execute a TM Service Agreement (which includes this Agreement as an Exhibit).  Bank will notify Company whether Company's access to Digital Banking is approved and enrollment is complete.

**4.   CORE SERVICES.**  By enrolling in Digital Banking, Company will receive access to the Core Services set forth below.  As specified below, some Core Services require Company to complete additional setup steps prior to using that Service.  Company may subscribe to Treasury Management Services accessed through Digital Banking by executing the TM Service Agreement.

**A.   ACCOUNT ACTIVITY AND BALANCE REPORTING.**  Company may receive balance, term and maturity date information through the previous Business Day on each of its time deposit Accounts (CDs).  Company may receive balance and transaction information through the current Business Day on each of its demand, savings and money market Accounts.  Account balances are updated each Business Day and current day transactions will be displayed throughout each Business Day.  Current day balances in Digital Banking include pending transactions that will not be posted to Company's Accounts until nightly processing. The final posting of transactions may include adjustments to preliminarily posted information.  Company may view up to the prior eighteen (18) months of transaction history and issued checks, deposit tickets, and deposited item return images in the Account. When an Account is initially set up on Digital Banking, limited history is available.

**B.   ELECTRONIC ACCOUNT STATEMENTS.**  Company may elect to receive its monthly Account statements electronically through Digital Banking.  Electronic Account statements typically are available through Digital Banking on the first Business day of each new statement cycle for the prior statement cycle.  If Company elects to receive electronic Account statements, Company will no longer receive paper Account statements.

**C.   ELECTRONIC ACCOUNT ANALYSIS STATEMENTS**.  Company may elect to receive its monthly Account analysis statement for analyzed Accounts through Digital Banking.  The Account analysis statement shows Company's service volumes and fees, including any earnings credit allowance based on Account balances, for the applicable month.  Account analysis statements typically are available through Digital Banking on or about the 12th day of each month for the prior month.  If Company elects to receive electronic Account analysis statements, Company will no longer receive paper Account analysis statements unless requested by Company.

**D.   INTERNAL ACCOUNT TRANSFER SERVICE.**  Company may initiate same day funds transfers and schedule future funds transfers between its Accounts using Digital Banking.  Company also may make funds transfers from its Accounts to its Affiliates' accounts if such accounts are linked in Digital Banking.  There are no limits on the number of transfers Company may make from its checking Accounts. **Any transfer from a money market or savings Account counts towards the six-transaction limit for such Account during each monthly statement period.**  Funds transfer may not result in immediate availability in the receiving Account because of the time required to process the request. Same day transfer requests submitted and approved before Bank's Cutoff Time for internal transfers typically will be processed same day.  If a transfer request exceeds the transferring Account's Available Balance at the requested processing time for the transfer, Bank typically will not process the transfer.  Bank, in its discretion, may process a transfer request, when permitted by Company's Account Contract, which would cause Company's Account to be overdrawn or add to the amount by which it is overdrawn.  If this occurs, Bank's current overdraft fees will apply.  Bank will not honor any transfer request if Company's Account is restricted from transfers for any reason.  Bank will use reasonable efforts to make Company's requested transfers in accordance with Company's transfer instructions, but Bank shall incur no liability if Bank is unable to complete any transfer request.

**E.   STOP PAYMENT SERVICE.** Company may request a stop payment on any outstanding check drawn on Company's Account(s) through Digital Banking, except Stop Payment Service is not available through the Mobile Application.  Stop payment requests properly submitted will be processed provided Bank has not already paid the check and has sufficient time to act on the request before paying the check.  Each stop payment request must describe the check with reasonable accuracy so that Bank's current technology systems can identify the applicable check.  Prior to requesting a stop payment through Digital Banking, Company has the responsibility to first verify that the check has not already been posted to its Account.  Bank will acknowledge its receipt of a stop payment request with a confirmation message displayed in Digital Banking.  No stop payment request is considered received by Bank until this confirmation message is displayed and Company is responsible for ensuring that such message is displayed.  If a check is paid (1) prior to Bank's acceptance of and ability to act on a stop payment request or (2) because the User entered incorrect identifying information for the check, then Bank need not further attempt to stop or reverse payment and shall not be liable for any loss incurred by Company arising from the event, even though Bank received or acknowledged receipt of the stop payment request prior to payment of the check. If Company submits the wrong check number in a stop payment request and Bank dishonors that check based on the check number only (even if the other identifying information is different), Company agrees that Bank will not be liable for wrongful dishonor of that check.  If Company submits a stop payment request, Company will be charged Bank's current stop payment fee even if the check has already been paid or Company previously submitted a stop payment request on the same check.  A stop payment request will remain in effect for six (6) months after the date of the original request.  After that, the stop payment request will expire unless it is resubmitted. Additional terms or disclosures may apply to the Stop Payment Service and these terms will be disclosed at the time Company submits a Stop Payment request. **The Stop Payment Service is not available to cancel payments scheduled through any preauthorized debits to the Account(s)**.  If Company needs to cancel a scheduled bill payment, Company should follow the procedures applicable to the Bill Payment Service.

**F.   BILL PAYMENT SERVICE.** Company may schedule one-time and recurring bill payments from Customer's eligible checking Account(s) to payees.  Company also may request and receive electronic billing and see a history of payments made from Company's Accounts using the Bill Payment Service. To use the Bill Payment Service, Company must set up payees, designate the funding Account, and enter the necessary information to schedule a payment.

Payees.  All payees must have a U.S. Postal address. Company may not designate any payee for gambling, marijuana, or any illegal purpose. Company may not designate a payee for purposes of making tax or court-ordered payments.  Bank may limit Company's ability to specify any other payee, class of payees, or type of payments. If Company initiates any payments not permitted hereunder, such payments may be blocked by Bank.

Limits.  Bank, in its discretion, may limit the amount of each bill payment and the amount of total daily bill payments from the Account(s) and may modify these limits from time to time in its discretion. See the Bill Pay User Guide for current limits.

Payment Dates.  When scheduling a bill payment, Company must enter the payment date for the payment.  The Bill Payment Service will provide the earliest and latest possible payment dates for standard delivery.  Payments may not be scheduled more than 12 months in advance.  Company may request that a payment be sent via expedited means either electronically (if the payee receives electronic payments) or as an overnight paper check.  Expedited requests cannot be made through the Mobile Application. Additional charges apply for expedited payments.  If Company schedules an expedited payment for the current Business Day after the Bill Pay Cutoff Time or on a non-Business Day, Bank will process the request on the following Business Day.  Company should schedule payments with adequate lead-time prior to the payment due date.

Payment Delivery.  Bank will use reasonable efforts to process all bill payments properly initiated through the Bill Payment Service in accordance with this Agreement. Unless Company has selected a specific method for expedited delivery of a payment, Company authorizes Bank, and its Processor(s), to make the requested payments to the payees using whatever method Bank or its Processor(s) determine, in their sole discretion, is the most effective method to process Company's payment. Company understands and agrees that Bank is not responsible for the timely delivery of mail or the improper handling of payments by third parties. Bank does not guarantee when the payee will receive and process the payment.  Bank shall have no liability to Company if any of the following occur:
    (a)   Sufficient Available Funds are not in the Account at the time Bank seeks to debit the Account for the payment.
    (b)   Funds in the Account are subject to legal process or other encumbrances restricting debits to the Account.
    (c)   The requested payment exceeds Company's current bill pay limit.
    (d)   Company had knowledge of the possible malfunction of Digital Banking or the Bill Payment Service when Company initiated the payment or when Bank is scheduled to process the payment.
    (e)   Any information provided by Company about the payee or the payment is incorrect.
    (f)   Natural disasters (fire, flood, tornado, etc.) or other uncontrollable circumstances (power failures, epidemics, etc.) prevent proper completion and delivery of the payment.
    (g)   Bank reasonably believes that the payment is in violation of any law, regulation or Bank policy.
    (h)   Other applicable laws and/or regulations exempt Bank from liability.

(i)   The payee failed to process the payment timely or correctly.
(j)   Mail delays by the U.S. Post Office.
(k)   The payment or Company's instruction does not comply with the terms and conditions of the applicable Account.
(l)   Bank had reason to believe that the payment may not be authorized by Company.
(m)  Bank had other reasonable cause not to make the payment.

<u>Debits to Funding Account</u>.  The time when Customer's Account will be debited for a payment will depend on the method of payment. If payment is made electronically by ACH transaction, Customer's Account will be debited on the ACH settlement date, which will typically be the payment due date, but may be up to two Business Days prior to the payment due date.  If payment is made by check, the Account will be debited when the check is presented to Bank and processed for payment (which will be on or after the date that the payee deposits the check).  If the designated Account does not contain sufficient Available Funds at the time Bank attempts to debit the Account for a bill payment, Bank may, in its sole discretion: (1) honor the request and debit the Account for the amount of the payment, which would cause the Account to be overdrawn or add to the amount by which it is overdrawn; or (2) decline the request, in which case no payment will be made to the payee.  Bank may take either of these actions without notifying Company. Overdraft Fees or Returned Item NSF Fees will apply in accordance with Bank's current Schedule of Fees. When a User requests a bill payment and the Bill Payment Service generates a check for the payment, Company agrees that Bank may debit the Account on which the check is drawn, without requiring the signature of an authorized signer on the Account.

<u>Modification and Cancellation of Payments</u>.  Bank, in its discretion, may suspend or cancel any scheduled payment if Bank believes there is any suspicious or unusual aspect to the requested payment and Bank is not able to confirm with Company through a method acceptable to Bank that the payment is authorized.  Company may modify or cancel a scheduled bill payment through the Bill Payment Service only if the payment is still pending and processing has not yet begun.  Any change or cancellation of a payment on the date that processing is scheduled to occur must be completed before the Cutoff Time for Bill Payment Service. The current status of each scheduled payment is shown in the Bill Payment Service.

<u>Electronic Bills</u>.  The Bill Payment Service permits electronic presentment of bills ("eBills") from select billers.  Electronic bills are provided by Bank as a convenience only, and Company remains solely responsible for contacting its billers directly if Company does not receive its bill(s) or wants a copy of previously delivered electronic bills.  Company will receive electronic bills from a biller only if both: (a) Company elects within the Bill Payment Service to receive electronic bills from the biller and (b) the biller has arranged with Bank's bill pay Processor to deliver electronic bills.  When electing to receive electronic bills, Company may be presented with terms from that biller for its acceptance.  Bank is not a party to such terms.  If Company starts receiving electronic bills, the biller may stop sending paper bills to Company. Company's ability to receive a paper copy of its eBill(s) is at the sole discretion of the biller.

Bank will notify applicable billers of Company's request to receive electronic billing. The presentment of the first electronic bill varies from biller to biller and may take up to 60 days, depending on the billing cycle of each biller. While electronic billing is being activated, it is Company's responsibility to pay its bills on time. Each electronic biller reserves the right to accept or deny Company's request to receive electronic bills. Company is responsible to logon periodically to the Bill Payment Service and check on the delivery of new electronic bills. The time for delivery and/or notification varies by biller. Company is responsible for scheduling payments and the timeliness of payments for all electronic bills. Bank is not responsible for the accuracy of electronic bill(s). Company must resolve any discrepancies or disputes regarding its electronic bills directly with the biller.

Company authorizes Bank and billers to share identifying information about Company for purposes of matching Company's identity on Bank's records and the biller's records to activate a request for electronic bills. For some billers, Company will need to provide Bank with its user name and password for that biller so that Bank can request Company's bill data.  Bank is unable to change any Company information that is held by the biller. Any changes will require Company to contact the biller directly. Company must maintain all usernames and passwords for its electronic biller sites.

Company or an electronic biller may cancel electronic bills at any time. The timeframe for cancellation of electronic bills varies by biller and may take up to 60 days, depending on the billing cycle of each biller. If Company cancels eBills from a biller or Company's Bill Payment Service is terminated, Bank will use reasonable efforts to notify the applicable electronic biller(s). Company is solely responsible to arrange for an alternative form of bill delivery if Company is no longer receiving eBills from a biller for any reason.

    **G.   LOAN SERVICES.**  Company may subscribe to one or more of the following Loan Services provided through Digital Banking. Bank reserves the right to restrict or disqualify any Loan from eligibility for any of the Loan Services.

<u>Electronic Loan Statements and Notices</u>.  Company may receive its monthly Loan statements electronically through Digital Banking. If Company elects to receive electronic Loan statements, Company will no longer receive paper Loan statements.  Company may view up to the prior twelve months of Loan statements provided Company has had this Service for that long.  In addition, Company may receive (i) notice of Loan Maturity prior to the maturity date of the applicable Loan and (ii) notice that a payment is past due.

Loan Information Reporting. Company may receive information updated through the prior Business Day on each of its Loans through Digital Banking. Available Loan information includes advance and payment history, available credit, next payment due date, interest paid, and interest rate.  Company may view up to the prior twelve months of Loan history.  When a Loan is initially setup on Digital Banking, limited Loan history is available.

Loan Payments.  Company may schedule one time and recurring payments on its Loan(s) from its Account(s) via Digital Banking. Savings and time deposit Accounts are not eligible for Loan payment transactions. A same day Loan payment request must be transmitted to Bank prior to the Loan payment Cutoff Time on a Business Day. Payment requests transmitted after the Cutoff Time on a Business Day or on a non-Business Day will be processed on the following Business Day. If there are insufficient Available Funds in the designated Account to make the full requested payment, the entire payment will be rejected. Once a Loan payment is transmitted to Bank, Company cannot stop the Loan payment using the Loan Services within Digital Banking. If Company wishes to change or cancel a scheduled loan payment, Company must timely notify Bank and Bank will use reasonable efforts to comply with Company's request.  Once processed, Bank may, but is not required to, reverse a Loan payment if Company promptly notifies Bank.

Loan Advances.  If approved by Bank, in its discretion, Company may request an advance on its revolving Loans through Digital Banking.  Advance requests will be funded to the designated Account provided that the amount of the advance request does not exceed the amount available for advances under the Loan agreement.  If an advance request exceeds the current availability under the Loan agreement, the advance will not be made.  If the advance request is within the current availability under the Loan agreement, the requested Advance amount will be funded to the designated Account on the Business Day requested if requested prior to the Cutoff Time or on the next Business Day if requested on a non-Business Day or after the Cutoff Time on a Business Day. Bank, in its discretion, may decline to make an advance if (i) an event of default exists under the applicable Loan agreement; or (ii) the Loan agreement has matured or terminated.

**H.   ALERT SERVICES.**  Company may setup optional Alert Services through Digital Banking.  In addition, Bank may send mandatory Alerts to Company when certain events occur.  Alert Services provide Company with alerts for certain pre-defined events relating to Company's Accounts through email, text messages, push notification, and/or display within Digital Banking. Alerts are designed to give Company timely notice of specific events, but they cannot provide immediate notice.  Errors, interruptions, delays or failures in delivery or receipt of Alerts may happen for a variety of reasons, including technical difficulties experienced by Bank, Company's phone or internet service provider, or others. If Company chooses to have Alerts delivered to a wireless device or certain other devices, a portion of the Alert, or related information and disclaimers may be omitted. Company is responsible for providing Bank with the correct phone numbers and email addresses for Company's Alerts.  If Company wants to discontinue any optional Alerts, discontinue delivery of Alerts to a specific email address or phone number, or add new email or phone numbers for receipt of Alerts, Company must do so through Digital Banking. Company is responsible for any message and data fees that may be assessed by its phone or internet service providers.  Company represents and agrees that each User receiving Alerts on his or her mobile device has consented to receipt of such Alerts and Company will promptly remove such User's phone number from the Alert Service if the User objects to receipt of Alerts.

**5.   MOBILE APPLICATION.**  If enrolled in Digital Banking, Company may access the Core Services through the Mobile Application except Stop Payment Service is not available in the Mobile Application.  Some functionality of the other Core Services also may not be available through the Mobile Application.  Each authorized User must download the Mobile Application on a Mobile Device and complete the mobile enrollment process. The Mobile Application provides access to the Mobile Deposit Service.

**Mobile Deposit Service**
The Mobile Deposit Service allows Company to deposit eligible checks to its Accounts using the Mobile Application.  Bank reserves the right to limit or revoke the availability of this Service, eliminate any of its features, refuse any check for mobile deposit at any time for any reason, and limit the number or amount of checks Company or any User may deposit through the Service.  The Mobile Deposit Service may not support all types of Mobile Devices.

***Important Note:***  If Company has Remote Deposit Services and uses the TCF Commercial Mobile Deposit App, Company should continue to use that App for all its mobile deposits and should not use the Mobile Deposit Service in the TCF Bank Business Mobile Application.

To use the Mobile Deposit Service:
- Company's Account must be eligible for Mobile Deposit (all checking accounts and most savings and money market Accounts are eligible for Mobile Deposit; certificate of deposit accounts are not eligible for Mobile Deposit); and
- Company must be enrolled in Digital Banking.

When making a Mobile Deposit, the User must enter the check amount, designate the Account into which the check should be deposited, ensure that the back of the check is signed by all payees and includes "For TCF Mobile Deposit Only" after these

signatures, image the front and back side of each check (the "Check Image") using the camera on the Mobile Device and electronically submit the Check Image and related instructions to Bank.

Checks Eligible for Mobile Deposit.  Only checks payable on demand and drawn on or payable through a United States financial institution are eligible for Mobile Deposit.  In addition, the following check types are not eligible for Mobile Deposit:

- Checks payable on the check front to any person or entity other than Company or a registered assumed name of Company;
- Federal Home Loan Bank checks;
- Savings bonds;
- Travelers checks;
  - Checks payable in a foreign currency (i.e. not payable in United States currency);
  - Checks written on an account at a financial institution located outside the United States or without an U.S. ABA Routing number;
  - Checks that are missing information or have been altered;
  - Checks future dated or stale dated (180 days old) at the time of the deposit;
  - Checks that have been returned unpaid or uncollected;
  - Checks that have been previously cashed or deposited;
  - Checks not properly endorsed with the following restrictive language: "For TCF mobile deposit only".

Bank's failure to identify an ineligible check through Mobile Deposit does not limit Company's liability or Bank's ability to return the check unpaid if Bank also is the payor bank. Any check deposited using Mobile Deposit is subject to verification by Bank.  Bank may reject an item for deposit for any reason and will not be liable to Company.  Company must bring any paper check which is ineligible for or rejected for Mobile Deposit to a Bank banking center for processing.

Image Quality.  Check Images must meet Bank's current standards.  The Mobile Application will notify User if an image is not acceptable and instruct User to retake the picture. Bank will not be able to process a check if the MICR data is unreadable.

Daily and Monthly Transaction Limits.  Bank may place per item, daily, and other periodic limits on Mobile Deposits for Company and for each User. Bank may modify these limits at any time without notice to Company.  Contact the Bank to find out the current limits.  If an attempted deposit exceeds a current limit, it will be rejected.

Receipt and Processing.  Bank shall not be deemed to have received a Mobile Deposit of a check and shall not be liable or responsible therefore until the entire Mobile Deposit transmission in which such check is contained is received by Bank's server and such Mobile Deposit entry complies with the requirements for data, image quality and other specifications set forth in this Agreement as updated from time to time. Bank is not responsible for items that it does not receive. Processing and/or errors may occur after Bank acknowledges receipt that may impact transaction completion.  Bank may, in its discretion, determine the manner in which Bank will seek to collect a deposited check including, without limitation, (i) by presenting or transferring the Check Image to the paying bank, a Federal Reserve Bank, check clearinghouse, image share/exchange network, or other bank; (ii) creating a Substitute Check from the Check Image and then collecting such item, or (iii) requesting that Company provide to Bank the original paper check from which the Check Image was created and then collecting the original paper check.

Funds Availability.  Subject to the other sections of this Agreement, a check properly submitted and received by Bank for Mobile Deposit (i) prior to the Mobile Deposit Cutoff Time on a Business Day will be treated as received for deposit to the designated Account on that same Business Day; and (ii) after the Mobile Deposit Cutoff Time on a Business Day or on a non-Business Day will be treated as received for deposit to the designated Account on the next Business Day. Checks deposited via Mobile Deposit into a business Account typically will be Available Funds on the first Business Day after the Day of Deposit subject to Bank's right to delay availability. See Bank's Funds Availability Schedule in the Terms and Conditions for Checking and Savings Accounts.

No Duplicate Deposit.  Company is liable for all damages resulting from duplicate deposit of a check deposited with Mobile Deposit. Without limiting the other indemnities in this Agreement, Company agrees that it will promptly reimburse Bank if Bank is required to indemnify any other financial institution or third party because any check deposited using Mobile Deposit also is deposited as a paper check and is returned unpaid, regardless of whether or not the paper check contained a restrictive endorsement and regardless of whether or not Company had any fault in connection with the deposit of the paper check.

Security of Physical Checks and Check Images.  Company must limit access to both physical checks and Check Images to those with a specific reason for such access. Company must securely store and safeguard all original checks converted to Mobile Deposit entries until destruction so that unauthorized persons do not have access to the paper checks.

Retention and Destruction of Checks. Company should keep paper checks processed for Mobile Deposit in a secure location for at least 60 days prior to destruction and longer if there are any issues with the check deposit.  After this time and provided Company

has confirmed the check has been correctly processed for deposit, Company may destroy the check. Company shall retain an original check for a longer period upon Bank's written request. Company shall keep a log of destroyed checks and, upon request, provide Bank with a copy of such log.  If an original check has not been destroyed, Company shall provide the original check to Bank at Bank's request.

**6.   DIGITAL BANKING ADMINISTRATORS AND USERS**. Company must designate one individual to act as its primary Administrator with authority to designate and terminate Users and to establish the authority and limits of Users in Digital Banking. Bank has the right to assume that access to the Accounts through Digital Banking and use of any Service using the login credentials of an Administrator or User has been authorized by Company.  Bank is not responsible for verifying the authorization and authenticity of any transactions transmitted through Digital Banking by any User or Administrator. Company represents and agrees that all Administrators and Users will be domiciled in the United States and employees of either Company (or another U.S. company affiliated with Company) and that Company will not designate any Administrator or User that would cause Bank to violate any applicable laws (including federal laws and regulations administered by OFAC). Company agrees to provide Bank with the legal names and other personal information on its Administrator and Users that Bank may from time to time reasonably request. Administrators and Users may access Digital Banking and use all Core Services for which they are authorized by the Administrator, including conducting transactions on the Account(s) and requesting stop payments, even if they are not Authorized Signers on the Account(s). Company agrees to notify Bank promptly, and confirm such notice in writing, if Company wants to remove its primary Administrator for any reason.  If the current primary Administrator is removed, Company must designate a new primary Administrator and execute such documentation as Bank may require to reflect the change in the Administrator.  Company agrees that if any User is no longer authorized to access Digital Banking or other Service for an Account, the Administrator will promptly disable such individual's access to Digital Banking and/or the applicable Service for the applicable Account(s).

**7.   FEES AND TAXES.**  For each Core Service used by Company, Bank may charge Company the fee in effect from time to time for such Service, as set forth in Bank's most current fee disclosure provided by Bank to Company.  Even if Bank does not currently charge a fee for a Core Service, Bank may choose to do so in the future.  Bank will provide Company with prior notice of any new or changed fees.  Service fees typically are billed monthly in arrears. If Company terminates this Agreement and/or any or all Services during a month, Company agrees to pay the full monthly fee for all Services in place at the beginning of such month. The Service fees may be changed by Bank from time to time. In addition, Company shall pay all fees and charges not covered under the standard Service fees for any requested or required special service or handling. Company also shall pay all taxes and other governmental assessments related to any Services (excluding taxes based on Bank's net income).  Bank may debit any Account of Company for fees and taxes due Bank.

**8.   AVAILABILITY OF DIGITAL BANKING AND CUT-OFF TIMES.**  Digital Banking is generally available 24 hours a day, seven days a week. However, Digital Banking may not be available at certain times because of system maintenance, circumstances beyond Bank's control, or other reasons.  Bank may temporarily change, suspend, or terminate Company's access to Digital Banking or specific Services at any time without prior notice.  Services that involve deposits of funds into or the transfer of funds from an Account are available only on Business Days.  If a deposit or transfer request is received by Bank on a non-Business day or after the established Cutoff Time for the related Service, Bank may treat the deposit or transfer request as received by Bank on the next Business Day.

**9.   AVAILABLE BALANCE.**   Company agrees to maintain a sufficient Available Balance in each Account to cover all transactions, fees and other amounts due Bank on that Account. If Company fails to maintain an Available Balance in an Account sufficient to cover all transactions and other amounts due Bank with respect to such Account, Bank may debit or offset against any other Accounts of Company at Bank.

**10.   REPRESENTATIONS, WARRANTIES AND COVENANTS.**  Company represents, warrants and agrees for the benefit of Bank that, as of the date it enrolls in Digital Banking and as of the date it uses any Service, that:
(a)   Company has all requisite power and authority to enter into this Agreement and perform its obligations under this Agreement; this Agreement constitutes its legal, valid and binding obligation; and, upon Bank's request, Company will provide Bank with written indicia of such authority;
(b)   **This Agreement is entered into for business purposes only**, Company will not use the Account(s) or any Core Service for personal, family or household purposes, and any limits of liability relating to consumer accounts or transactions disclosed in the Account Contract shall not apply to Company's liability or responsibility to Bank or third parties under this Agreement which is commercial in nature;
(c)   Company will comply with all applicable laws, rules and regulations in connection with its use of Digital Banking, the Core Services, and its Account(s); and
(d)   Company will execute any document that Bank reasonably deems necessary or appropriate to provide Digital Banking or any of the Core Services.

**11.   SECURITY.**  Company agrees to comply with the Security Procedures and to maintain internal procedures to ensure that all Authorized Signers, Administrators, Users, employees and agents of Company comply with the Security Procedures applicable to such person. If compliance with any Security Procedure is within Company's control, Bank will not audit Company's compliance with such Security Procedure. If Company fails to implement or follow the Security Procedures, Company assumes responsibility for all losses which could have been avoided had they been implemented at or before the time the loss occurred. Company acknowledges and agrees that the security protocol set forth in the Security Procedures for initiating any transfer from the Accounts provide Company with a commercially reasonable degree of protection against unauthorized transfers in light of Company's particular needs and circumstances.  Company agrees that Bank may electronically mail to Company or post in Digital Banking any information relating to changes or additions to the Security Procedures.

Company agrees to notify Bank immediately, and confirm such notice in writing, if Company believes security impacting its Digital Banking access may have been compromised.  Bank has no responsibility to discover, audit or report to Company any breach of the Security Procedures by Company, its agents, authorized representatives, parties acting in concert with them or third parties who obtained access to Digital Banking through Company or Company's agents; provided that Bank will use reasonable efforts to notify an Authorized Signer or the Administrator of any such breach of which Bank has actual knowledge; provided, however, that Bank will not incur any liability for its failure or delay in providing any such notice. Company is liable for all transactions, including unauthorized transactions, made with a User's login credentials prior to the time Company notifies Bank that a User's login credentials have been compromised. Company shall notify Bank in writing when any security problem within Company's control is corrected.

If any suspected or actual breach of Security Procedures occurs or any loss is incurred by or claim is made against Bank with respect to an Account or Service, Bank shall have the right, but is under no obligation, to inspect Company's books and records, facilities, and internal security procedures, and interview Company's personnel to determine the existence, extent, cause and other particulars in connection therewith.  Company agrees to fully cooperate and preserve evidence and records of any event, loss or breach for Bank's review and inspection. Bank's records and logging system shall be conclusive evidence with respect to any requests, directions or communications regarding Digital Banking or a Service and shall be binding upon Company.

**12.   CONSENT TO ELECTRONIC DELIVERY OF COMMUNICATIONS.**  By enrolling in Digital Banking, Company agrees that Bank may, at its option, provide Communications to Company in electronic form by: (1) posting the Communication in Digital Banking; (2) sending the Communication to the email address(es) provided by Company; or (3) sending the Communication via email, text message, or push notification to the phone number(s) provided by Company.  Company's technology provider may charge fees for sending or receiving Communications by email or text message.  Company is responsible for all such fees. By agreeing that Bank may provide Communications to Company in electronic form, Company also agrees that Bank is not required to provide Company with a paper version of the Communication.  Company agrees that a Communication is considered delivered to and received by Company on the date it is posted, made available, or sent to Company as provided in this Agreement.

**13.   VIRUS PROTECTION.**  Bank is not responsible for any electronic virus or malware that Company may encounter.  Bank encourages Company to routinely scan its systems using a reliable virus detection software or other product to detect and remove any viruses or malware.  Undetected or un-repaired viruses may corrupt and destroy Company's programs, files and even hardware. Additionally, Company may unintentionally transmit the virus to other computers.

**14.   CANCELLATION AND TERMINATION OF DIGITAL BANKING.**  Company may terminate its enrollment in Digital Banking any time by contacting Bank at 855.336.9460. Bank may require Company to put its termination request in writing by mail, e-mail, or personal delivery to Bank at the following address: TCF Bank, Attn: Business Client Services, 2301 W. Big Beaver Rd, Suite 525, Troy, MI, 48084 or businessclientservices@tcfbank.com.  Bank shall have a reasonable time to act on Company's request to terminate Digital Banking.  Company must provide Bank with written notice to terminate any Treasury Management Service at least thirty (30) days prior to the effective date of termination.

Bank may terminate this Agreement and/or cancel or suspend access to Digital Banking by Company or any User, in whole or in part, at any time without prior notice. Company will remain responsible for all transactions initiated through Digital Banking prior to the termination and/or cancellation. If Bank cancels Company's Digital Banking access, in whole or in part, Company may request the reinstatement of Digital Banking by contacting Bank. Reinstatement of Digital Banking is at Bank's sole discretion.

**15.  DISCLAIMER OF WARRANTIES; LIMITATIONS ON LIABILITY; FORCE MAJEURE; INDEMNITY.**  As used in this Section, the term "Bank" includes any and all officers, directors, employees, agents, affiliates, successors, assigns of Bank as well as its Processors, each of which are hereby deemed beneficiaries of the disclaimer, the limitations of liability and indemnities set forth in this Agreement.  The disclaimers, limitations of liability and indemnities contained below are in addition and cumulative to those contained elsewhere in this Agreement and in the Account Contract.  Company understands that Bank's fees for Services are very small in relation to the amount of transfers that may be initiated through Digital Banking and that accordingly, Bank's willingness

to provide Digital Banking and the Services to Company is contingent upon the limitation of Bank's liability in accordance with the terms of this Agreement.  The provisions of this Section shall survive termination of this Agreement.

Disclaimer of Warranties.  Digital Banking and the Services are provided to Company "AS-IS."  Except as required by applicable law for business customers, Bank makes no representation, warranty, or guaranty, express or implied, and disclaims all warranties in connection with Digital Banking, the Services, and the related software, equipment and communications, including any warranty of merchantability, fitness for a particular purpose or suitability of any Service for Company, or as to the compatibility of software, equipment or communication interfaces with those of Company.  Without limiting the foregoing, Bank does not warrant (i) that Digital Banking or the Services will be uninterrupted or error free or that defects will be corrected, (ii) that Digital Banking will be free of viruses, malware, or other harmful components; or (iii) that the Security Procedures will prevent all mistakes, unauthorized access or fraud.

General Liability Limit.  Except to the extent required by applicable law, in no event shall Bank be liable for any loss, claim, injury, or damage to Company or its agents in connection with (1) Digital Banking or this Agreement; (2) use of the Services or inability to use the Services; (3) any problems with the Communications; (4) any unauthorized interception of the Communications; (5) any computer virus or malware; or (6) the actions or inactions of Processors or other third parties, including any governmental agency, financial institution or other party through which a funds transfer subject to this Agreement is effected (whether or not selected by Bank), except for Company's actual proven damages arising directly from Bank's gross negligence, willful misconduct or bad faith and subject to the maximum liability set forth below.  If Bank is adjudged liable to Company under this Agreement or in connection with the Services, Bank's liability to Company shall not exceed the amount of fees paid by Company for the Service in connection with which Bank's liability arose in the twelve month period prior to the events giving rise to the liability.  IN NO EVENT SHALL BANK BE LIABLE FOR INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF REVENUES, LOST PROFITS, LOST OPPORTUNITIES, LOSS OF OR DAMAGE TO REPUTATION, OR LOST GOODWILL, WHETHER OR NOT FORESEEABLE, WHICH MAY ARISE IN CONNECTION WITH THIS AGREEMENT, DIGITAL BANKING OR THE SERVICES, WHETHER SUCH LOSSES OR DAMAGES ARISE FROM TORT, CONTRACT OR OTHERWISE AND EVEN IF THE COMPANY ADVISES THE BANK OF THE POSSIBILITY OF SUCH DAMAGES.  Any claim, action, suit or proceeding brought by Company against Bank for damages arising out of or in connection with Digital Banking or any Service must be initiated within ninety (90) days from the time the act or omission giving rise to the claim occurred. Notwithstanding the foregoing, this time period shall not apply to any act or omission involving fraud by the party against whom the claim is brought.

Liability Limit if Company Declines Fraud Protection Services or Fails to Review Available Information.  Bank offers (i) fraud protection services including ACH and check positive pay, (ii) dual control functionality for Payment Orders; and (iii) current day online reporting and Alert Services.  These Services and Digital Banking features help detect and deter fraud and keep Company timely informed of its account activity.  Bank highly recommends that Company use these Services and features.  If Company fails to use the positive pay Services, Company waives all claims against Bank for any losses that could have been prevented if Company had chosen to use these Services, including any claims against Bank for paying any unauthorized, altered, counterfeit or other fraudulent check or failing to return any unauthorized or fraudulent ACH debit entry.  Company agrees that Bank will not be required to re-credit Company's account or otherwise have any liability for paying such checks or not returning such ACH debit entries except to the extent that Bank's gross negligence, willful misconduct or bad faith directly contributed to such loss.  Company also agrees that Bank will not have any liability for losses that could have been prevented if Company had timely reviewed and acted on information provided through the Digital Banking reporting and Alert Services except to the extent that Bank's gross negligence, willful misconduct or bad faith directly contributed to such losses.

No Liability for Force Majeure Events.  Without limiting the foregoing, Bank shall not be liable to Company for failures, delays, errors or damages occurring by reason of circumstances beyond the control of Bank, including without limitation, any acts of civil, military, or banking authorities, national emergencies, labor difficulties, fire, flood, windstorms, or other catastrophes, acts of God, insurrection, war, terrorism, riots, pandemics, failure of transportation, failure of vendors, communication or power supply interruptions, malfunction of system hardware or software, hackers, vandals and law breakers, or any computer virus or malware.

Indemnity.  Company agrees to indemnify, defend and hold harmless Bank from and against any and all actions, suits, claims, damages, losses, liabilities, penalties, assessments, charges, taxes, costs and expenses (including reasonable attorneys' fees, costs of investigation and court costs at the trial level and in any appeal) (together, the "Losses") directly or indirectly arising from or relating to (i) Bank's honoring or complying with any Payment Order (or a request to cancel or change the terms of a Payment Order), whether or not such request was actually authorized by Company, so long as Bank accepts the Payment Order in good faith and in compliance with the applicable required Security Procedures, (ii) Bank's honoring or complying with any Payment Order (or any amendment or cancellation of a Payment Order) which was actually authorized by Company even if Bank has waived any Security Procedures in connection with such Payment Order (iii) Bank's refusal to accept or process a Payment Order that is communicated to it other than in compliance with the Security Procedures, (iv) the failure of Company (or its employees, agents, affiliates or representatives) to comply with its obligations in this Agreement or the Account Contract, including Company's failure to observe, maintain or comply with the Security Procedures, (v) the failure of Company (or its employees, agents, affiliates

or representatives) to comply with any applicable law, (vi) Bank's compliance with applicable federal, state, local and foreign laws, regulations, codes, orders, rulings and judgments in performing the Services, including compliance with inconsistent orders or laws of competing jurisdictions, (vii) other acts or omissions of Company (including its affiliates, agents, employees and representatives) or any third party which create, lead to or result in claims, liability, damages, costs or expenses, or (viii) any action taken or omitted to be taken by Bank in reliance upon information or instructions provided to Bank by Company or any affiliate or subsidiary of Company or by anyone using the login credentials of Users; provided, however, that Company shall not be obligated to indemnify Bank for any Losses that are caused directly by Bank's gross negligence, willful misconduct or bad faith.

**16.   HARDWARE, SOFTWARE, AND INTERNET ACCESS.**  Company agrees that it is responsible for all hardware, software, and Internet access services it uses to access Digital Banking. Accordingly, Bank is not responsible for any failure of this hardware, software or Internet access service.

**17.   LOSS OF DATA.**  Company agrees that, should Company's data be lost or destroyed as a result of Company's systems failure or interruption, Company is responsible for all consequences resulting from such systems failure or interruption.  Company is responsible for verifying the accuracy and completeness of all transactions conducted through Digital Banking including those affected by any system failure or interruption.

**18.   BANK'S OBLIGATION TO CONDUCT TRANSACTIONS.**  Bank does not have to honor, in whole or in part, any transaction that: (1) does not comply with the terms and conditions of this Agreement, the Account Contract or any Loan agreement; (2) Bank has reason to believe may not be authorized by Company or any person authorized to use the Account or applicable Service; (3) involves funds or other property subject to a hold, dispute, restriction, or legal process; (4) Bank believes would violate any guidelines or advice of any regulatory agency with jurisdiction over Bank, including the Federal Reserve Board, the Office of the Comptroller of the Currency, or the Consumer Financial Protection Bureau; (5) Bank believes would violate any applicable laws; (6) does not comply with any other requirement of Bank's policies, procedures, or practices; or (7) Bank has other reasonable cause not to honor.

**19.   LINKS TO OTHER WEBSITES.**  Digital Banking may contain links to third-party websites and may permit Company to export its information from Digital Banking to a third-party service.  Unless expressly noted otherwise, Bank is not affiliated with, nor does Bank endorse, any of these sites or services, and provides such links and export capability solely for Company's convenience. Company's use of these sites and third-party services is at Company's own risk, and in no event shall Bank be responsible or liable for any information, content, products, services, practices or other materials on or available from or through such sites. Bank makes no representation or warranties regarding any third-party service or its software or security. Company is assuming all risks associated with exporting or importing its Account information to a third-party service. Company should review the third-party's privacy policy and terms of use to understand how such third-party protects and uses Company's information.

**20.   NO WAIVER.**  The failure of Bank to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless agreed to by Bank in writing.  No waiver shall be implied from failure of Bank to exercise a right or remedy.  In addition, no waiver of Bank's right or remedy will affect the other provisions of the Agreement.

**21.   GOVERNING LAW.**  Bank is a national bank with its main office in South Dakota. Therefore, all disputes relating in any way to this Agreement will be governed by federal law. Federal law includes the National Bank Act and regulations adopted by the Comptroller of the Currency. To the extent state law applies and is not preempted, the substantive and procedural law (but not the conflict of law rules) of the State of South Dakota will apply.

**22.   ASSIGNMENT.**  This Agreement shall be binding upon and inure to the benefit of Bank and Company and their respective successors and assigns; provided that Company may not sell, assign or transfer this Agreement, in whole or in part, without Bank's prior written consent.  Bank may assign this Agreement or any of its rights or obligations hereunder, in whole or in part, without Company's consent to any subsidiary, affiliate, successor or purchaser of Bank or any portion of its business or assets.  Except as expressly set forth in this Agreement, no third party shall have any rights or remedies hereunder.

**23.   OWNERSHIP OF MATERIAL.**  The images, text, screens, and web pages in Digital Banking are owned by Bank, or others, and are protected by copyright laws.  Company agrees not to copy, display, distribute, download, license, sub-license, modify, publish, repost, reproduce, reuse, sell, transmit, create a derivative work from or otherwise use for public or commercial purposes, the information and materials on Digital Banking, without Bank's express written permission.  All trademarks, service marks, and logos on Digital Banking are the trademarks, service marks or logos of Bank or others, as indicated.

**24.   PROCESSORS.**  Company acknowledges and agrees that Bank may use Processors to assist with the delivery of the Services.  The authorizations granted to Bank under this Agreement will be deemed to include each and every Processor, all actions to be taken by Bank under this Agreement may be taken by Bank directly or through a Processor, and all limits on liability and indemnities shall apply to every Processor.  In addition, some Services are provided through access to a third-party network.

Such Services are dependent upon the availability of the third-party network on conditions acceptable to Bank.  Bank reserves the right to provide any Service through an alternative third-party network or through alternative Processors.

**25.   AMENDMENTS.**  Bank reserves the right to change unilaterally the terms of this Agreement, in whole or in part, at any time in its sole discretion by providing Company with notice. Bank may, when it determines it is practical to do so, give Company ten (10) days prior notice of the effective date of the amendment, unless a different notice period is required by applicable law. Bank may notify Company of any amendment either via a paper mailing or electronically, including by posting in Digital Banking or sending via email. If Company does not agree with the change(s), Company must notify Bank in writing to cancel its Digital Banking access prior to the effective date of the amendment. Company's continued use of Digital Banking after the effective date of such changes signifies Company's agreement with the changes.

**26.   JURY TRIAL WAIVER.**  Company and Bank acknowledge that the right to trial by jury is a constitutional one, but that it may be waived.  Company and Bank, after consulting or having had the opportunity to consult with counsel of their choice, knowingly and voluntarily, and for their mutual benefit, each waive any right to trial by jury in any proceeding related to Digital Banking, this Agreement, or the Accounts.

**27.   ENTIRE AGREEMENT; HEADINGS**. This Agreement and the applicable provisions of the other Account Contract documents constitute the entire agreement between Company and Bank and supersede all other prior agreements, communications and understandings between Company and Bank with respect to the subject matter hereof, provided that prior Service setup directions made by Company and implemented by Bank for Company's Accounts will remain in effect unless and until Company provides Bank in writing with updated Service setup directions and Bank has a reasonable opportunity to implement. The provisions of the Account Contract documents shall, to the extent possible, be interpreted to supplement each other and avoid conflict between them. However, if there is a conflict between this Agreement and the TM Service Agreement, the conflicting term in the TM Service Agreement shall prevail, but only to the extent of the conflict. In all other cases, the conflicting terms of this Agreement shall prevail with respect to Company's use of Digital Banking. Headings are for reference purposes only.

**28.   SEVERABILITY.**  If there is any conflict between this Agreement and applicable law, this Agreement will be considered changed to the extent necessary to comply with the law.  If any provision in this Agreement is declared to be invalid, unenforceable or illegal by any adjudicatory body of competent jurisdiction or any governmental regulatory agency, such provision shall be construed as being severed from this Agreement and shall not affect the validity or enforceability of the remaining provisions. Any provision of this Agreement found invalid or unenforceable only in part or degree will remain in full force and effect to the extent not found invalid or unenforceable.  If performance of any Service in accordance with the terms of this Agreement would result in a violation of any statute, regulation or government policy to which the Bank is subject, this Agreement shall be deemed amended to the extent necessary to comply with such statute, regulation or policy.

# EXHIBIT 2
## Security Procedures

These Security Procedures supplement the Business eBanking Agreement and the Treasury Management Services Terms and Conditions.  Capitalized words used herein and not defined herein have the meaning given such words in these agreements.  The term "Users" includes Administrators unless otherwise noted.

These Security Procedures include both required and recommended procedures.  The recommended security procedures are within Company's control and Bank will not monitor Company's compliance with these procedures.  If Company fails to comply with any recommended Security Procedures or directs Bank to waive any required Security Procedures, Company assumes responsibility for all claims, damages and losses that could have been avoided if Company had complied with the required or recommended Security Procedures.

## General Security Procedures

**Company System Security**:  Bank highly recommends that Company follow current best practices for accessing online banking services ("Digital Services"), including the following:
- Access all Digital Services using Secure Socket Layer (SSL) or Transport Layer Security (TLS) 256 bit encryption.
- Ensure that Users use a current supported or certified version of their selected desktop web browser (older browser versions present security risks as well as performance issues). Some Digital Services require the use of specific browser types and versions.  These supported browsers are available in the User Guide available within the applicable Digital Service.
- Use screen savers with automatic timeouts and passwords.
- Install and maintain updated anti-virus, malware and firewall protection for all Company personal computers, laptops, servers, networks and/or any other internet connected device
- Maintain computer operating systems on a regular basis and install the latest patches and updates.
- Apply updates and download software from trusted sites only; beware of download requests from pop-ups or advertisements.
- Educate Users not to leave their computers unattended when logged into any Digital Service and to exit/log off the Digital Service upon completing activities and prior to closing the web browser.
- If possible, use a dedicated computer for Digital Services that is password protected and with no web searches or email allowed on that computer.  If a dedicated computer is not an option, limit internet use on computers used for Digital Services to reduce the risk that malicious programs will infect those computers.

**Email Security**:  Bank highly recommends that Company educate employees on email security risks including:
- Direct employees not to respond to unsolicited emails, to delete this type of email and refrain from clicking on links in any unsolicited or suspicious email.
- Educate employees that criminals can send fake emails that appear to come from an insider or other known contact (see Identity Impersonation below).
- Educate employees not to respond to emails asking for login credentials even if they appear to be from a trusted source; Bank would never request login credentials via email.
- Educate employees not to respond to emails asking for confidential information unless the employee has verified that the request is from a valid source with a need to know the information.
- Educate employees to email confidential information only via secure email or within a secure network. Emails can be intercepted and used for fraudulent activity.
- Provide employees with updates and warnings on known phishing attempts.
- Educate employees on the risks of fraudulent web sites and email addresses designed to look legitimate.

**Beware of Identity Impersonation**: Bank highly recommends that Company educate employees on the risks of identity impersonation. Criminals may impersonate Company officers and owners and direct other employees (often accounts payable personnel) to initiate fund transfers. Criminals may impersonate known contacts at vendors and other third parties and re-direct payments validly due to these third parties to an account controlled by the criminal. Criminals also may impersonate Bank employees to obtain account and security information. This fraud may occur through fake emails that appear to come from a Company insider or known third-party contact requesting wire transfers, certified checks, or other payment orders or changing existing payment instructions. These requests also may be made by an impersonator through a phone call or voice mail.  If a request for a fund transfer, for security information, or a change to payment instructions has unusual characteristics, train employees to verify that the requestor and the request are legitimate before initiating or approving it.  Employees should not simply "reply" to suspicious emails, use automatic phone call back features, or call the number included in a suspicious communication to verify the validity of an unsolicited email or phone call.  Rather, the employee should look up the correct email address or phone number and re-enter that email address or phone number to contact the applicable person.

If Company believes that someone is trying to impersonate a Bank employee, report that information to Bank.  Educate employees not to provide Digital Service login credentials or Account information unless involving verified Bank personnel.

**Beware of Malware Intrusions**:  Bank highly recommends that Company educate Users to beware of malware intrusions on computers used for Digital Services and to promptly report any suspected malware intrusions involving a Digital Service to Bank.  Computer activity that may indicate malware includes unexplained trouble logging in to a Digital Service, pop-up notices that are unusual and ask for security information, unexplained screen changes, changes in images, items on a page appear in different locations or on another page requiring extra authorizations.  If a malware intrusion is suspected, the User should stop the login process or terminate the online session by logging out.

**Beware of Imitation Websites:**  Bank highly recommends that Company educate Users to access Digital Services through the applicable link within tcfbank.com and to verify the URL address for both this website and the Digital Services in the address bar of their browser, including verifying that the URL for all Digital Services starts with https:// and not just http://.

**Protect IDs, Passwords and Authentication Information**:  Bank highly recommends that Company safeguard all IDs, passwords and other authentication information (together, "Login Credentials"), including educating Users to do the following:
*   Memorize their Login Credentials and change passwords frequently.
*   Make passwords strong using a combination of alpha, numeric and special characters and not to use easily identifiable personal information such as birthdates as passwords.
*   Use different Login Credentials and passwords for Digital Services than they use for other sites.
*   Never store Login Credentials on their mobile devices or leave a written version in an unsecure location at any time.
*   Never share their Login Credentials with anyone.

**Manage Users**:  Bank highly recommends that Company do the following with respect to its Users of Digital Services:
*   Set up all Users with the User's full legal name and not use business or generic names for Users.
*   Perform periodic reviews of Users' authority to ensure that only persons authorized by Company have access to the Digital Services and that their access is limited to required functions within the scope of their responsibility.
*   Perform periodic reviews of User activity using audit logs available to Company within the Digital Services.
*   Disable a User's access to Digital Services immediately if Company terminates its relationship with a User.

**Maintain Confidentiality of Security Procedures:**  Bank highly recommends that Company safeguard and not disclose any Security Procedures to any third party and to limit internal disclosure of specific Security Procedures to Company's employees, agents and representatives who have a need to know such information.

**Monitor Compliance with Security Procedures**:  Bank highly recommends that Company perform regular periodic audits of its compliance with the Security Procedures and correct all deficiencies disclosed.

**Notify Bank if Suspicious Activity**:  Promptly notify Bank of any suspected unauthorized access and/or activity involving any Digital Service or any network or systems connected to Bank.  Also, promptly notify Bank if Company or any User suspects that Login Credentials have been compromised.

## Security Procedures for Business eBanking and Business Mobile Banking (together "BeB")

**Login Requirements and Options.**  Bank requires two-factor authentication for Users to access BeB. Company will have a Company ID and each User will have a User ID and both must be correctly entered for BeB login.  In addition, Company must use one of two additional authentication protocols for logging into BeB and using certain Services within BeB.  These are (i) out-of-band authentication; or (ii) hard tokens.

**Out-of-Band Authentication**:  When out-of-band authentication is used, each User must create a password as part of his or her BeB Login Credentials. In addition, when a User seeks to login to BeB from an unknown device or IP address and at random intervals, the User must enter a unique one-time security code that is sent to the User.  A User also must enter a one-time security code when using certain Digital Services (see Service Authentication below).

Bank has established minimum requirements for User passwords including:
*   Passwords must be a minimum number of characters.
*   Passwords require alpha (upper and lower case), numeric and special characters.
*   Passwords expire at scheduled intervals.
*   Passwords cannot be repeated.
*   Users are locked out after a set number of invalid password attempts and will need their password reset.

**Hard Tokens:**  When hard tokens are used, each User will receive a physical hard token that generates a random number periodically.  Each User will need to set up a PIN to be used with the hard token.  When a User seeks to log into BeB, the User must enter his or her User ID, and then the PIN and current token number (the "Token Code").  A User also must enter a Token Code when using certain Digital Services (see Service Authentication below).  Company should promptly notify Bank if a hard token is lost or stolen. Bank will then disable this token and provide Company with a replacement.

**Administrators and Users**:

- The Administrator will perform BeB maintenance including (i) adding and deleting Users and other Administrators; (ii) generating temporary login credentials for Users; (iii) managing the permissions and authorized dollar limits by Service for other Users; and (iv) managing approval requirements.
- BeB permits the Company's primary Administrator to add Users with the administration role and to require that one administrator approve any changes requested by the other administrator ("Dual Control of Administration").  Bank highly recommends that Company implement Dual Control of Administration.
- The Administrator is responsible for creating and securely delivering to each User his or her User ID and temporary login information.  Upon each User's initial logon, the User will need to establish his or her PIN or password (as applicable) and enroll in one-time passcode if using Out-of-Band Authentication.
- A User may update his or her contact information after being authenticated with his or her Login Credentials.
- A User is locked out of BeB after a set number of days of inactivity and if the User enters his or her Login Credentials incorrectly multiple consecutive times.
- If a User is locked out of BeB, only the Administrator can terminate the lockout.  Bank highly recommends that the Administrator verify the identity of a User requesting a re-set of login credentials.
- Temporary login credentials can be used only one time and Users must set new login credentials to access BeB.
- BeB includes Alerts related to certain Administrator actions and User updates.  Bank highly recommends that these Alerts are set up to go to the Administrator and at least one other User with the ability to detect any potential unauthorized changes.
- If Company desires to remove its primary Administrator, Company must promptly notify Bank to assist with this removal.

**Service Authentication**:  In addition to the login procedures set forth above, Bank requires Users to input either an one-time security code or the Token Code (as applicable) to access and use certain Services including but not limited to approval of ACH entries and wire transfers. Bank may from time to time modify or add additional actions that require a one-time security code or Token Code.

**Dual Authorization for ACH, Wire Transfers and Bill Payments**:  Bank highly recommends that all ACH entries, wire transfers and bill payments require authorization by two different Users, meaning that one User must initiate the transfer using standard security protocols and a second User must approve the transfer using standard security protocols prior to the transfer being processed.

**Automatic Logoff**:  To help prevent unauthorized access to Company's Accounts, Bank will end a User's BeB session after a set interval.  Users may click "continue" to avoid being logged off.  If logged off, the User will be prompted to re-enter his or her login credentials to access BeB again.

**Daily Maximum for ACH Entries and External Transfers**:  Bank will establish limits on the amount of ACH entries, wire transfers and bill payments from Company's Accounts that can occur daily through BeB and Direct Send services.  Bank, in its discretion, also may establish limits for other time periods.  Company's Administrator may establish lower limits for any User and Bank highly recommends that Company ensure that the Administrator set appropriate limits in BeB based on expected and authorized activity for each User.

**Callback Procedures for Digital Wire Transfers**:  In addition to the above Security Procedures, Bank may initiate a callback to Company to verbally confirm any digital wire transfer request.  When Bank performs a wire callback confirmation, Bank, in its discretion, may call any authorized signer on the Account using contact information on record or may call an individual specifically identified by Company as a wire callback approver.  When performing callbacks, Bank may require the approver to provide authenticating information, which may include a personal identification code assigned to that approver.

**Device Identification**:  Bank uses security software to identify characteristics of the device used to access the Digital Services, including the internet protocol (IP) address. Bank may choose to block access to some or all Digital Services from certain IP addresses.

**Encryption Technology**:  Bank uses encryption technology that scrambles communications between the User's browser and the web servers used for the Digital Services.

## Additional Security Procedures for Mobile Devices

Bank highly recommends that Company follow current best practices for accessing Digital Services through mobile devices, including the following:

Physical Security:

- Do not leave mobile devices unattended in public places.
- If a mobile device is lost or stolen, immediately report the loss to Bank and receive new login credentials.
- Use the lock function on mobile devices and frequently change the lock password.
- Delete any confidential information from mobile devices prior to third-party servicing.
- Do not store financial information or login credentials on mobile devices.

System Settings and Device Software:

- Keep the operating system software up to date by installing updates when available.
- Install mobile security software and regularly update security patches.

- Don't leave the Wi-Fi on mobile devices in ad hoc mode, which permits mobile devices to communicate directly with each other, when using Mobile Banking.
- Don't access Mobile Banking through unsecure public Wi-Fi connections.
- Disable discoverable mode after enabling Bluetooth® devices if the mobile device does not automatically default to off.
- Setup a personal firewall to protect mobile devices from unauthorized electronic access. The firewall can be set on different levels, allowing varying degrees of limited access.
- Validate that personal credentials don't appear in the URL when interacting with a web site.
- Don't modify mobile devices to permit more user control, enable features that void warranties, or change root file systems.

<u>Application Management</u>
- Research and review feedback on applications before downloading to mobile devices.
- Download applications only from reputable sites/stores and monitor application permission requests.

## Account Monitoring and Alert Services
Bank highly recommends that Company do each of the following:
- Monitor Account balances and activity daily through the Digital Services to assure only authorized transactions occur.
- Ensure that applicable employees are set up to receive and review the automatic Alerts sent through BeB.
- Review and enable the optional Alerts in BeB that are applicable to Company's use of the Accounts and ensure that applicable employees receive and review these Alerts.
- Report any suspicious activity immediately to Bank.

## Check and ACH Positive Pay Services
Bank offers Check Positive Pay Services designed to detect and deter check fraud on the Accounts.  Bank also offers ACH Positive Pay Services designed to detect and deter ACH fraud on the Accounts.  Bank highly recommends that Company use these Services.

## Changes to Security Procedures
Bank may require or recommend that Company use additional or alternative security procedures from time to time.  Bank will provide further information about the use of such alternative security procedures in separate instructions provided to the Company through Business eBanking, via email or in other written material.  Bank may from time to time add to or otherwise change its internal security procedures with or without prior notice to Company.

## Bank Contact Information
Whenever these Security Procedures require or recommend that Company contact or notify Bank, including if a User's Login Credentials, a Hard Token, or other means to access a Digital Service has been lost or stolen, if Company suspects that someone has used or may attempt to use a Digital Service without Company's consent or has made or may make a transfer or payment without Company's permission, Company must notify Bank immediately by calling Business Client Services at 855.336.9460 or emailing businessclientservices@tcfbank.com. Company also may contact its Treasury Management Sales Advisor or Relationship Manager directly.